# Exhibit 1

10/29/2018 11:05:00 AM
Chris Daniel - District Clerk :04 AM
Harris County District Clerk Harris County
Envelope No: 28621655 lo. 28621655
By: CUERO, NELSON v: Nelson Cuero
Filed: 10/26/2018 5:06:00 PM 40 PM

CAUSE NO. _____

| | | |
|---|---|---|
| **FIRST NATIONAL PETROLEUM CORPORATION,** | § § § | **IN THE DISTRICT COURT** |
| Petitioner, | § § | |
| | § | **OF HARRIS COUNTY, TEXAS** |
| **v.** | § § | |
| **OAO TYUMENNEFTEGAZ,** | § § | |
| Respondent. | § § | **_____TH JUDICIAL DISTRICT** |

<u>**PETITION AND MEMORANDUM OF LAW**</u>
<u>**TO CONFIRM ARBITRAL AWARD**</u>

Pursuant to the Convention on Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") and its implementing legislation, the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 *et seq.*, and the Texas General Arbitration Act ("TAA"), TEX. CIV. PRAC. & REM. CODE § 171.000, *et. seq.*, Petitioner First National Petroleum Corporation ("FNP" or "Petitioner") respectfully asks this Court for an Order confirming the final arbitral award (the "Final Award") entered in *First National Petroleum Corporation v. OAO Tyumenneftegaz*, SCC Arbitration V 2015/178, conducted pursuant to the Arbitration Rules of the Stockholm Chamber of Commerce (the "SCC Rules"). In the Final Award, the Arbitral Tribunal determined that Respondent OAO Tyumenneftegaz ("TNG" or "Respondent") was liable to FNP for USD 70,000,000 plus interest, running from December 25, 1998 until its payment in full. Final Award ¶ 368.[1] The Arbitration

---

[1] A copy of the Final Award is attached as Exhibit A to the Declaration of Mr. Alex Genin, which is submitted with this Petition (the "Genin Declaration"). The Background is drawn from factual findings made by the Tribunal in the Final Award.

Certified Document Number: 82351176 - Page 1 of 11

Tribunal further ordered Respondent to reimburse FNP for the costs it fronted in the arbitration, totaling EUR 264,700.000. *Id.* ¶ 368.

## THE PARTIES

1.    Petitioner FNP is a company incorporated under the laws of Texas, having its principal place of business in Houston, Texas.

2.    Respondent TNG is an open stock joint company incorporated under the laws of the Russian Federation, with its principal place of business in Tyumen, Russian Federation. It is a subsidiary of PJSC Rosneft Oil Company, a Russian integrated energy company that is majority-owned by the Government of Russia and has world-wide operations, including ventures in the state of Texas.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this petition pursuant to the FAA, 9 U.S.C. §§ 207–208, as well as under Sections 171.081 and 171.082 of the TAA, Tex. Civ. Prac. & Rem. Code § 171.081–82. Respondent also has personally availed itself to this district by having continuous and systematic communications and business contacts with the Petitioner, a Houston-based company, related to the underlying agreement that culminated in the Final Award.

4.    Venue is proper in this judicial district pursuant to Section 171.096 of the Texas Civil Practice and Remedies Code.

## ATTACHMENTS

5.    Petitioners have submitted with this Petition the Declaration of Mr. Alex Genin, along with the following exhibits:

Certified Document Number: 82351176 - Page 2 of 11

2

**Exhibit A** – Final Arbitration Award, dated March 30, 2018;

**Exhibit B** – Correction to Final Arbitration Award, dated April 15, 2018.

## BACKGROUND

6.     FNP was incorporated in 1991 to operate as a strategic and financial partner in the oil and gas industry, focusing primarily on joint ventures in Russia and the Commonwealth of Independent States. *See* Final Award ¶ 110. FNP and TNG entered into a Joint Venture Agreement on March 23, 1992 (the "Agreement"), for the purpose of developing the Kalchinskoye Oil Field, located in Siberia, Russia.[2] Each of the parties agreed to make capital contribution to the Joint Venture,[3] after which Respondent would own 60% of the shares, and FNP would own the remaining 40%.[4] *Id.* ¶ 115. Importantly, the Joint Venture could not be liquidated without the express agreement of both parties. *Id.* ¶ 115.

7.     The parties subsequently specified in April 1992 what capital contributions each party would make to the Joint Venture. *Id.* ¶ 117. FNP honored its commitment by providing bonds and contributing millions of dollars worth of assets to the Joint Venture. *Id.* ¶¶ 122–23.

8.     At a board meeting in June 1993, TNG falsely represented that it was not possible to renew the oil and gas operating license for the Joint Venture. *Id.* ¶124. Relying on this misrepresentation, FNP agreed to discontinue further participation in the Joint Venture for the Kalchinskoye oil field, contingent on repayment in full of its capital contribution amount, with

---

[2] The Respondent, TNG, is referred to in this agreement by its former denomination, Tyumenneftegas Research and Production Association. Final Award ¶ 115.

[3] The Joint Venture was to be called "the Enterprise" or "Tyumtex." *See* Final Award ¶ 115.

[4] Under this scheme, Respondent was to make capital contributions in "roubles, guarantees of contributions in roubles, equipment, materials, know-how, the right to develop the oilfield, the right to use the land and natural resources, geological prospecting and oilfield construction expenses," and FNP undertook to make capital contributions "in hard currency, guarantees of hard currency, equipment, materials, technology and know-how." Clauses 3.3 and 3.4.

3

Certified Document Number: 82351176 - Page 3 of 11

interest, by the end of 1993. *Id.* ¶ 126. Once FNP was re-paid, the Joint Venture would then transfer all remaining assets to TNG. *Id.* ¶ 126.

9. TNG never repaid FNP's capital contributions, despite repeated attempts and demands for payment of the debt. *Id.* ¶¶ 127–32. TNG sought consent from FNP to liquidate the Joint Venture in May 1996, but FNP declined to liquidate the Joint Venture or transfer any of its equity or assets until TNG paid FNP its investments back with interest. *Id.* ¶¶ 133–35.

10. In 1998, TNG forged minutes of a fake board meeting between the founders of the Joint Venture. *Id.* ¶ 142. At this fake meeting, which purportedly took place on Christmas Day in 1998, all the alleged attendees voted for the liquidation of the Joint Venture. *Id.* ¶ 142. TNG submitted a fraudulent application to the Russian government in order to officially liquidate the Joint Venture on December 26, 1998. The application bore a fake seal of FNP, as well as the forged signatures of two FNP representatives acting on behalf "of the liquidation committee." *Id.* ¶ 142. Liquidation was granted in June 1999. *Id.* ¶¶ 142, 144.

11. In March 2004, FNP contacted Respondent's successor in the oilfield to inquire about what had happed to its interest in the Joint Venture. *Id.* ¶ 145. FNP was informed that the Joint Venture had been liquidated in 1999. *Id.* ¶ 146. FNP initially sought recourse by filing a Request for Arbitration with the SCC in December 2007, but due to financial constraints, it was unable to proceed with the arbitration. *Id.* ¶ 148.

12. FNP then sought recourse by filing a criminal investigation in Russia. *Id.* ¶¶ 148-49. The Captain of Justice of the city of Tyumen issued a decree on January 19, 2009, finding that TNG stole the property belonging to FNP by means of fraud and deceit, "using a false protocol of 'Tyumex' JV's founding shareholders' meeting arranged to liquidate the JV with the intent of

Certified Document Number: 82351176 - Page 4 of 11

4

concealing the oil load at the Kalchinsk Oilfield." *Id.* ¶ 149. A graphological expert report issued in 2010 confirmed that the seal and signatures on the application for liquidation were forged – they did not belong to the FNP corporate representatives. *Id.* ¶ 150.

13.     FNP filed a second arbitration in December 2011 against Respondent, and was awarded damages in the amount of USD 173,211,897.00 plus interest in December 2013. *Id.* ¶ 151. The award was set aside on purely procedural grounds by the Svea Court of Appeals in June 2015. *Id.* ¶ 151. Since the Swedish court did not permit FNP's leave of appeal, Petitioner commenced its third arbitration, which resulted in the Final Award.

## INITIATION OF ARBITRATION AND FINAL AWARD

14.     On December 23, 2015, FNP filed its Request for Arbitration with the Arbitration Institute of the Stockholm Chamber of Commerce. *Id.* ¶ 8. The arbitration clause in the parties' Agreement provides:

> 9.1. The Founders [the Parties] should take all reasonable efforts for a mutually favourable settlement of all discrepancies and disputes by means of discussion, caused by the present Treaty, its change, addition and termination, as well as its lawfulness.
>
> 9.2. In case when such discrepancies or disputes cannot be settled by friendly negotiations, such discrepancies or disputes should be ultimately settled by the arbitration composed of three arbitrators. The arbitrators shall be appointed and act in accordance with the Rules of the Institute of Arbitration of the Chamber of Commerce in Stockholm. The place of arbitration should be Stockholm, Sweden. Any decision of the arbitrators shall be final.
>
> 9.3. The arbitrators shall use the Swedish substantive law and procedural rules for the analysis and interpretation of the present treaty. The trial of cases in the arbitration should be in English and the arbitrators make a decision also in English." Final Award ¶ 7; Exhibit B, Clauses 9.1–9.3.

15.     The parties thereafter exchanged document and submitted extensive briefs, witness statements and expert reports on the merits of FNP's claims. *Id.* ¶¶ 9-83.

Certified Document Number: 82351176 - Page 5 of 11

16.    From March 29 to April 4, 2017, the Arbitral Tribunal held a full evidentiary hearing in Stockholm, Sweden, during which both sides presented their evidence and cross-examined the other side's witnesses and experts. *Id.* ¶ 84. The parties issued further reports and post-hearing briefs, and a final oral closing hearing took place on November 6, 2017. *Id.* ¶¶ 85-103. The parties submitted their Statement of Costs on November 27, 2017, and respective comments on December 4, 2017. *Id.* ¶¶ 105-106.

17.    On March 30, 2018, the Arbitral Tribunal issued the Final Award. The Tribunal found "that Claimant is entitled to damages with respect to the Liquidation Claim."[5] *Id.* ¶ 365. The Arbitral Tribunal ordered that Respondent pay FNP a total of USD 70 million plus interest, calculated in accordance with Sections 4 and 6 of the Swedish Interest Act, running from December 25, 1998. *Id.* ¶ 368. The Arbitral Tribunal also ordered TNG to reimburse FNP in the amount of EUR 264,700 for the advance on costs paid to the SCC, plus interest on this separate amount. *Id.* ¶¶ 353, 368.

18.    In particular, the Arbitral Tribunal held that:

(A) "[T]he Arbitral Tribunal concludes that the Claimant satisfied the requirements of Section 5(3) of the [Swedish] Limitation Act, and, in consequence, reset the limitation period of the Liquidation Breach for an additional 10-year period until 27 December 2017... [t]hus ... the Liquidation Breach is not time-barred." *Id.* ¶¶ 292–93;

---

[5] The Tribunal defined the "Liquidation Breach" as "the Respondent's breach of Clause 10 and 11 of the Agreement and of its duty of loyalty under the Agreement by drawing up and signing liquidation protocols on 25 December 1998, the making of the subsequent application to the Russian authorities, and its knowing reliance on both documents bearing the forged signatures of Messrs. Genin and Russo and the Claimant's forged company seal." Final Award ¶ 152.

Certified Document Number: 82351176 - Page 6 of 11

Certified Document Number: 82351176 - Page 7 of 11

(B) "[T]he Arbitral Tribunal observes that Clause 10.1.3 of the Agreement clearly provides that the Joint Venture may only be liquidated "unanimously and in writing" by the Parties. Clause 10.1.5 also requires the "unanimous agreement" of the Parties to liquidate the Joint Venture. The terms of the Claimant's letters of ... 1996 ... are unambiguous as to the Claimant's refusal to liquidate the Joint Venture until the Respondent had paid the amounts due to the Claimant..." *Id.* ¶ 333;

(C) "In flagrant breach of its obligations pursuant to the Agreement, the Respondent drew up and adopted the Liquidation Protocol dated 25 December 1998, which bore the forged signatures of the Claimant's representatives and a forged company seal of the Claimant, to apply to the Russian authorities for the liquidation of the Joint Venture, which duly relied upon these forgeries when they approved the liquidation of the Joint Venture on 29 June 1999." *Id.* ¶ 334; and

(D) "[O]n the basis of the evidence before, the Arbitral Tribunal finds that the Claimant did not consent to the liquidation of the Joint Venture and, further, that the Respondent intentionally breached Clause 10 of the Agreement and its duty of loyalty by its manifest abuse of the Claimant's rights under Clause 10 of the Agreement." *Id.* ¶ 335.

19. The Arbitral Tribunal awarded FNP the following damages:

(A) "The Respondent shall pay the Claimant the amount of USD 70,000,000.00, together with interest calculated in accordance with Sections 4 and 6 of the Swedish

7

Interest Act (SFS 1975:635) from 25 December 1998 until its payment in full." *Id.*
¶ 368(5);

(B) "The Respondent shall reimburse to the Claimant the amount of EUR
264,700.00 corresponding to the advance on Respondent's costs paid by the
Claimant to the SCC, plus interest pursuant to Section 6 of the Swedish Interest Act
(SFS 1975:635) from the date of this Final Award until its payment in full."
*Id.* ¶ 368(6).

20.　　A correction of the Final Award was issued on April 15, 2018, clarifying the fees
paid to the Tribunal members and SCC Institute, and fixing a typographical error.[6] The Tribunal
made no change to the previous finding of Respondent's liability, or to the amount of damages
awarded to FNP.

## APPLICABLE LAW

21.　　Confirmation of an arbitration decision is a streamlined summary proceeding that
merely makes what is already a final arbitration award a judgment of the court. *See, e.g, Im v.
Chun*, CIV.A. H-08-691, 2008 WL 4238784, at *1 (S.D. Tex. Sept. 11, 2008) (citing *Yusuf Ahmed
Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). Both Texas and
Federal law favor arbitration and require that arbitral decisions be given great deference. *See
Citigroup Global Markets, Inc. v. Bacon*, 562 F.3d 349, 358 (5th Cir. 2009); *Brazoria County v.
Knutson*, 176 S.W.2d 740, 743 (Tex. 1943).

22.　　The TAA and FAA direct that, upon application by a party, the trial court "shall"
confirm an arbitration award unless a party opposing confirmation presents grounds for vacating,

---

[6] A true and correct copy of the Correction to the Final Arbitration Award is attached as Exhibit B.

Certified Document Number: 82351176 - Page 8 of 11

modifying, or correcting the award. *See* TEX. CIV. PRAC. & REM. CODE §§ 171.087, 171.092; 9 U.S.C. § 207; *see also Baker Hughes Oilfield Operations, Inc. v. Hennig Prod. Co.*, 164 S.W.3d 438 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A court may only refuse to confirm an arbitration award under one of the very limited grounds, and review of an arbitration award "is extraordinarily narrow." *In re Arbitration Between Trans Chem. Ltd and China Nat'l. Mach. Import & Export Corp.*, 978 F. Supp. 266, 303 (S.D. Tex. 1997), *op. adopted* 161 F.3d 314 (5th Cir. 1998); *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 352 (5th Cir. 2004).

23. The burden of proof is on the party defending against confirmation and enforcement. *Imperial Ethiopian Gov't v. Baruch-Foster Corp.*, 535 F.2d 334, 336 (5th Cir. 1976); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak*, 364 F.3d 274, 288 (5th Cir. 2004). Unless the defending party can make "a convincing showing" that one of the narrow exceptions applies, the arbitral award "will be confirmed." *See Anzilotti v. Gene D. Liggin, Inc.*, 899 S.W.2d 264, 266 (Tex. App.—Houston [14th Dist.] 1995, no writ) (a reviewing court will not set aside an arbitration award for a mere mistake of fact or law); *In re Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Import & Export Corp.*, 978 F. Supp. 266, 309 (S.D. Tex. 1997), *op. adopted* 161 F.3d 314 (5th Cir. 1998); *Biotronik Mess–Und Therapiegeraete GmbH & Co. v. Medford Medical Instr. Co.*, 415 F.Supp. 133, 136 (D.N.J. 1976); *Indocomex Fibres Pte., Ltd. v. Cotton Co. Int'l, Inc.*, 916 F.Supp. 721, 726 (W.D. Tenn. 1996); *Geotech Lizenz AG v. Evergreen Sys.*, 697 F.Supp. 1248, 1252 (E.D.N.Y. 1988)).

24. A district court should further enforce an arbitration award as written, for "to do anything more or less would usurp the Arbitral Tribunal's power to finally resolve disputes and undermine" the pro-arbitration enforcement policies of the FAA and TAA. *See Wartsila Finland OY v. Duke Capital LLC*, 518 F.3d 287, 292 (5th Cir. 2008).

Certified Document Number: 82351176 - Page 9 of 11

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays that:

(A) The Court enter an Order pursuant to 9 U.S.C. § 207 and TEX. CIV. PRAC. & REM. CODE § 171.087 confirming the Final Award against Respondent;

(B) On the basis of the confirmed Final Award, the Court enter judgment that Respondent is liable to Petitioner in the amount of USD 70,000,000.00 plus interest at a rate specified in the Swedish Interest Act at sections 4 and 6, running from December 25, 1998;

(C) That the Court enter an order that Respondent is liable to Petitioner in the amount of EUR 264,700.000, corresponding to the advance on costs paid by FNP to the Arbitration Institute of the Stockholm Chamber of Commerce;

(D) That the Court enter an Order requiring Respondent to pay FNP the costs of these confirmation proceedings, including attorneys' fees; and

(E) Such other relief as the Court deems just and proper.

Dated: Houston, Texas
October 26, 2018

<div style="margin-left:50%">

Respectfully submitted,
BAKER & HOSTETLER LLP

By: /s/ *Sashe D. Dimitroff*
Texas Bar Number 00783970
sdimitroff@bakerlaw.com
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Telephone: 713.751.1600
Facsimile: 713.751.1717

</div>

Certified Document Number: 82351176 - Page 10 of 11

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served in accordance with the Texas Rules of Civil Procedure to the Respondent and previous counsel of record on October 26, 2018.

By: /s/ Sashe D. Dimitroff



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 10, 2019

Certified Document Number:      82351176 Total Pages:  11

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

10/29/2018 11:05:00 AM
**Chris Daniel - District Clerk**
**Harris County**
**Envelope No: 28621655**
**By: CUERO, NELSON**
**Filed: 10/26/2018 5:40:00 PM**

CASE NO. _____

| | | |
|---|---|---|
| **FIRST NATIONAL PETROLEUM CORPORATION,** | § § § | **IN THE DISTRICT COURT** |
| Petitioner, | § § | |
| | § | **OF HARRIS COUNTY, TEXAS** |
| **v.** | § § | |
| **OAO TYUMENNEFTEGAZ,** | § § | |
| Respondent. | § § | _____**TH JUDICIAL DISTRICT** |
| | § | |

## DECLARATION OF ALEX GENIN

I, Alex Genin, declare as follows:

1.     I am the owner of Petitioner First National Petroleum Corporation, and I am familiar with the facts set forth herein.

2.     This declaration is submitted in support of the petition to confirm the arbitration award dated March 30, 2018, with its subsequent correction dated April 15, 2018, and to enter judgment against the Respondent, OAO Tyumenneftegaz.

3.     Attached hereto are true copies of the following documents:

   **Exhibit A** – Final Arbitration Award, dated March 30, 2018;

   **Exhibit B** – Correction to Final Arbitration Award, dated April 15, 2018.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Houston, Texas
    October 26, 2018

Respectfully submitted,

/s/

Certified Document Number: 82351178 - Page 2 of 2



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 10, 2019

Certified Document Number:          82351178 Total Pages:  2

Marilyn Burgess, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# EXHIBIT A

Certified Document Number: 82350778 - Page 1 of 104

ARBITRATION INSTITUTE

OF THE

STOCKHOLM CHAMBER OF COMMERCE

SCC Arbitration V (2015/178)

FIRST NATIONAL PETROLEUM CORPORATION

(U.S.A.)

Claimant

v.

OAO TYUMENNEFTEGAZ (TNG)

(Russian Federation)

Respondent

FINAL AWARD

Place of Arbitration: Stockholm

Certified Document Number: 82350778 - Page 2 of 104

# TABLE OF CONTENTS

I.   PARTIES AND COUNSEL ................................................................................................4

II.  THE ARBITRAL TRIBUNAL .........................................................................................5

III. THE ARBITRATION AGREEMENT ..............................................................................7

IV.  SUMMARY OF THE PROCEEDINGS ..........................................................................8

V.   SUMMARY OF FACTS ................................................................................................21

VI.  THE PARTIES' RESPECTIVE REQUESTS FOR RELIEF ........................................34
   A. THE RELIEF SOUGHT BY THE CLAIMANT ....................................................................34
   B. THE RELIEF SOUGHT BY THE RESPONDENT ................................................................36

VII. ISSUES TO BE DETERMINED .....................................................................................38
   1. ISSUES TO BE DETERMINED ACCORDING TO THE CLAIMANT ...................................38
      *Definitions* ...........................................................................................................39

      *Issues Relating to FNP's Primary Claim* .........................................................39

      *Issues Relating to FNP's Secondary Claim* ......................................................41

      *Issues Relating to Costs* ....................................................................................41

   2. ISSUES TO BE DETERMINED ACCORDING TO THE RESPONDENT ...............................42
      *Definitions* ...........................................................................................................42

      *Preliminary Objections Relating to Jurisdiction and admissibility* ................43

      *FNP's Claims* ......................................................................................................43

         I.   *TNG's Defenses to FNP's Primary and Secondary Claims* ..................44

      II.    COSTS .........................................................................................................44
      I. INTRODUCTION ...............................................................................................45
      II. DEFINITIONS ..................................................................................................45
      III. PRELIMINARY OBJECTIONS RELATING TO JURISDICTION AND ADMISSIBILITY ........45
      IV. FNP'S CLAIMS ...............................................................................................46
      V. FNP'S SECONDARY CLAIM .............................................................................47
      VI. TERMINATION OF THE TREATY ......................................................................48
      VII. COSTS ..........................................................................................................48
      I. INTRODUCTION ...............................................................................................49
      II. DEFINITIONS ..................................................................................................49
      III. PRELIMINARY OBJECTIONS RELATING TO JURISDICTION AND ADMISSIBILITY ........49
      IV. FNP'S CLAIMS ...............................................................................................50
      V. COSTS .............................................................................................................52

VIII. SUMMARY OF THE PARTIES' POSITIONS AND CLAIMS – ANALYSIS OF THE ISSUES
TO BE DETERMINED AND FINDINGS ...............................................................................53
   1. THE RESPONDENT'S PRELIMINARY OBJECTIONS AND RELEVANT LAWS TO BE APPLIED
   ...........................................................................................................................................53
      *A. The relevant laws to be applied in this arbitration* ......................................53

Certified Document Number: 82350778 - Page 3 of 104

*a. The law of the seat of this arbitration* ........................................................................... *53*

*b. The law applicable to the arbitration agreement* .............................................................. *54*

*c. Are the Claimant's claims arbitrable upon an application of Swedish law (and/or any*

*mandatory provisions of Russian law)?* ............................................................................... *55*

*d. The Limitation of Actions and the Applicable Law* .......................................................... *62*

*aa. The law applicable to the merits* ..................................................................................... *63*

*bb. The Limitation of Actions under Swedish law* ................................................................. *66*

*aa. The Claimant's Primary Claim* ........................................................................................ *73*

*bb. The Claimant's Secondary Claim* .................................................................................... *88*

2. THE MERITS OF THE CLAIMANT'S CLAIMS ................................................................. 90

**IX. THE COSTS OF THIS ARBITRATION** ........................................................................ **100**

**X. THE AWARD** .................................................................................................................... **103**

# I.    PARTIES AND COUNSEL

1.    <u>Claimant</u>

**FIRST NATIONAL PETROLEUM CORPORATION**

2973 Bingle Rd.

Houston, Texas 77055

United States of America

Represented by:

Mr. Johan Sidklev

Mr. Carl Persson

Ms. Annika Pynnä

ROSCHIER, Attorneys Ltd.

Box 7358

SE-103 90 Stockholm

Tel.: + 46.8.553.190.00

E-mails: johan.sidklev@roschier.com

carl.persson@roschier.com

annika.pynna@roschier.com

2.    <u>Respondent</u>

**OAO TYUMENNEFTEGAZ**

67 Lenin Street

625000 Tyumen

Russian Federation

4

Represented by:

> Mr. Thomas Sprange QC
>
> Mr. Viren Mascarenhas
>
> Mr. Grigori Lazarev
>
> Ms. Alexandra Rotar
>
> Ms. Valeriya Subocheva
>
> Ms. Pui Yee (Lisa) Wong

> KING & SPALDING International LLP
>
> 125 Old Broad Street
>
> London EC2N 1AR
>
> United Kingdom
>
> Tel: +44.20.7551.7578
>
> E-mails: TSprange@KSLAW.com
>
> VMascarenhas@KSLAW.com
>
> GLazarev@KSLAW.com
>
> Arotar@KSLAW.com
>
> VSubocheva@KSLAW.com
>
> LWong@KSLAW.com

3. The Claimant may hereinafter be referred to either as "FNP" or the "Claimant". The Respondent may hereinafter be referred to as "TNG" or the "Respondent". The Claimant and the Respondent will hereinafter be referred to jointly as the "Parties".

## II.   THE ARBITRAL TRIBUNAL

4.   The Claimant nominated as Co-arbitrator:

5

Mr. Platt W. Davis III

7500 San Felipe, suite 600

Houston, Texas 77063

United States of America

Tel: +1.713.825.3123

Email: plattdavis@comcast.net

5. The Respondent nominated as co-arbitrator:

Mr. John Beechey CBE

Arbitration Chambers Hong Kong

Chinachem Hollywood Centre

1 Hollywood Road, Suite 801

Hong Kong S.A.R.

China

Tel: +44.7785.700171

Email: jb@beecheyarbitration.com

6. The Arbitration Institute of the Stockholm Chamber of Commerce appointed as Chairperson of the Arbitral Tribunal:

Mr. José Rosell

Bredgade 30

DK-1260 Copenhagen K

Denmark

Tel: +33.6.08.72.67.22

E-mail: jose.rosell@arb-intal.com

Certified Document Number: 82350778 - Page 7 of 104

## III.   THE ARBITRATION AGREEMENT

7.   Article 9 of "[T]the Statutory Treaty on the establishment of TYUMTEX, Russian-American Joint Venture" made between the Respondent (formerly denominated Tyumenneftegas Research and Production Association) and the Claimant on 23 March 1992, as amended (the "**Agreement**"),[1] provides that:

> *"9.1. The Founders [the Parties] should take all reasonable efforts for a mutually favourable settlement of all discrepancies and disputes by means of discussion, caused by the present Treaty, its change, addition and termination, as well as its lawfulness.*

> *9.2. In case when such discrepancies or disputes cannot be settled by friendly negotiations, such discrepancies or disputes should be ultimately settled by the arbitration composed of three arbitrators. The arbitrators shall be appointed and act in accordance with the Rules of the Institute of Arbitration of the Chamber of Commerce in Stockholm. The place of arbitration should be Stockholm, Sweden. Any decision of the arbitrators shall be final.*

> *9.3. The arbitrators shall use the Swedish substantive law and procedural rules for the analysis and interpretation of the present treaty. The trial of cases in the arbitration should be in English and the arbitrators make a decision also in English."*

---

[1] The Agreement was signed in both Russian and English. The Agreement was submitted by the Claimant as Exhibit C-1. The Respondent also submitted as Exhibit R-3 the Russian version of the Agreement, together with a recent English translation of it. The latter is not signed and is entitled "Incorporation Agreement". The Arbitral Tribunal will only refer to and rely on the signed English version of the Agreement in Exhibit C-1 in this Final Award.

Certified Document Number: 82350778 - Page 8 of 104

# IV. SUMMARY OF THE PROCEEDINGS

8. The Claimant submitted its Request for Arbitration (the **"Request for Arbitration"**), dated 23 December 2015, to the Arbitration Institute of the Stockholm Chamber of Commerce (the **"SCC"**).

9. In its Request for Arbitration the Claimant appointed Mr. James Lloyd Loftis as co-arbitrator.

10. By letter dated 21 January 2016, the Respondent submitted a challenge against Mr. James Lloyd Loftis as co-arbitrator before the SCC.

11. On 29 January 2016, the Respondent informed the SCC that it had appointed King & Spalding International LLP as its counsel of record in place of Advokatfirman Vinge KB.

12. By letter of 29 January 2016, the SCC informed the Parties and Mr. James Lloyd Loftis that (i) the Claimant had accepted the Respondent's request to release Mr. Loftis from the appointment, (ii) based on Article 15(4) of the 2010 Arbitration Rules of the SCC (the **"SCC Rules"**) Mr. Loftis should resign, and (iii) the Claimant had to appoint a new arbitrator.[2]

13. On 5 February 2016, the Claimant appointed Mr. Platt W. Davis III as co-arbitrator.

14. On 18 February 2016, the Respondent submitted its Answer to the Request for Arbitration (the **"Answer"**). In paragraph 39 of the Answer the Respondent reserved its rights to raise any objections concerning the existence, validity or applicability of the arbitration agreement in accordance with Article 5(1)(i) of the SCC Rules.

15. In its Answer, the Respondent appointed Mr. John Beechey CBE as co-arbitrator.

16. By letter of 31 March 2016, the SCC informed the Parties, in particular, of its determination that the SCC did not manifestly lack jurisdiction over the dispute.

---

[2] A subsequent challenge submitted by the Claimant against the appointment of Mr. Beechey was rejected by the SCC.

Certified Document Number: 82350778 - Page 9 of 104

Certified Document Number: 82350778 - Page 10 of 104

17.  By letter of 7 April 2016, the SCC informed the Parties and the Co-arbitrators that the SCC Board had appointed Mr. José Rosell as Chairperson in this arbitration.

18.  By letter dated 12 April 2016, the Respondent informed the Claimant that for the time being the Respondent would refrain from paying its portion of the advance on costs in this arbitration.

19.  On 15 April 2016, the SCC informed the Claimant that the Respondent had not paid its share of the advance on costs. It offered the Claimant the opportunity to pay the Respondent's share of the advance on costs.

20.  On 29 April 2016, the SCC informed the Arbitral Tribunal that the Claimant had paid the total amount of the advance on costs and it referred the case to the Arbitral Tribunal. The SCC informed the Arbitral Tribunal that the final award should be made by 31 October 2016.

21.  By letter of 1 May 2016, the Chairperson confirmed to the Parties that the case had been referred by the SCC to the Arbitral Tribunal. He notified them that the Arbitral Tribunal proposed to draw up a document setting forth the terms of reference of this case, and that it wished to hold a case management conference in Stockholm. The Arbitral Tribunal also invited the Parties to attempt to reach an agreement regarding the issues to be determined by the Arbitral Tribunal and to submit a joint list setting forth these issues.

22.  By emails of 8 and 9 May 2016, the Arbitral Tribunal submitted for the Parties' consideration drafts of the Procedural Order no.1 and the provisional timetable, together with a preliminary draft of the Terms of Reference in this arbitration.

23.  On 13 May 2016, the Claimant informed the Arbitral Tribunal that the Parties had been unable to reach an agreement on the list of issues to be determined by the Arbitral Tribunal.

24.  On 25 May 2016, the Arbitral Tribunal and the Parties held the first case management conference in Stockholm. They continued the discussions regarding the drafts of the Terms of Reference, the Procedural Order no. 1 and the provisional timetable. They further discussed

several procedural issues, the signature of an agreement on party representation, and of the Terms of Reference, including a preliminary list of issues to be determined by the Arbitral Tribunal (the **"Terms of Reference"**).

25. On 27 May 2016, the Chairperson submitted to the Parties a draft agreement on party representation and revised drafts of the Procedural Order no.1 and the provisional timetable for their comments.

26. On 4 June 2016, the Arbitral Tribunal issued the Procedural Order no. 1 (**"Procedural Order No. 1"**) and established the provisional timetable (the **"Provisional Timetable"**), which was attached as Exhibit A to Procedural Order No.1.

27. By email of 4 June 2016, the Chairperson communicated Procedural Order No.1 and the Provisional Timetable to the SCC in accordance with Article 23 of the SCC Rules.

28. By email of 7 June 2016, the Claimant stated that certain comments made by the Claimant regarding the draft provisional timetable had not been taken into account in the Provisional Timetable. On the same date the Chairperson invited the Respondent to comment on the statements made by the Claimant in its email. The Respondent submitted its comments on 8 June 2016.

29. After having taken into account the Parties' additional comments on the Provisional Timetable, on 10 June 2016, the Arbitral Tribunal amended the latter and issued Procedural Order no. 2 (**"Procedural Order No. 2"**) attaching the amended provisional timetable (the **"Amended Provisional Timetable"**), which were also communicated to the SCC in accordance with Article 23 of the SCC Rules.

30. By letter dated 13 June 2016, the SCC invited the Parties to submit their comments on the Arbitral Tribunal's request for an extension of time for the rendering of the award, which had been submitted on 7 June 2016.

Certified Document Number: 82350778 - Page 11 of 104

Certified Document Number: 82350778 - Page 12 of 104

31. After having taken into account the Parties' consent to the Arbitral Tribunal's request for an extension of time, on 21 June 2016, the SCC wrote to the Arbitral Tribunal to inform it that the SCC had decided that the Final Award should be rendered by 30 November 2017.

32. The Parties and the Arbitral Tribunal signed an agreement on party representation, which was dated on 28 June 2106 (the "**Agreement on Party Representation**").

33. On 7 July 2016, the Claimant submitted its Statement of Claim (the "**Statement of Claim**").

34. On 20 August 2016, the Respondent submitted its Statement of Defense (the "**Statement of Defense**").

35. On 26 August 2016, the Respondent submitted an application for bifurcation of the arbitration proceeding (the "**Application for Bifurcation**").

36. On 6 September 2016, the Claimant submitted a reply to the Application for Bifurcation (the "**Reply to the Application for Bifurcation**").

37. On 9 September 2016, the Respondent requested the Arbitral Tribunal to disregard the Claimant's submissions contained in the Reply to the Application for Bifurcation insofar as they relied on the award rendered in the SCC arbitration No. V (196/2011), which had been annulled by the Svea Court of Appeal on 25 June 2015 (the "**Annulled Award**").

38. By letter dated 13 September 2016, the Claimant objected to the Respondent's request to dismiss the references made, and reliance placed, by the Claimant to and upon the Annulled Award. It submitted that the Respondent's request was not consistent with the Swedish Arbitration Act, which requires arbitral tribunals to consider all evidence that has been submitted to them in accordance with the applicable rules.

39. On 15 September 2016, the Arbitral Tribunal issued Procedural Order no. 3 ("**Procedural Order No. 3**"), whereby it amended item 6 of the Amended Provisional Timetable.

11

Certified Document Number: 82350778 - Page 13 of 104

40. On 19 September 2016, the Arbitral Tribunal issued Procedural Order no. 4 (**"Procedural Order No. 4"**), whereby it denied the Respondent's Application for Bifurcation for the reasons contained therein.

41. On the same date, the Arbitral Tribunal issued Procedural Order no. 5 (**"Procedural Order No. 5"**), amending item 3 of the Amended Provisional Timetable.

42. On 27 September 2016, the Arbitral Tribunal issued Procedural Order no. 6 (**"Procedural Order No. 6"**), amending item 3 of the Amended Provisional Timetable, as agreed by the Parties.

43. On 30 September 2016, the Parties submitted their respective requests for the production of documents.

44. On 21 October 2016, the Claimant submitted an updated request for document production.

45. On 22 October 2016, the Arbitral Tribunal issued Procedural Order no. 7 (**"Procedural Order No. 7"**), amending items 10 and 11 of the Amended Provisional Timetable.

46. Upon the Arbitral Tribunal's invitation, the Respondent submitted its comments on the Claimant's updated request, on 26 October 2016.

47. On 2 November 2016, the Claimant submitted a reply to the Respondent's comments, which were rebutted by the Respondent in its letter dated 8 November 2016.

48. On 14 November 2016, the Arbitral Tribunal issued Procedural Order no. 8 (**"Procedural Order No. 8"**), whereby it granted certain of the requests for document production submitted by the Parties and dismissed others. The Parties' respective Redfern Schedules, incorporating the decisions made by the Arbitral Tribunal, were attached to Procedural Order No 8.

49. On 17 November 2016, the Claimant submitted a new updated version of its request for document production.

12

Certified Document Number: 82350778 - Page 14 of 104

50. On 11 December 2016, the Claimant informed the Arbitral Tribunal that the Respondent had not submitted any response to the Claimant's new updated request.

51. On 12 December 2016, the Arbitral Tribunal issued Procedural Order no. 9 ("**Procedural Order No. 9**") and attached to it the new updated version of the Claimant's Redfern Schedule, including the decisions made by the Arbitral Tribunal.

52. On 20 December 2017, the Claimant submitted its Statement of Reply (the "**Statement of Reply**").

53. On 20 December 2017, the Claimant submitted a request for separate award on costs (the "**Request for Separate Award on Costs**").

54. On 28 December 2016, the Arbitral Tribunal invited the Respondent to submit a reply to the Request for Separate Award on Costs.

55. The Respondent submitted its reply to the Request for Separate Award on Costs, on 13 January 2017. In its reply, the Respondent requested the Arbitral Tribunal, *inter alia*, to reject the Request for Separate Award on Costs, and to order the Claimant to disclose whether it had recourse to external financing ("**TPF**"), and, in the affirmative, to disclose the identity of the funder and the terms of the TPF in order to ascertain whether the TPF would cover the Claimant's liability for any adverse award on costs.

56. On 16 January 2107, the Arbitral Tribunal issued Procedural Order no. 10 ("**Procedural Order No. 10**"), whereby it denied the Claimant's Request for Separate Award on Costs. The Arbitral Tribunal further ordered the Claimant to disclose whether it was receiving external financing to fund its costs and expenses in this arbitration and, in the affirmative, to disclose the identity of the funder and to produce evidence satisfactory to the Arbitral Tribunal, demonstrating that in the event that the Claimant was ordered to pay any part, or all, of the costs of this arbitration, the funder would meet any such award.

13

57. By letter dated 23 January 2017, the Claimant informed the Arbitral Tribunal and the Respondent that (i) the Claimant is receiving external financing in connection with this arbitration from Mintron Limited ("Mintron") a subsidiary of Calunius Litigation Risk Fund 2 LP, which was advised by Calunius Capital LLP; and (ii) the financing arrangement between the Claimant and Mintron did not include coverage for a potential adverse costs award.

58. By email of 24 January 2017, the Arbitral Tribunal (i) informed the Parties that none of the Members of the Arbitral Tribunal had any conflict of interest with Mintron, Calunius Litigation Risk Fund 2 LP or Calunius Capital LLP, and (ii) invited the Respondent to inform the Arbitral Tribunal as to whether the Respondent and/or its Counsel had any conflicts of interest with these funders.

59. By email of 27 January 2017, the Respondent informed the Arbitral Tribunal that neither the Respondent nor its Counsel had any conflicts of interest with Mintron, Calunius Litigation Risk Fund 2 LP or Calunius Capital LLP.

60. On 14 February 2017, the Respondent submitted its Rejoinder (the "**Rejoinder**").

61. On 21 February 2017, the Respondent requested the Arbitral Tribunal to reconsider its decision in Procedural Order No. 8, by which the Arbitral Tribunal had denied the Respondent's request No. 18 in its Redfern Schedule on the ground that the request lacked specificity. To this effect, the Respondent modified the Request No. 18, such that it sought disclosure only of such deposition transcripts of Mr. Alex Genin and Mr. William Walker as may have been taken during the *Livchits* litigation.[3]

---

[3] Mr. Yuri Livchits was the Deputy General Director of Purneftegas, a former Soviet state oil enterprise company, which was involved in a joint venture together with Mr. Alex Genin (Exhibit R-37, #5). The purpose of this joint venture project was to facilitate Purneftgas' oil sales abroad and to import into Russia goods and services, which Purneftegas needed (Exhibit R-37, #6). Mr. Genin made Mr. Livchits an officer of Neftecredit Limited, a Hong Kong company, owned by Mr. Genin. According to Mr. Pavlov, Mr. Livchits introduced Mr. Genin to Mr. Pavlov and Mr. Vereshinin, the Respondent's General Director in 1991, with whom Mr. Genin negotiated the possibility of a joint venture between the Parties (Exhibit RWS-1, #38). The Claimant and other affiliated companies, including Neftecredit Limited, (the "Plaintiffs"), which were owned by Mr. Alex Genin, filed a law suit against Mr. Livchits, in Texas state court (the *"Livchits"* litigation) *alleging*, in particular, that Mr. Livchits used Neftecredit Limited's name and bank account to misappropriate funds from the Plaintiff (Exhibit R-46).

Certified Document Number: 82350778 - Page 15 of 104

Certified Document Number: 82350778 - Page 16 of 104

62. On 22 February 2017, the Arbitral Tribunal invited the Claimant to submit a reply to the Respondent's request.

63. On 27 February 2017, the Claimant submitted its reply, objecting to the Respondent's request of 21 February 2017.

64. Pursuant to Procedural Order no. 11 ("**Procedural Order No. 11**"), dated 28 February 2017, the Arbitral Tribunal granted the Respondent's application, since the modified Request No. 18 had been narrowed down to the deposition transcripts of Messrs. Alex Genin and William Walker. The Arbitral Tribunal found that these two deposition transcripts were relevant and material to deciding the merits of the Claimant's Secondary Claim. The Arbitral Tribunal ordered the Claimant to produce these two deposition transcripts to the extent that they were in its possession, by no later than 13 March 2017.

65. On 28 February 2017, the Parties submitted their respective lists of witnesses and experts who were to appear at the Evidentiary Hearing. On the same date, the Arbitral Tribunal invited each Party to comment on the other Party's submissions.

66. On 3 March 2017, the Parties submitted their respective comments. The Claimant submitted (i) that it was opposed to the Respondent's request to allow Mr. Pavlov to testify by video conference, and (ii) that Mr. Boyarintsev's witness statements should be admitted pursuant to the Swedish Arbitration Act, although it did not insist on Mr. Boyarintsev being heard at the Hearing. For its part, the Respondent maintained (i) that Mr. Pavlov should testify by video conference due to his age and the fact that he resided in Tyumen, and (ii) that Mr. Boyarintsev's witness statements should be declared inadmissible, because he was a public official and he was not authorized to testify in this arbitration.

67. On 4 March 2017, the Arbitral Tribunal decided (i) that Mr. Pavlov should appear in person at the Hearing, unless prior to the Pre-Hearing Teleconference to be held on 16 March 2017, the Respondent produced medical support for its claim that he was not able to travel for health reasons, and (ii) that Mr. Boyarintsev should also appear in person at the Hearing, if the Claimant wanted his testimony to be considered. By his email of 4 March 2107, the

Certified Document Number: 82350778 - Page 17 of 104

Chairperson invited the Parties to confer in order to attempt to reach an agreement regarding certain outstanding procedural issues related to the Hearing.

68. On 13 March 2017, the Respondent submitted Exhibits R-70 and R-71, and requested the Arbitral Tribunal to grant the Respondent until 17 March 2017 to review documents related to litigation in two pending court proceedings before the U.S. Federal District Court, i.e. *FNP v. State Industrial Ass'n Ministry of Fuel and Energy of Moldova* (Exhibit R-42) and *Neftegas Int'l Co. v. A/O Yugansknefiegas* (Exhibit R-44), and to submit documents gathered from such review into the record.

69. On 14 March 2017, the Respondent submitted a medical certificate dealing with Mr. Pavlov's health. It requested, consequently, that the Arbitral Tribunal permit Mr. Pavlov to testify via video-conference from Tyumen. On the same date, the Respondent requested the Arbitral Tribunal to draw adverse inferences against the Claimant based on its failure to ascertain whether Messrs. Genin and Mr. Walker had been deposed in the *Livchits* Litigation.

70. On 14 March 2017, the Claimant submitted that it was not able to locate the deposition transcripts of Messrs. Genin and Walker and it opposed the Respondent's request for an extension of time for the submission of documents related to the two U.S. Federal District Court proceedings aforementioned.

71. On 15 March 2017, the Parties submitted a joint proposal regarding the Evidentiary Hearing, stating the areas of agreement and disagreement between the Parties, for discussion during the Pre-Hearing Teleconference to be held on 16 March 2017.

72. On 15 March 2017, the Claimant made two submissions regarding the testimony of Mr. Aleksej Boyarintsev and Mr. Nikolay Evgenievich Pavlov, respectively.

73. On the same date, the Respondent submitted further comments regarding Mr. Pavlov's testimony, and applied (i) to strike the two witness statements submitted by Mr. Aleksej Boyarintsev, and (ii) to strike Exhibits C-96 to C-100.

16

84. The Evidentiary Hearing took place in Stockholm between 29 March 2017 and 4 April 2017. During the Evidentiary Hearing the Parties submitted their arguments and the following witnesses and experts gave evidence:

    (i)     Mr. Alex Genin (Claimant's fact witness)
    (ii)    Mr. William Walker (Claimant fact witness)
    (iii)   Mr. Nikolai Evgenievich Pavlov (Respondent's fact witnesses), who appeared by videoconference
    (iv)    Professor Erik Nerep (Claimant's expert)
    (v)     Professor M Runesson (Respondent's expert)
    (vi)    Professor Irina Sergeyevna Shitkina (Claimant's expert)
    (vii)   Professor Anton Asoskov (Respondent's expert)
    (viii)  Professor Ivan Nikolaevich Sidorov (Claimant's expert)
    (ix)    Professor Gennady Alexandrovich Volkov (Respondent's expert)
    (x)     Mr. William B. Cline (Claimant's expert)
    (xi)    Mr. Dee Patterson (Respondent's expert)
    (xii)   Mr. Brent C. Kaczmarek (Claimant's expert), and
    (xiii)  Mr. Valery Knyazev (Respondent's expert)

85. On 25 April 2017, the Claimant submitted on behalf of the Parties a draft procedural order dealing with the procedural timetable for the remainder of this arbitration proceeding, as agreed during the Evidentiary Hearing.

86. On 27 April 2017, the Arbitral Tribunal issued Procedural Order no. 14 ("**Procedural Order No. 14**"), including the new procedural timetable agreed between the Parties.

87. On 28 April 2017, the Claimant submitted a Further Report by Professor Nerep and the Respondent submitted both a Further Report of Professor Runesson and the Joint Report of Professor Volkov and Dr Sidorov.

88. On 1 May 2017, the Chairperson submitted to the SCC Procedural Order No. 14, including the new procedural timetable, in accordance with Article 23 of the SCC Rules.

Certified Document Number: 82350778 - Page 18 of 104

Certified Document Number: 82350778 - Page 19 of 104

89. On 12 May 2017, the Respondent submitted Professor Volkov's Further Report on Appendix 1 to Professor Sidorov's Report.

90. By email of 23 May 2017, the Respondent submitted a proposal, jointly agreed by the Parties, modifying the provisional timetable included in Procedural Order No. 14.

91. On 24 May 2017, the Arbitral Tribunal issued Procedural Order No. 15 ("**Procedural Order No. 15**"), including an amended provisional timetable for the remainder of this arbitration.

92. On 26 May 2017, the Claimant submitted the Further Export Report of Dr. Sidorov.

93. On 12 June 2017, the Claimant submitted Eurocapital's balance sheet as of 1992, which had been discussed during the cross-examination of Mr. Alex Genin, under the reference C-107.

94. On 19 June 2017, the Parties simultaneously submitted their respective Post-Hearing Briefs.

95. On 1 July 2017, the Arbitral Tribunal invited the Parties to submit a joint proposal regarding the organization of the Oral Closing Hearing to be held in Stockholm on 1 September 2017, and informed them that it would be useful if the Parties each summarized their views on the opinions expressed by the experts of the opposing Party during the Oral Closing Hearing.

96. On 12 July 2017, the Claimant provided the Arbitral Tribunal with the Parties' joint proposal regarding the practical arrangements for the Oral Closing Hearing.

97. On 13 July 2017, the Arbitral Tribunal by means of Procedural Order No. 16 ("**Procedural Order No. 16**"), confirmed its agreement with the Parties' joint proposal and specified the scope of the oral arguments to be submitted by the Parties during the Oral Closing Hearing.

98. On 11 August 2017, the Respondent requested the Arbitral Tribunal to authorize the introduction into the record of this arbitration of two decisions, which had been published in a recent collection of SCC awards.

99. By email of the same date the Arbitral Tribunal invited the Claimant to submit its comments on the Respondent's request.

100. By email of 18 August 2017, the Arbitral Tribunal stated that it did not have in mind any particular additional issue, which should be addressed by the Parties during the Oral Closings Hearing.

101. By letter of 21 August 2017, the Claimant set out the basis of its objection to the introduction of the two SCC decisions. It also asked the Arbitral Tribunal to clarify the scope of the oral submissions.

102. By Procedural Order No. 17 (**"Procedural Order No. 17"**), the Arbitral Tribunal denied the Respondent's application, due, in particular, to the lack of relevance of the issue dealt with in the extracts of the two cases attached to the Respondent's letter of 21 August 2017. The Arbitral Tribunal also clarified that the scope of the oral hearings was defined by Procedural Order No. 16.

103. In the event, it was necessary to postpone the Oral Closing Hearing as extraordinary weather conditions in the United States made it impossible for the Arbitral Tribunal to convene, as planned, in Stockholm on 1 September 2017. The Oral Closing hearing subsequently took place on 6 November 2017 in Stockholm, as agreed between the Parties and the Arbitral Tribunal, following the postponement of the 1 September 2017 hearing and as confirmed by the Chairperson in his email of 12 September 2017 addressed to the Parties.

104. On 14 November 2017, the SCC informed the Parties and the Arbitral Tribunal that the date for the rendering of the Final Award was extended until 28 February 2018.

105. The Parties submitted their respective Statements of Costs on 27 November 2017.

106. On 4 December 2017, the Parties submitted their respective comments on the other Party's Statement of Costs, pursuant to the directions given by the Arbitral Tribunal at the Evidentiary Hearing.

Certified Document Number: 82350778 - Page 20 of 104

107. By means of Procedural Order No. 18 ("**Procedural Order No. 18**"), dated 8 December 2017, the Arbitral Tribunal declared this arbitration proceeding closed, pursuant to Article 34 of the SCC Rules.

108. On 1 February 2018, the SCC informed the Arbitral Tribunal that it had determined the costs of this arbitration and on 23 February 2018, the SCC granted to the Arbitral Tribunal an extension until 2 April 2018 for the rendering of the Final Award.


## V.   SUMMARY OF FACTS


109. The following is a summary of the factual background underpinning the dispute submitted in this arbitration, which is established by the evidence and the submissions made by the Parties.

110. The Claimant is a company incorporated under the laws of Texas, USA, having its principal place of business in Houston, Texas, USA. The Claimant states that it was incorporated in 1991 for the purpose of operating as a strategic and financial partner in the oil and gas industry, focusing primarily on joint ventures in Russia and within the CIS. The Claimant also conducted business as a supplier of oil exploration equipment to the Balkans and other regions. The Claimant is currently wholly owned and controlled by Mr. Alex Genin.[4] During the period in which the dispute arose, Mr. Joe Russo was the Claimant's President and Mr. William Walker was its General Counsel.

111. The Respondent is an open stock joint company incorporated under the laws of the Russian Federation with its principal place of business in Tyumen, Russian Federation. The Respondent states that it is a subsidiary of Rosneft, an oil company that is majority owned by the Government of Russia. The Respondent's principal business is the exploration and development of oil in the Tyumen region of the Russian Federation.[5]

---

[4] Statement of Claim, ##16-17

[5] Answer to the Request for Arbitration, #13

Certified Document Number: 82350778 - Page 21 of 104

112. The "Tyumennefiegas" scientific industrial amalgamation, acting on behalf of "Novosibirskgeologia" geologic company and the Claimant entered into a Protocol on 1 November 1991 (the "**Protocol of Intentions**"), whereby these parties agreed to begin the work necessary to establish a joint venture for the development of the Kalchinskoye oil field in the Tyumen Region (the "**Joint Venture**").[6]

113. On 6 December 1991, the "Tyumennefiegas" scientific industrial amalgamation and the Claimant signed the Preliminary Operations Agreement (the "**Preliminary Operations Agreement**"),[7] pursuant to which, these parties (i) confirmed their intention to establish the Joint Venture; (ii) agreed, *inter alia*, (a) to conduct preliminary operations (including rouble and American dollar investments) prior to the signature of the documents related to the establishment of the Joint Venture, and (b) that the Claimant would invest USD 20 million and RUB 200 million for the preliminary operations; and (iii) specified that those investments would be made by supplying Tyumennefiegas with the necessary equipment, tools and materials and also by transferring money to the bank accounts of Tyumennefiegas, according to an investment schedule to be agreed at a later stage.

114. On 7 February 1992, NPO Tyumennefiegas and the Claimant signed a Protocol (the "**Protocol**"),[8] whereby these parties agreed, in particular, that the Respondent would own a 60% stake and the Claimant would own 40% stake in the Joint Venture to be established and that the Claimant would send its own experts to Tyumen.[9] The Protocol also stated that the Claimant had transferred RUB 200 million to the NPO Tyumennefiegas's bank account in accordance with the Preliminary Operations Agreement.[10]

115. On 23 March 1992, the Respondent (formerly denominated Tyumennefiegas Research and Production Association) and the Claimant signed the Agreement.[11] Under the terms of the Agreement, the Parties agreed to establish the Joint Venture (named therein as the

---

[6] Exhibits C-2 and R-1

[7] Exhibits C-3 and R-2

[8] Exhibit C-4

[9] Exhibit C-4, articles 6 and 8

[10] Exhibit C-4, article 3

[11] Exhibit C-1

Certified Document Number: 82350778 - Page 22 of 104

Certified Document Number: 82350778 - Page 23 of 104

"Enterprise") in the city of Tyumen, Russian Federation, for the development of the Kalchinskoye Oil Field, located in Siberia. Each of the Parties agreed to make contributions to the capital of the Joint Venture to be formed. As envisaged in the Protocol, the Respondent would own 60% of the shares, while the Claimant would own the remaining 40%. The Respondent was to make capital contributions: "in roubles, guarantees of contributions in roubles, equipment, materials, technology, know-how, the right to develop the oilfield, the right to use the land and natural resources, geological prospecting and oilfield construction expenses". The Claimant undertook to make capital contributions "in hard currency, guarantees of hard currency, equipment, materials, technology and know-how". The Claimant was also entitled to make part of its contributions in roubles, subject to the unanimous agreement of the Parties. Clause 4 of the Agreement provided, *inter alia*", that the Parties were obliged "not to take part in any activity which may directly or indirectly adversely affect the work of the Enterprise", and that the Respondent: "will render assistance to the Enterprise in getting the right for the development of the Kalchinskoye oil field, the right to use the land, water and other natural resources". Importantly, the liquidation of the Joint Venture required the agreement of both Parties.

116. On 3 April 1992, the State Committee for Industrial and Mining Safety Supervision issued an Act certifying the allotment of the mining area for the development of reserves of Category C1 of the productive strata I-O 3-4 of the Kalchinskoye oil and oil-dissolved gas field in favour of the Respondent. This Act specified that the Respondent was not allowed to transfer the allotted mining area to another enterprise.[12] The license for the use of the Kalchinskoye field subsoil was registered on 1 April 1994.[13]

117. On 6 April 1992, the Parties signed a Supplement Agreement to the Agreement (the "**Supplement Agreement**"),[14] whereby they agreed that the "charter capital" of the Joint Venture during the first year would be RUB 95 million or USD 52 million. The contribution to be made by the Claimant was RUB 38 million or USD 21.1 million and the contribution to be made by the Respondent was RUB 57 million or USD 31.7 million. The Parties

---

[12] Exhibit R-17, page 123

[13] Exhibit R-17

[14] Exhibits C-7 and R-4

acknowledged that the Respondent had already made its contribution to the charter capital in kind by way of work performed in the field, and that the Claimant should make its contribution to the charter capital within a year, taking into account the investments made pursuant to the Preliminary Operations Agreement.

118. The Russian authorities ordered the registration of the Joint Venture "Tyumtex" as a closed joint-stock company by means of a decree dated 10 April 1992.[15] Subsequently, a certificate of registration was issued on 12 May 1992 by the Russian authorities.[16]

119. The Parties held a board meeting of the Joint Venture in Tyumen on 23 November 1992. At that meeting, it was agreed to appoint Mr. V.A. Osikin as the General Director of the Joint Venture.[17]

120. Following this board meeting, the Claimant sent a letter to the Respondent on 4 December 1992 in which the Claimant (i) made clear that it expected that: "appropriate authorities will issue the necessary licenses and permits in order to allow this Joint Venture to realize its goals"; (ii) acknowledged that a protocol, which the Arbitral Tribunal was given to understand had been made by the Parties at the conclusion of the board meeting, required that the Claimant make available, in accordance with the Agreement and protocols, an aggregate of USD 10.5 million for the benefit of the Joint Venture by 15 December 1992; and (iii) confirmed that it was making arrangements to fund the required contribution. In this letter, the Claimant also stated that it was essential to transfer the oil rights with the exploration license in order to satisfy the Claimant's investors and banks of the legitimacy of the Claimant's interest in the Joint Venture and its relative value.[18]

121. On 7-8 January 1993, the Parties held a board meeting in Houston. The Protocol of this meeting mentions, *inter alia*, that: (i) the Respondent had applied for a license to explore and produce oil and other hydrocarbons from the Kalchinskoye oil field; (ii) the Respondent had received all approvals from the regional authorities; (iii) Mr. Pavlov anticipated that the

---

[15] Exhibits C-8 and R-11
[16] Exhibit C-8
[17] Exhibit C-9
[18] Exhibit C-9

Certified Document Number: 82350778 - Page 24 of 104

Certified Document Number: 82350778 - Page 25 of 104

requisite approval from the Russian central governmental authorities would be forthcoming by the end of January 1993, and that "the transfer and assignment of the license" to the Joint-Venture "will occur before the end of March 1993"; (iv) the Joint Venture's budget provided for drilling 18 additional wells during 1993, (v) the level of the Joint Venture's production should be of the order of approximately 27,000 tons of oil from the Kalchinskoye oil field during 1993; (vi) Mr. Walker reported that the Claimant (a) had arranged for guarantees and commitments from financial institutions sufficient to fund the capital commitments provided under the Agreement and the subsequent protocols, (b) had made arrangements for securing equipment and other property, all of which would be transferred to the Joint Venture as part of its contribution and (e) had purchased two mobile tankers, which it intended to transfer to the Joint Venture; and (vii) the Claimant's board had recommended that the Claimant transfer to the Joint Venture securities in an aggregate amount equal to the balance due in respect of the Claimant's capital contributions to the Joint Venture. The Protocol further states (i) that the Directors of the Joint Venture had accepted the Claimant's proposal, provided that the Claimant deposited in favour of the Joint Venture, on or before 5 February 1993, sufficient bonds with at face value equivalent to the difference between USD 10.5 million and the actual contributions recorded on the Joint Venture's books; (ii) that the Claimant would make an additional arrangement for bonds in favour of the Joint Venture in the aggregate amount of USD 10.5 million on or before 10 April 1993; and (iii) that the Claimant would continue to assist the Joint Venture by providing capital goods and equipment to the Joint Venture. [19]

122. By letter dated 12 March 1993, the Claimant confirmed to the Respondent that the Claimant (i) had honoured its commitment and lodged US government agency bonds to the value of USD 9 million and would provide approximately USD 10 million of additional bonds before the required date; and (ii) had sent several utility vehicles and two tanker truck rigs to Russia. In this letter, the Claimant asked for a status report on the transfer of the assets to the Joint Venture and a: "confirmation that the exploration licenses and all necessary licenses for the exploration and production of oil from the field had been transferred to the Joint Venture".[20]

123. A few days later, on 30 March 1993, the Claimant wrote a letter to the Respondent in which it stated that (i) it had arranged to purchase bonds at a face value of USD 18 million issued by

[19] Exhibit C-10
[20] Exhibit C-11

the Resolution Funding Corporation and guaranteed by the US government; (ii) these bonds, which had been placed in a special custodial account under the Joint Venture's control, would satisfy the balance of the Claimant's capital commitment to the Joint Venture, pursuant to the Agreement and the subsequent protocols; and (iii) it had contributed over USD 4 million worth of other assets to the Joint Venture. In this letter, the Claimant highlighted that under the 8 January 1993 Protocol, the Respondent was to have transferred all of the exploration and development permits and all of the rights to the Kalchinskoye oil field to the Joint Venture, pursuant to the Agreement. The Claimant requested the Respondent to confirm that: "all of the permits and exploration, development and business permits necessary to carry out the business of the Joint Venture have been fully assigned and lodged in the Joint Venture".[21]

124. Between 28 June and 2 July 1993, an important board meeting of the Joint Venture took place in Paris (the "**Paris Meeting**").[22] The minutes of the Paris Meeting purport to record that Messrs. Vershinin, Pavlov, Russo, Walker, Genin and Osikin were all in attendance.[23] The minutes further record, *inter alia*, that: (i) Mr. Pavlov informed the board of the Joint Venture (a) about "new geological updates concerning Kalchinskoye oil field", and (b) that "due to several reasons, mostly objective, it was not possible to renew the operating license for JV "Tyumtex" on this field, and also informed that now this procedure was going to be even more complex, than before (in connection with the regulatory changes which have occurred recently in Russia"); (ii) Mr. Osikin reported that (a) in lieu of the scheduled delivery of equipment from the Claimant by way of a payment in kind into the equity, the Joint Venture had received a health centre along with equipment, (b) the Claimant had ordered and paid for certain equipment, furniture and vehicles, and provided "the means for financing the operating expenses and others", and (b) two bonds had been deposited by "American partners into the company's equity capital in the total amount of $18,000,000.00, by this "FNP" finished the formation of its part of the equity capital of JV in the period of less than a year from the day the JV registration"; (iii) Mr. Vershinin (a) noted that, although the Claimant had provided a

---

[21] Exhibit C-12

[22] The Claimant submitted a copy of the original Russian version signed by the representatives of the Claimant, the Respondent and the Joint Venture together with an English translation, as Exhibit C-13. The Respondent submitted another English translation of the original Russian version, as Exhibit R-49. Since the Parties were not able to agree on a joint English translation, the Arbitral Tribunal will only refer to and rely on the English translation submitted, together with the original Russian version, by the Claimant as Exhibit C-13, in this Final Award.

[23] The record shows that neither Mr. Russo nor Mr. Walker attended the Paris Meeting (cf. Mr. Genin's testimony: Transcript Day 2, at 210:5-15)

Certified Document Number: 82350778 - Page 26 of 104

currency guarantee of USD 5.5 million to collateralize the Joint Venture's rouble loans and the items previously mentioned, there had been a delay to the start of the financing and the main task of investing into establishing and drilling the location had been put on the Respondent, (b) informed the Joint Venture's board that the main elements of the infrastructure of the Kalchinskoye oil field were either operational or about to start operating as a result of the Respondent's hard work and (c) "Based on these issues, he questioned the purpose for continuing working with the JV on the project of Kalchinskoye oil field location and offered "FNP" to participate as currency and rouble creditor in this project."

125. In the course of the discussion which followed, the Claimant raised a question about "the failure to execute the Tyumenneftegas's (sic) responsibilities to register and transfer the licenses, allowing the start of work on the oil field, to JV "Tumtex" (sic), and also about the transfer of all its assets, related to Kalchinskoye oil field, on the JV balance sheet".

126. The minutes state that, as a result, the board of the Joint Venture resolved:

"- To consider further participation of the JV "Tyumtex" in the project of development of Kalchinskoye oil field as inadvisable;

- To consider currency investment in Kalchinskoye oil field by "FNP" as a loan from "FNP" to Tyumenneftegas until 01.01.94;

- To consider rouble financing of works on Kalchinskoye oil field as a rouble interest bearing loan by Tyumtex to Tyumenneftegas;

- To compensate by the end of 1993 Tyumenneftegas for currency loan by "FNP"

- To compensate Tyumenneftegas's rouble investments into Kalchinskoye oil field including their service expenses;

- Tyumtex to transfer to the balance sheet of Tyumenneftegas all assets (ruble (sic) and currency) related to Kalchinskoye oil field;

- Tyumtex to concentrate main efforts on realization of projects in other fields, like:

In the field of creation of a network of the brand fueling (sic) stations;

27

In the field of financing and procurement for oil extraction and drilling;

In the field of repair and restoration of un-operating wells;

In the field of preparation and implementation of investment and financial projects;

In other areas.

- The next Board meeting of joint venture "Tyumtex" to take place in the first half of October 1993. "

127.   Between the Paris Meeting and March 1994, the Claimant provided information purporting to set out the funds owed to it by the Respondent under the agreement reached at the Paris Meeting.

128.   By letter dated, 20 March 1994, the Claimant notified the Respondent that it had not received the funds as agreed and that it would engage legal counsel to settle the dispute, if the payment was not made.[24]

129.   The Claimant wrote again to the Respondent on 7 May 1994, requesting payment of the "funds as agreed in Paris".[25] The payment request was reiterated in subsequent letters dated 20 May 1994, 6 January 1995 and 17 May 1996.[26]

130.   By letter dated 24 March 1997, the Claimant sent a formal demand for payment of the amounts due from the Respondent, specifying the nature of the outstanding debt and the amount.[27]

131.   On 15 December 1997, Mr. Pavlov sent a letter to Mr. Genin stating that Mr. Vershinin, "who is dealing with this question in person, is ill at the moment".[28]

---

[24] Exhibit C-18
[25] Exhibit C-19
[26] Exhibits C-20, C-21 and C-22
[27] Exhibit C-68
[28] Exhibit C-24

Certified Document Number: 82350778 - Page 29 of 104

132. By letter dated 9 January 1998, the Respondent informed the Claimant that: "the decision regarding the payment of the outstanding sums concerning our joint project of development of Kalchinsk oil field (JV Tyumtex) in accordance with the decisions in Paris (1993) take[s] time due to objective reasons. We would like to ensure (sic) that in the course of 30-40 days we will be able to decide on all outstanding questions".[29]

133. In the meantime, by letter dated 14 May 1996, the Respondent had asked the Claimant to confirm its agreement to the liquidation of the Joint Venture.[30]

134. By letter dated 20 May 1996, the Claimant stated that it declined to liquidate the Joint Venture and reminded the Respondent that it still owed the Claimant over USD 3,000,000. The Claimant also highlighted the fact that it was still: "legal owners of 51% of all its [the Joint Venture] assets, including Kalchinskoye Oil Field".[31] The Claimant sent a similar letter to Mr. Vershinin on 26 May 1996.[32]

135. In a letter, dated 28 May 1996, the Claimant stated that it did not oppose the transfer of the Joint Venture's equity/active assets (including the Kalchinskoye oil field) to the Respondent, subject to the condition that "all the investments of our company concerning the project of development of Kalchinsk oil field will be paid back as stated in the Paris agreement". The Claimant further stated that "As you know, until today, it is still outstanding. Therefore, our share in the JV (40%) and in Kalchinsk oil field is still the same". In addition, Mr. Genin observed that "you [Mr. Vershinin] and Nikolaj Jevgenjevich [Mr. Pavlov] have been honest with me [Mr. Genin] in 1993 when you told me that the well flow rates of the Kalchinsk oil field were nearly 0 and that there was no meaning to continue the development and that there could be problems concerning the re-execution of the license. However, we still have invested considerable amounts in dollars and in roubles in the development of the oil field and Uvat region so that our efforts are not wasted for the people of the region. All I want is that our agreements would (sic) put into practice".[33]

---

[29] Exhibit C-25
[30] Exhibit C-30
[31] Exhibit C-31
[32] Exhibit C-37
[33] Exhibit C-23

Certified Document Number: 82350778 - Page 30 of 104

136. Nearly a month before the Claimant's letter of 28 May 1996, and without reference to the Claimant, the Respondent and Great Plains Petroleum (Cyprus) Limited ("**Great Plains**")[34] signed an "*Agreement on the establishment of Tura Petroleum Company*" (the "**Tura Agreement**"), on 30 April 1996,[35] concerning the same Kalchinskoye oil field. The structure, objectives and planned operations of Tura Petroleum Company (the "**Tura JV**") were set out in a corporate charter, which was approved by the Respondent and Great Plains on 30 April 1996.[36] The Tura JV was registered with the State Registration Chamber under the Ministry of Economy of the Russian Federation, according to the certificate of registration issued by the latter on 28 November 1996.[37]

137. In a letter dated 30 December 1996 addressed to the chairman of ZapSib RGC, the Respondent stated that it consented to the reissuance of licence No. 00228 TIOM HP, which was originally issued in favour of the Respondent for the exploration and further production of oil and gas at the Kalchinskoye oil field, to the Tura JV. The Respondent further stated therein that the original licence had been issued in compliance with the "Instruction on the order of reissuance of licenses for subsoil use", which was approved by the Russian Federation Committee on Geology and Mineral Resources on 18 May 1995.[38]

138. On 6 July 1998, in proceedings involving the Respondent and the Tyumen Region Administration, the RF Committee for Geology and the Use of Subsurface Resources represented by Western Siberian regional geological centre, and in which the Tura JV appeared as "Third party non filing independent demands", the Tyumen Region Arbitration Court resolved that the decision "*to reissue the license No. 00228 TIOM HP...from the Respondent to Tura Petroleum Company, CJSC...is found invalid*".[39]

---

[34] Great Plains Petroleum (Cyprus) Limited. was a wholly owned subsidiary of Ivanhoe Energy Ltd ("Ivanhoe") a Canadian company (cf. Statement of Claim, #94)
[35] Exhibit C-26
[36] Exhibits C-27 and C-28
[37] Exhibit C-29
[38] Exhibit C-32
[39] Exhibit C-33 (page 15 of the English translation)

Certified Document Number: 82350778 - Page 31 of 104

139. Further to the above-mentioned Decision, a new license bearing the number TIOM 00416 HP was registered with the Geological Fund of Western Siberian Regional Geological Centre in the name of the Respondent on 7 October 1998.[40]

140. The decision of the Tyumen Region Arbitration Court to invalidate the reissuance of the license in favor of the Tura JV prompted TNK, the parent company of the Respondent at that time, to file a law suit before the Russian courts against Great Plains in order to invalidate the Tura Agreement. TNK alleged that the latter was made in breach of Russian legislation. The courts decided to invalidate the Tura Agreement and the reissuance of the license in favor of the Tura JV, on 28 July 1999.[41]

141. Thereafter, in June 1999, Great Plains initiated an UNCITRAL arbitration under the Tura Agreement against the Respondent, in which the SCC acted as the appointing authority. The seat of the arbitration was Stockholm. Great Plains claimed, in particular, the recovery of its investments made in the Tura project and lost profits. In August 2000, the parties reached a settlement agreement according to which Great Plains received approximately USD 29 million.[42]

142. What purport to be Minutes of a Meeting of the founders of the Joint Venture held in Tyumen on 25 December 1998, record that all the attendees mentioned in those Minutes (i.e., Messrs. Russo, Genin, Moshkin, Nikulina and Ternov) voted for the liquidation of the Joint Venture. Ostensibly, the Minutes were signed by Messrs. Moschkin and Ternov (the "**Liquidation Protocol**").[43] The record reflects no prior notice to the Joint Venture's Board of such a meeting and there is no evidence that any representative of the Claimant actually attended.

143. The following day, on 26 December 1998, the Joint Venture applied to the Russian government for authority to liquidate the Joint Venture. The application represented that it had been signed by Messrs. Russo and Genin on behalf of the "liquidation committee" and bore a seal represented to be that of the Claimant. Neither Mr. Russo nor Mr. Genin actually signed the application and the alleged Claimant's seal was not in fact that of the Claimant.

---

[40] Exhibit C-33 (page 3 of the English translation)
[41] Exhibit C-36
[42] Exhibit C-36
[43] Exhibit C-38

31

Certified Document Number: 82350778 - Page 32 of 104

144. On 29 June 1999, the Department of Justice - Administration of the Tyumen Region ordered the liquidation of the Joint Venture.[44]

145. The Claimant sent a letter, on 15 March 2004, to TNK-BP, the alleged successor of A/O TNK, which had allegedly acquired the Respondent's shares, enquiring what had happened to the Claimant's interest in the Joint Venture and what was the status of the Joint Venture. The Claimant further stated that if it did not receive a reply within 10 working days, it would initiate legal proceedings in order to protect its Joint Venture's rights.[45]

146. By letter dated 5 April 2004, TNK informed the Claimant that the Joint Venture had been liquidated in 1999.[46]

147. On 3 March 2005, U.S. legal counsel for the Claimant sent a letter to TNK-BP stating that the Claimant had learned that the Kalchinskoye field was actually being developed by TNK-BP, which was the apparent successor in interest to TNK, itself the successor of the Joint Venture. This letter also highlighted that the Claimant still maintained "a 40% interest in the original Kalchinskoye holdings of Tyumtex".[47]

148. On 28 December 2007, the Claimant filed a request for arbitration against the Respondent before the SCC (the "2007 Arbitration").[48] The Claimant applied to the Arbitral Tribunal for an order requesting the Respondent to pay the Claimant the value of its 40% share of (i) the current value of the Kalchinskoye Oil Field and (ii) any production from the Kalchinskoye Oil Field. However, this Arbitral Tribunal was told that due to the Claimant's financial constraints, an arbitral tribunal was never appointed and the 2007 Arbitration did not proceed.[49]

149. As a result of a criminal investigation, which he had conducted, the Senior Investigation Officer, Captain of Justice of the city of Tyumen, issued a Decree on 19 January 2009. It

---

[44] Exhibit C-41

[45] Exhibit C-44
[46] Exhibit C-45
[47] Exhibit C-47
[48] Exhibit C-49
[49] Statement of Claim, #127

stated that on 25 December 1998 one of the principal managers of the Joint Venture: "with the intention to steal the said property that belonged to the First National Oil Corporation acting with profit motives, by means of fraud (deceit) and using a false protocol #1 of "Tyumtex" JV's founding shareholders' meeting arranged to liquidate the JV with the intent of concealing the oil load at the Kalchinsk Oilfiled (sic). After that criminal act directed for stealing the property of the First National Petroleum Corp., he sold "TyumanNeftegaz" (sic) to ГНК (sic), which extracted major amounts of oil at Kalchinskiy oilfiled (sic) in 2006".[50]

150. During the course of those criminal investigations, a graphological expert issued an expert opinion on 4 March 2010. He concluded that what purported to be the signature of Mr. Joe Russo, appended to the application for liquidation of the Joint Venture submitted by the Joint Venture to Mr. Faleyev, head of the Administration of Tyumen Region, on 26 December 1998,[51] was not in fact that of Mr. Russo.[52]

151. On 23 December 2011, the Claimant filed a new request for arbitration against the Respondent before the SCC (the "**2011 Arbitration**"). The Claimant sought relief for loss allegedly caused by the Respondent's breaches of the Agreement in the amount of USD 184,664,885. The arbitral tribunal rendered its final award on 9 December 2013.[53] Based on the arbitral tribunal's finding that the Respondent had breached the Agreement, the Claimant was awarded damages in the amount of USD 173,211,897. Upon the Respondent's challenge, however, that Award was set aside on procedural grounds by the Svea Court of Appeal in June 2015. Since, the latter did not grant the Claimant's leave to appeal the judgment to the Swedish Supreme Court, the Claimant commenced this arbitration.[54]

---

[50] Exhibit C-51
[51] Exhibit C-39
[52] Exhibit C-43
[53] Exhibit C-54
[54] Statement of Claim, #144; Statement of Defense, ##141-148

Certified Document Number: 82350778 - Page 33 of 104

Certified Document Number: 82350778 - Page 34 of 104

# VI. THE PARTIES' RESPECTIVE REQUESTS FOR RELIEF

## A. The relief sought by the Claimant

152. The Claimant is in essence setting forth two substantive claims: (1) a damages claim for lost profit (the **"Primary Claim"**), which consists of: (i) the Respondent's breach of Clauses 3.3 and 4.6 of the Agreement and of its duty of loyalty under the Agreement by reason of its failure to provide the Joint Venture with the right to develop the exploration area and the rights to use the land, water and other natural resources (the **"License Breach"**); (ii) the Respondent's breach of its duty of loyalty under the Agreement in that it provided misleading information to the Claimant during the Paris Meeting (the **"Paris Breach"**); (iii) the Respondent's failure to correct any such erroneous information conveyed to the Claimant during the Paris Meeting, which is, according to the Claimant, a breach of the Respondent's duty of loyalty under the Agreement (the **"Failure-to-Correct"**); (iv) breach of items 6 and 7 of Clause 4.5 of the Agreement, in that the transfer by the Respondent to Tura JV of the oil field rights granted to the Claimant under the Agreement constituted a fundamental breach of the Respondent's duty to loyalty under the Agreement (the **"Exclusivity Breach"**); and (v) the Respondent's breach of Clause 10 and 11 of the Agreement and of its duty to loyalty under the Agreement by drawing up and signing the liquidation protocol on 25 December 1998, the making of the subsequent application to the Russian authorities, and its knowing reliance on both documents bearing the forged signatures of Messrs. Genin and Russo and the Claimant's forged company seal (the **"Liquidation Breach"**); and (2) an alternative claim for payment of the money invested by the Claimant in the Joint Venture (the **"Secondary Claim"**).[55]

153. In the Terms of Reference, the Claimant sought the following relief:

   1. A preliminary request that the Arbitral Tribunal:

      i.    order the Respondent to pay compensation to the Claimant for losses due to the Respondent's material breaches of the Treaty in the amount of:

            a.    approximately USD 200 million for lost profits and future lost profits; or alternatively,

            b.    USD 4,610,564 for repayment of loan/loss of investment;

---

[55] Statement of Claim, #149 and ##176-186

ii.    order the Respondent to pay interest to the Claimant calculated in accordance with
       Section 6 of the Swedish Interest Act (SFS 1975:635) to be further detailed in the
       Statement of Claim; and

iii.   order the Respondent to compensate the Claimant in full for its costs, including
       interest pursuant to the Swedish Interest Act (SFS 1975:635) from the date of the
       Award until full payment has been made; and

iv.    order the Respondent, as between the Parties, to bear all fees and costs for the
       arbitral proceedings.

154. In its Statement of Reply, the Claimant's prayers for relief were finally developed as follows:

1. An award to the effect that:

   i.    the Respondent pay compensation to the Claimant for losses due to the
         Respondent's breach of the Treaty, in the amount of:

         a.  USD 172,646,664 for lost profits and future lost profits; or alternatively,

         b.  USD 4,610,564 for repayment of loan/loss of investment.

   ii.   The Respondent pay interest to the Claimant:

         a.  on USD 172,646,664 calculated in accordance with Section 6 of the
             Swedish Interest Act as from 28 December 2007 until payment has been
             made in full, or, alternatively, as applicable:

             (A) in an amount of USD 63,555,826 up until 20 December 2016
                 and, thereafter, as from 20 December 2016, on USD 172,646,664
                 calculated in accordance with Section 6 of the Swedish Interest Act
                 until payment has been made in full;

             (B) in an amount of USD 52,002,746 up until 20 December 2016
                 and, thereafter, as from 20 December 2016, on USD 172,646,664
                 calculated in accordance with Section 6 of the Swedish Interest Act
                 until payment has been made in full;

             (C) on USD 172,646,664 calculated in accordance with Section 6 of the
                 Swedish Interest Act as from 23 December 2011 until payment has
                 been made in full;

Certified Document Number: 82350778 - Page 36 of 104

(D) on USD 172,646,664 calculated in accordance with Section 6 of the Swedish Interest Act as from 23 December 2015 until payment has been made in full;

b.  on USD 4,610,564 calculated in accordance with Section 6 of the Swedish Interest Act as from 1 January 1994 until payment has been made in full, or, alternatively, as applicable:

(A) on USD 3,018,207as from 24 April 1997 until 22 December 2011, and

(B) on USD 4,610,564 as from 23 December 2011 until payment has been made in full, or, alternatively, as applicable

(C) on USD 4,610,564 from 23 December 2011 until full payment has been made; or

(D) on USD 4,610,564 from 23 December 2015 until full payment has been made.

iii.  The Respondent shall, as between the Parties, bear all costs for the arbitral proceedings.

iv.  The Respondent shall pay all of the Claimant's costs relating to this arbitration together with interest thereon calculated in accordance with Section 6 of the Swedish Interest Act as from the date of the award until payment has been made in full.

2. The Claimant reserved its right to adjust or amend the relief sought, and to plead additional heads of relief.

**B. The relief sought by the Respondent**

155. In the Terms of Reference, the Respondent sought the following relief:

1.  The Respondent's threshold objections on jurisdiction and admissibility (§§39-45 of Respondent's Answer)

i.      Respondent relies on provisions of ss 33 and 225(1) of the Russian Arbitrazh (Commercial Court) Procedure Code 2002, which provide that corporate disputes in relation to Russian entities are non-arbitrable and fall under the exclusive jurisdiction of Russian state courts. Claimant's claims against Respondent concern matters that fall within the scope of s 225(1). As such, Russian state courts have exclusive jurisdiction to hear the claims brought by Claimant against Respondent.

ii.     the limitation period in respect of Claimant's claims expired in July 1996 under chapter 4, section 4 of the Swedish Partnership Act, or, at the latest, in July 2003 under s 2 of the Swedish Limitation Act. Thus, all of the claims alleged by Claimant in its Request for Arbitration are time-barred, and are not admissible.

## 2. Relief sought by the Respondent (§56 of the Respondent's Answer)

iii.     dismiss the Claimant's claims against the Respondent in their entirety;

iv.     make appropriate declarations regarding the Parties' contractual obligations;

v.     order the Claimant to pay the Respondent's Advance on Costs, as defined in the SCC Rules;

vi.     order the Claimant to pay the Respondent's costs in this arbitration, including costs of legal representation; and

vii.     award the Respondent's damages associated with its losses incurred with respect to the Claimant's misrepresentations, contractual breaches and pursuance of vexatious past arbitrations.

156. In its Rejoinder, the Respondent requested that the Arbitral Tribunal make the following orders and declarations as applicable:

    1.   Russian law governs the Primary Claim and the Secondary claim brought by the Claimant;

2. The Arbitral Tribunal does not have jurisdiction to hear the Claimant's Primary claim and Secondary Claim;

3. In the alternative, the Claimant's Primary Claim and Secondary claim are time-barred and should be denied in their entirety with prejudice;

4. In the alternative, the Claimant's Primary Claim and Secondary Claim lack merit and should be dismissed in their entirety with prejudice;

5. With regard to damages:

   a. The Claimant is not entitled to recovery of any damages with regard to the Primary Claim and the Secondary claim;

   b. In the alternative, if the Arbitral Tribunal decides to award the Claimant monetary damages, the Arbitral Tribunal should award damages in the amounts specified in the Second Expert Report of Valery Knyazev.

6. The Claimant should be ordered to pay the Respondent's costs in this arbitration, including costs of legal representation;

7. The Arbitral Tribunal should grant the Respondent any other relief it deems just and appropriate.

157. In its Rejoinder, the Respondent reserved all of its rights, including the rights to vary, amend and/or supplement the Statement of Defense and the Rejoinder and, in particular, the relief sought from the Arbitral Tribunal to the full extent permitted under the SCC Rules of Arbitration (2010) and applicable law.

## VII.    ISSUES TO BE DETERMINED

158. In Section 5 of the Terms of Reference the Parties identified the following issues to be determined by the Arbitral Tribunal:

## 1. Issues to be determined according to the Claimant

1.1.1 This list identified in broad terms the main issues identified in the arbitration at the early stage of the proceedings.

Certified Document Number: 82350778 - Page 38 of 104

Certified Document Number: 82350778 - Page 39 of 104

1.1.2 The order of issues does not convey the relative importance of the issues nor bind the Arbitral Tribunal as to the manner in which evidence is to be adduced in relation thereto or indicate the order in which the issues are to be considered and/or determined. FNP maintained its rights to add issues to or remove issues from this list under the course of the proceedings.

## Definitions

1.1.3 The following definitions are used in this List of Issues.

a) The "JV" means the joint venture formed by FNP and TNG in 1992 in the name of "Tyumtex, a Russian-American Joint Venture".

b) Reference to the "Kalchinskoe oil field" include also the North-Kalchinskoe, the South-Kalchinskoe, the Tanjagskaja and the South-Tanjagskaja fields.

c) The "Oil Field Rights" means the right to develop the Kalchinskoe oil field and the rights to use the land, water and other natural resources.

d) The "Treaty" means the agreement between FNP and TNG named "The Statutory Treaty on the establishment of Tyumtex, Russian-American Joint Venture" dated 23 March 1992.

## Issues Relating to FNP's Primary Claim

i) Did TNG breach the Treaty by not obtaining the Oil Field Rights in the name of the JV?

(a) If yes, was TNG's breach substantial?

(b) If yes, what damage did this breach of contract cause FNP?

(c) If yes, was TNG's breach intentional, alternatively, grossly negligent?

(d) What interest is FNP entitled to in relation to the damages?

ii) Did TNG breach the Treaty by misleading FNP into an agreement at the Paris meeting by providing erroneous information concerning (i) the oil available for commercial production at the Kalchinskoye oil field, (ii) TNG's unsuccessful efforts to provide the JV with the Oil Field Rights and (iii) with respect to certain regulatory changes in Russia making it impossible to provide the JV with the Oil Field Rights?

(e) If yes, was TNG's breach substantial?

(f) If yes, what damage did this breach of contract cause FNP?

(g) If yes, was TNG's breach intentional, alternatively, grossly negligent?

(h) What interest is FNP entitled to in relation to the damages?

iii) If TNG at the time of the Paris meeting genuinely believed in the information conveyed by it, did it breach the Treaty by not correcting the information conveyed to FNP once it learned of the true situation?

(i) If yes, was TNG's breach substantial?

(b) If yes, what damage did this breach of contract cause FNP?

(c) If yes, was TNG's breach intentional, alternatively, grossly negligent?

(d) What interest is FNP entitled to in relation to the damages?

iv) Did TNG breach the Treaty when it entered into another joint venture agreement concerning the exploration of the Kalchinskoye oil field and under which agreement TNG undertook to transfer the Oil Field Rights to another joint venture?

(i) If yes, was TNG's breach substantial?

(j) If yes, what damage did this breach of contract cause FNP?

(k) If yes, was TNG's breach intentional, alternatively, grossly negligent?

(l) What interest is FNP entitled to in relation to the damages?

v) Did TNG breach the Treaty when it liquidated the JV in 1998 – 1999?

(m) If yes, was TNG's breach substantial?

(n) If yes, what damage did this breach of contract cause FNP?

(o) If yes, was TNG's breach intentional, alternatively, grossly negligent?

(p) What interest is FNP entitled to in relation to the damages?

**Issues Relating to FNP's Secondary Claim**

vi) Did TNG breach its obligations under the Treaty by not repaying FNP's investments as agreed upon at the Paris meeting?

    (a) If yes, was the breach substantial?

    (b) If yes, what damage did this breach of contract cause FNP?

    (c) What interest is FNP entitled to in relation to the damages?

vii) Did TNG breach its obligations under the Treaty by not repaying FNP's loan as agreed upon at the Paris meeting?

    (a) If yes, was the breach substantial?

    (b) If yes, what damage did this breach of contract cause FNP?

    (c) What interest is FNP entitled to in relation to the damages?

viii) Did TNG breach its obligations under the Treaty by not returning any funds still outstanding after FNP's termination of the Treaty on 21 May 2012?

    (a) If yes, what damage did this breach of contract cause FNP?

    (b) What interest is FNP entitled to in relation to the damages?

**Issues Relating to Costs**

ix) Is TNG obliged to compensate FNP in full for its costs, including interest pursuant to the Swedish Interest Act (SFS 1975:635) from the date of the Award until full payment has been made?

x) Is TNG obliged to bear all fees and costs of the arbitral proceedings?

## 2. Issues to be determined according to the Respondent

    2.1.1. The list identifies in broad terms the main issues pleaded in the arbitration at the early stage of the proceedings.

    2.1.2. The list neither limits the Arbitral Tribunal's jurisdiction, nor constitutes the basis for its jurisdiction, nor does it prescribe the correct legal test for resolving any issue, and is without prejudice to the freedom of the Parties to make such submissions on issues of law or fact as they consider appropriate in the proceedings.

    2.1.3. The order in which the issues appear on the list has no bearing on the relative importance (if any) of the issues, nor does it bind the Arbitral Tribunal as to the manner in which evidence is to be adduced in relation to any issue, or indicate the order in which the issues are to be considered and/or determined.

    2.1.4. TNG reserved the right to add, modify or withdraw issues from this list in the course of the proceedings.

### Definitions

    2.2. The following definitions are used in this List of Issues.

    e) The "JV" means the joint venture formed by FNP and TNG in 1992 in the name of "Tyumtex, a Russian-American Joint Venture".

    f) The "Treaty" means the agreement between FNP and TNG named "The Statutory Treaty on the establishment of Tyumtex, Russian-American Joint Venture" dated 23 March 1992.

Certified Document Number: 82350778 - Page 42 of 104

**Preliminary Objections Relating to Jurisdiction and admissibility**

2.3.1. Do any/all of the claims brought by FNP fall within the scope of the arbitration agreement in the Treaty?

2.3.2. Are any/all of the claims brought by FNP under the Treaty arbitrable?

2.3.3. Are any/all of the claims brought by FNP under the Treaty time-barred under the applicable statute of limitations/prescription period?

**FNP's Claims**

2.4.1 In the Claimant's Request for Arbitration, Claimant alleges, *"TNG's main obligations were to conduct the daily operations of the oil field and obtain, in the name of the JV, the right to develop the Kalchinskoe oil field[56] and the rights to use the land, water and other natural resources" (RFA para 9):*

    a) Whether the Treaty imposed the above obligations on TNG, and, if so, what was the nature and extent of such obligations?

    b) Was TNG in breach of the above obligations?

    c) If TNG was in breach of such obligations, did it cause FNP loss and damage?

    d) What is the quantum of damages, if any?

    e) Is FNP entitled to any interest in relation to the damages?

---

[56] The parties are in disagreement in relation to whether or not references to the "Kalchinskoe oil field" include the North-Kalchinskoe, the South-Kalchinskoe, the Tanjagskaja and the South-Tanjagskaja fields.

2.5.1. To the extent that any of the claims brought by FNP are admissible, arbitrable and fall within the scope of the arbitration agreement in the Treaty, should TNG prevail in its defence that none of these claims brought by FNP has any merit?

2.5.2. Even if FNP's claims in the arbitration have merit, would FNP not be entitled to damages if it misled TNG or misrepresented to TNG material information regarding its ability to fulfil its obligations under the Treaty?

II. Costs

3.1.1. The Parties request the Arbitral Tribunal to decide the allocation of the Costs of the Arbitration, as the term is defined in Article 43 of the SCC Rules.

159. On 10 March 2017, the Parties submitted their updated respective lists of issues to be determined by the Arbitral Tribunal.

160. The Claimant submitted the following updated List of Issues:

**I. Introduction**

1. The list identifies in broad terms the main issues pleaded in this arbitration.

2. The list neither limits or extends the Arbitral Tribunal's jurisdiction, nor constitutes the basis for its jurisdiction, nor does it prescribe the correct legal test for deciding any issue. By submitting this list, FNP has not in any way agreed to limit its claims, defenses, legal grounds or factual circumstances as otherwise expressed in its submissions filed in this arbitration. This list is also without prejudice to the freedom of FNP to make such submissions on law and fact as it considers appropriate in the proceedings.

3. FNP reserves the right to add, modify or withdraw issues from this list in the course of the proceedings.

Certified Document Number: 82350778 - Page 44 of 104

## II. Definitions

4. The following definitions are used in this List of Issues:

   II. The "JV" means the joint venture formed by FNP and TNG in 1992 in the name of "Tyumtex, a Russian-American Joint Venture".

   III. The "Treaty" means the agreement between FNP and TNG named "The Statutory Treaty on the establishment of Tyumtex, Russian-American Joint Venture" dated 23 March 1992.

   IV. The "Oil Field Rights" means the right to develop any of the Kalchinskoe oil field, the North-Kalchinskoe, the South-Kalchinskoe, the Tanjagskaja and/or the South-Tanjagskaja fields and the rights to use the land, water and other natural resources.

## III. Preliminary Objections Relating to Jurisdiction and Admissibility

5. Arbitrability:

   V. Does Swedish or Russian law apply to the issue of whether the claims brought by FNP in this arbitration are arbitrable?

   VI. Are any/all of the claims brought by FNP in this arbitration arbitrable?

6. Applicable law:

   a) Does Swedish or Russian law govern the merits of FNP's claims in this arbitration?

7. Statute of limitations:

   a) Are FNP's claims time-barred under either Swedish law or Russian law (as applicable)?

Certified Document Number: 82350778 - Page 45 of 104

## IV. FNP's Claims

8. Which oil fields does the Treaty cover?

   b) The Parties disagree over which oil fields are covered by the Treaty. FNP's position is that the Treaty covers the Kalchinskoe, North-Kalchinskoe, South-Kalchinskoe, Tanjagskaja and South-Tanjagskaja oil fields. [57] TNG's position is that the Treaty only covers the Kalchinskoe oil field and not the other four oil fields proposed by FNP.[58]

9. Did TNG breach the Treaty by not providing the Oil Field Rights to the JV?

   a) If yes, was TNG's breach intentional or grossly negligent?

   b) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

10. Did TNG breach the Treaty by misleading FNP into an agreement at the Paris meeting by making misrepresentations with regard to (a) the oil reserves and/or the estimated oil production from the Kalchinskoe oil field, (b) TNG's unsuccessful efforts to provide the Oil Field Rights to the JV, (c) certain regulatory changes in Russia making it impossible to provide the JV with the Oil Field Rights and/or (d) it being economically inadvisable and inexpedient to further pursue the development of the Kalchinskoe oil field?

    a) If yes, was TNG's breach intentional or grossly negligent?

    b) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

---

[57] Statement of Claim at ¶45; Reply at Section 9.1.2.
[58] Statement of Defense at ¶45; Rejoinder at ¶¶34-37.

Certified Document Number: 82350778 - Page 46 of 104

11. If TNG at the time of the Paris meeting genuinely believed in the information it conveyed to FNP, did it breach the Treaty by not correcting the information conveyed to FNP once it learned of the true situation?

    a) If yes, was TNG's breach intentional or grossly negligent?

    b) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

12. Did TNG breach the Treaty by entering into a joint venture agreement with Great Plains Petroleum in 1996 to create the Tura Petroleum Company to explore and develop the Kalchinskoe oil field, including by agreeing to transfer the Oil Field Rights to the Tura Petroleum Company, or by transferring the license to operate the Kalchinskoe oil field to OAO Kalchinskoe on 22 March 2012?

    a) If yes, was TNG's breach intentional or grossly negligent?

    b) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

13. Did TNG breach the Treaty through the liquidation of the JV in 1998–1999?

    a) If yes, was TNG's breach intentional or grossly negligent?

    b) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

## V. FNP's Secondary Claim

14. Did TNG breach any obligation to repay FNP's investments in the JV as agreed upon at the Paris Meeting and, if so, did this amount to a breach of the Treaty?

Certified Document Number: 82350778 - Page 47 of 104

47

Certified Document Number: 82350778 - Page 48 of 104

c) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

15. In the alternative, did TNG breach any obligation to repay FNP's loan as agreed upon at the Paris meeting and, if so, did this amount to a breach of the Treaty?

a) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

16. Did TNG breach its obligations under the Treaty by not returning any funds still outstanding after FNP's termination of the Treaty on 21 May 2012?

b) If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

## VI. Termination of the Treaty

17. Was FNP entitled to terminate the Treaty on 21 May 2012 based on any substantial breach of the Treaty by TNG or otherwise?

(a) FNP's position is that each of the breaches listed in paragraphs 9–15 (the License Breach, Paris Breach, Failure-to-Correct Breach, Exclusivity Breach, Liquidation Breach as well as TNG's failure to repay FNP's investments/loan as agreed at the Paris meeting) separately and individually amount to substantial breaches of the Treaty by TNG, thus entitling FNP to terminate the Treaty with immediate effect based on any of the individual breaches.

## VII. Costs

18. FNP requests the Arbitral Tribunal to decide the allocation of the costs relating to the arbitration in accordance with Articles 43 and 44 of the SCC Rules of Arbitration.

161. The Respondent submitted the following updated List of issues:

48

Certified Document Number: 82350778 - Page 49 of 104

# I. Introduction

1. The list identifies in broad terms the main issues pleaded in this arbitration.

2. The list neither limits nor extends the Arbitral Tribunal's jurisdiction, nor constitutes the basis for its jurisdiction, nor does it prescribe the correct legal test for deciding any issue. By submitting this list, TNG has not in any way agreed to limit its claims, defenses, legal grounds or factual circumstances as otherwise expressed in its submissions filed in this arbitration. This list is also without prejudice to the freedom of TNG to make such submissions on law and fact as it considers appropriate in the remainder of the proceedings.

3. TNG reserves the right to add, modify or withdraw issues from this list in the course of the proceedings.

# II. Definitions

4. The following definitions are used in this List of Issues:

   a. The "JV" means the joint venture formed by FNP and TNG in 1992 in the name of "Tyumtex, a Russian-American Joint Venture."

   b. The "Treaty" means the agreement between FNP and TNG named "The Statutory Treaty on the establishment of Tyumtex, Russian-American Joint Venture" dated 23 March 1992.

# III. Preliminary Objections Relating to Jurisdiction and Admissibility

5. Arbitrability:

   a. Does Swedish or Russian law apply to the issue of whether the claims brought by FNP in this arbitration are arbitrable?

   b. Are any/all of the claims brought by FNP in this arbitration arbitrable?

49

6. Applicable law

   a. Does Swedish or Russian law govern the merits of FNP's claims in this arbitration?

7. Statute of limitations:

   a. Are FNP's claims time-barred under either Swedish law or Russian law (as applicable)?

## IV. FNP's Claims

8. Which oil fields does the Treaty cover?

   a. The Parties disagree over which oil fields are covered by the Treaty. FNP's position is that the Treaty covers the Kalchinskoe, North-Kalchinskoe, South-Kalchinskoe, Tanjagskaja and South-Tanjagskaja oil fields.[59] TNG's position is that the Treaty only covers the Kalchinskoe oil field and not the other four oil fields proposed by FNP.[60]

   ### a. FNP's Primary Claim

9. Did TNG breach its obligations under Articles 3.3 and 4.6 of the Treaty with regard to the JV obtaining a license to explore the Kalchinskoe oil field?

   a. If yes, was TNG's breach substantial?

   b. If yes, was TNG's breach intentional or grossly negligent?

10. Did TNG breach the Treaty by making misrepresentations to FNP at the Paris meeting with regard to (a) the transferability of the license to explore the Kalchinskoe oil field from TNG to the JV; and/or (b) the prospect of commercial production of oil from the Kalchinskoe oil field?

---

[59] Statement of Claim at ¶45; Reply at Section 9.1.2.
[60] Statement of Defense at ¶45; Rejoinder at ¶¶34-37.

50

Certified Document Number: 82350778 - Page 50 of 104

Certified Document Number: 82350778 - Page 51 of 104

a. If yes, was TNG's breach substantial?

b. If yes, was TNG's breach intentional or grossly negligent?

11. Was TNG under an obligation to provide FNP with information concerning exploration and development of the Kalchinskoe oil field after the Paris meeting, and, if so, did TNG breach the Treaty by failing to provide any such information?

a. If yes, was TNG's breach substantial?

b. If yes, was TNG's breach intentional or grossly negligent?

12. Did TNG breach the Treaty by entering into a joint venture agreement with Great Plains Petroleum in 1996 to create the Tura Petroleum Company to explore and develop the Kalchinskoye oil field?

a. If yes, was TNG's breach substantial?

b. If yes, was TNG's breach intentional or grossly negligent?

13. Did TNG breach the Treaty through the liquidation of the JV in 1998-1999?

a. If yes, was TNG's breach substantial?

b. If yes, was TNG's breach intentional or grossly negligent?

14. If FNP prevails on the merits of the claims listed in paragraphs 9 to 13, what damages should FNP be awarded (including interest on monetary damages, if any), taking into account Article 7 of the Treaty, which limits damages to "actual damage caused by such failure or inappropriate performance provided. Indirect losses, and the lost benefit shall not be compensated." (R-3).

### b. FNP's Secondary Claim

15. Did the Parties agree that TNG would have an obligation to repay FNP's investments in the JV at the Paris meeting?

    a. If yes, did TNG breach this obligation?

    b. If yes, did this amount to a breach of the Treaty?

    c. If yes, was the breach substantial?

    d. If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

16. In the alternative, did the Parties agree at the Paris meeting that TNG would have an obligation to repay any loan made by FNP to the JV?

    a. If yes, did TNG breach this obligation?

    b. If yes, did this amount to a breach of the Treaty?

    c. If yes, was the breach substantial?

    d. If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

17. In the alternative, was FNP entitled to terminate the Treaty on 21 May 2012 based on any substantial breach of the Treaty or otherwise, and, if so, did TNG breach any obligation to return any funds found to be outstanding after this termination?

    a. If yes, what damages should FNP be awarded as a result of such breach (including interest, if any, on any monetary award of damages)?

### V. Costs

18. The Respondent requests the Arbitral Tribunal to decide the allocation of the costs relating to the arbitration in accordance with Articles 43 and 44 of the SCC Rules of Arbitration.

Certified Document Number: 82350778 - Page 52 of 104

Certified Document Number: 82350778 - Page 53 of 104

# VIII. SUMMARY OF THE PARTIES' POSITIONS AND CLAIMS – ANALYSIS OF THE ISSUES TO BE DETERMINED AND FINDINGS

162. The starting point, so far as the Arbitral Tribunal's analysis of the claims advanced in this arbitration is concerned, is a consideration of the preliminary objections raised by the Respondent by reference to the applicable laws (or laws), which the Arbitral Tribunal determines is, or are, relevant to such an analysis. If and to the extent that the preliminary objections fail, then the Arbitral Tribunal will turn its attention to the merits of the substantive claims and defenses, which have been advanced in this case.

## 1. THE RESPONDENT'S PRELIMINARY OBJECTIONS AND RELEVANT LAWS TO BE APPLIED

163. The Parties disagree as to whether Russian or Swedish law should apply to determine whether the claims brought by the Claimant in this arbitration are arbitrable and, if so, whether the Claimant's claims are time-barred.

### A. The relevant laws to be applied in this arbitration

#### a. The law of the seat of this arbitration

164. The Respondent states that since the Parties agree that the seat of arbitration is in Sweden, the procedural law applicable to this arbitration proceeding shall be Swedish law. [61] The Respondent concludes that Swedish law determines the law of the arbitration agreement, the conflict-of-laws rules applicable to the choice of law agreement (which is separable from the main agreement), and to procedural matters.

---

[61] Respondent's Post-Hearing Brief, 105; Claimant

165. The Claimant asserts that the Swedish Arbitration Act is applicable to these proceedings by virtue of Section 46 of the 1999 Swedish Arbitration Act (the **"1999 Act"**).

166. The Arbitral Tribunal observes that Section 46 of the 1999 Act clearly provides that it applies to arbitral proceedings, which take place in Sweden.[62]

167. According, there can be no doubt that this arbitration is subject to the 1999 Act. Nonetheless, the Arbitral Tribunal still has to determine the law applicable to the arbitration agreement and whether conflict-of-laws rules should be applied to the choice of law agreement, as alleged by the Respondent. If so, the Arbitral Tribunal must consider which conflict-of-laws rules should be taken into consideration. These latter issues will be discussed hereinafter.

## b. The law applicable to the arbitration agreement

168. In this arbitration, the Respondent alleges that the Arbitral Tribunal lacks jurisdiction to hear the Claimant's Primary Claim and Secondary Claim.[63]

169. Therefore, the Arbitral Tribunal has to determine the law applicable to the arbitration agreement in order to ascertain whether it has jurisdiction over the Claimant's claims.

170. This is of particular relevance, since Section 3 of the 1999 Act provides that:

> *"Where the validity of an arbitration agreement which constitutes part of another agreement must be determined in conjunction with a determination of the jurisdiction of the arbitrators, the arbitration agreement shall be deemed to constitute a separate agreement."*

---

[62] Section 46 provides that: "*This Act shall apply to arbitral proceedings which take place in Sweden notwithstanding that the dispute has an international connection.*"

[63] Answer to the Request for Arbitration, #47; Statement of Rejoinder , #359.2

Certified Document Number: 82350778 - Page 54 of 104

171. Although the Agreement does not specify the law applicable to the arbitration agreement in this case, it is common ground between the Parties that Swedish law governs.[64]

172. The Arbitral Tribunal will proceed on the basis, therefore, that the arbitration agreement shall be governed by Swedish law, in accordance with Section 48 of the 1999 Act.[65]

173. There is a measure of agreement between the Parties' experts in that they agree that Swedish law applies to the question of the arbitrability of the dispute – see the Claimant's legal expert's, Professor Erik Nerep's Further Expert Report[66] and the Respondent's legal expert's, Professor Eric M. Runesson's, Further Legal Opinion.[67] But whereas the Claimant says that the matter rests there, the Respondent's position is more nuanced, as is explained below.

174. While the Respondent acknowledges that the law applicable to the arbitration agreement, i.e. Swedish law, determines *prima facie* the issue of the arbitrability of the Claimant's claims,[68] it qualifies that acknowledgement with the contention that the Arbitral Tribunal should have regard to mandatory provisions of foreign law, in this case Russian arbitration law.[69] That is a proposition with which the Claimant disagrees.[70]

### c. Are the Claimant's claims arbitrable upon an application of Swedish law (and/or any mandatory provisions of Russian law)?

175. The Respondent's expert, Professor Runesson, concurs that the arbitrability issue is related to the validity of the arbitration agreement.[71] However, he is of the opinion that this issue has to

---

[64] Respondent's Post-Hearing Brief, ##106.1 and 107; Transcript, page 92

[65] Section 48 provides that: "*Where an arbitration agreement has an international connection, the agreement shall be governed by the law agreed upon the parties. Where the parties have not reached such an agreement, the arbitration agreement shall be governed by the law of the country in which, by virtue of the agreement, the proceedings have taken place or shall take place.*"

[66] At, #8

[67] Further Legal Opinion, page 1

[68] Respondent's Post-Hearing Brief, #131

[69] Respondent's Post-Hearing Brief, #107

[70] Claimant's Post-Hearing Brief, #277

[71] Further Legal Opinion, page 1

Certified Document Number: 82350778 - Page 55 of 104

be analyzed from two perspectives. First, under Swedish procedural law (i.e. the law of the place of arbitration) and, second, under the law applicable to the arbitration agreement.

176. Under the first perspective, Professor Runesson submits that "*the procedural law dimension of the issue is whether the dispute is amenable to settlement as a matter of Swedish public policy*". He states that as a matter of procedural law, the Claimant's claims are arbitrable with regard to Swedish public policy.[72]

177. Under the second perspective, i.e., determining the validity of the arbitration agreement under the law applicable to the arbitration agreement, Professor Runesson considers that "*it may be correct to apply also the public policy of another state with materially closer connection to the dispute at hand under consideration of Swedish private international law to the question of validity and to the related question of arbitrability*".[73] He refers to the provisions of the 1980 Rome Convention on the Law Applicable to Contractual Obligations, which became part of Swedish private international law with effect from 1 July 1998 and to the Rome I Regulation (Regulation (EC) No. 593/2008, which succeeded to the Rome Convention and which has a bearing on contracts concluded after 17 December 2009.[74]

178. Professor Runesson's argument is that, though the arbitration agreement is valid under Swedish contract law, the analysis should be expanded to encompass the issue whether "*the parties, as a matter of Swedish private international law, can settle their dispute notwithstanding certain mandatory rules in another country to which the dispute is closely materially connected*".[75] In this regard, the Respondent asserts that there are no substantive links between this dispute and Sweden and that the choice of Swedish law in the Agreement is insufficient to displace mandatory provisions of Russian law on arbitrability.[76]

---

[72] Further Legal Opinion, pages 1-2
[73] Further Legal Opinion, page 1
[74] Further Legal Opinion, page 2
[75] Further Legal Opinion, page 2
[76] Respondent's Post-Hearing Brief, #135

Certified Document Number: 82350778 - Page 56 of 104

Certified Document Number: 82350778 - Page 57 of 104

179. Professor Runesson's view is that an arbitral tribunal sitting in Sweden has the power of discretion to find that a dispute is not arbitrable under Swedish law due to third country overriding mandatory rules within the limits of Article 7(1) of the Rome Convention or Article 9(3) of the Rome I Regulation, both of which are asserted to be applicable in relation to Russian law pursuant to Article 2 of the respective instrument.

180. Although Professor Runesson acknowledges that neither the Rome Convention nor the Rome I Regulation was part of Swedish private international law when the Agreement was made between the Parties, he opines that arbitral tribunals are bound by these two instruments. By way of support for this proposition, Professor Runesson refers to two Swedish court decisions, which are attached to his Further Legal Opinion.[77]

181. Furthermore, both Professor Runesson and the Respondent consider that the Arbitral Tribunal should take into account whether any eventual award that it rendered could be enforced in Russia, assuming that the Arbitral Tribunal accepted jurisdiction, due to the provisions of Article 47 of the SCC Rules.[78]

182. For the Claimant, Professor Nerep asserts that *ordre public* under foreign laws (or any form of international *ordre public*) should not affect the arbitrability of a dispute, unless equivalent principles are contained in Swedish *ordre public*. He concludes that in their absence, the issue of arbitrability should be determined exclusively under Swedish law.

183. In support for his position, Professor Nerep refers to a decision of the Svea Court of Appeal of 2005,[79] which held that Swedish law applied to the arbitration agreement even if Russian law applied to the merits of the case, since the arbitration proceedings took place in Sweden. Furthermore, the Svea Court of Appeals found that the *"preparatory works to the current Swedish Arbitration Act state that when [an] economic-political provision applies in a foreign*

---

[77] Exhibits 11 and 12

[78] Further Legal Opinion, page 3; Respondent's Post-Hearing Brief, #139

[79] Exhibit CL-66

*country, there is often no reason to allow the mandatory rules to affect the ability of the parties to reach a settlement in Sweden, and therefore the arbitrability under Swedish law"*.[80]

184. The Arbitral Tribunal observes that this decision of the Svea Court of Appeals, upon which both Parties' legal experts rely in their respective expert reports,[81] is particularly relevant, since in that case the law applicable to the merits was Russian law and Article 50 of the Russian Subterranean Natural Resources Act 1992 provided that the dispute could only be resolved by a Russian court.[82] Here, the Respondent alleges that the Claimant's claims are not arbitrable under Russian law, since they fall within the scope of Article 225.1 of the Arbitrazh Procedure Code. The Respondent states that pursuant to Article 33 of the Arbitrazh Procedure Code, such claims are subject to the exclusive jurisdiction of the state arbitrazh courts.

185. As to the issue related to the enforceability of the Arbitral Tribunal's putative award, Professor Nerep affirms that the Arbitral Tribunal is under no obligation to take that matter into account. He relies on the opinion expressed by Professor Kaj Hobér in his book "International Commercial Arbitration in Sweden", where he states that there is no obligation *per se* that arbitrators should safeguard the interest of the State whose mandatory rules are relied upon.[83]

186. Based on the opinions expressed by the Swedish legal experts and the submissions made by the Parties, the Arbitral Tribunal sets out below its conclusions regarding the arbitrability issue.

187. The Arbitral Tribunal concurs with both Parties that the arbitrability issue is related to the validity of the arbitration agreement. Therefore, the question as to whether the Claimant's claims are arbitrable is to be analyzed under the perspective of Swedish law, which is applicable to the arbitration agreement, pursuant to Article 47 of the 1999 Act.

---

[80] It should be mentioned that although the District Court, which annulled the award applied the 1929 Swedish Arbitration Act, the Arbitral Tribunal considers that the reasoning followed in the above cited case would be the same under the 1999 Act.
[81] Professor Nerep's Further Expert Report, #13; Professor Runesson's Further Legal Opinion, pages 2-4
[82] Professor Nerep's Further Expert Report, #13
[83] Exhibit CL-65

Certified Document Number: 82350778 - Page 58 of 104

Certified Document Number: 82350778 - Page 59 of 104

188. The Arbitral Tribunal observes that pursuant to Section 1 of the 1999 Act, an arbitral tribunal has jurisdiction to resolve disputes related to matters on which the parties may reach a settlement.[84]

189. Since, the disputes submitted to the Arbitral Tribunal are related to certain breaches of the Agreement, they are, in essence, contractual. In addition, the Parties, which are two commercial companies, as well as their respective Russian legal experts (i.e., Professor Shitkina and Professor Asoskov), agree that the disputes have a civil nature.[85] Therefore, the Arbitral Tribunal concludes that such disputes are amenable to settlement, and, therefore, arbitrable as a matter of Swedish procedural law, as confirmed by Professor Nerep and Professor Runesson in their respective expert reports.[86]

190. The Arbitral Tribunal has considered with care the proposition that it may exercise discretion to determine whether a dispute is arbitrable under Swedish law having regard to what are said to be overriding mandatory provisions of Russian law within the limits of Article 7(1) of the Rome Convention or Article 9(3) of the Rome I Regulation and in circumstances in which there are said to be no substantive links between the dispute and Sweden. The Arbitral Tribunal observes, first, that neither the Rome Convention nor the Rome I Regulation was incorporated into Swedish private international law when the Agreement was made. Indeed, the Rome Convention became part of was Swedish law on 1 July 1998, while the Agreement was signed in 1992[87] In addition, these instruments do not contain any retroactive provision.

191. Second, the Arbitral Tribunal observes that in the two Swedish cases to which Professor Runesson refers in his Further Legal Opinion, the Svea Court of Appeal, having considered the content of these two instruments, affirmed that they were not applicable.[88]

192. Third, and in any event, in the Swedish leading case on which both Swedish legal experts rely (i.e., *OAO Arkhangelskoe Geologodobychnoe Predpriyatie (AGD) v. Archangel Diamond*

---

[84] Section 1, paragraph 1 provides, inter alia, that:" Disputes concerning matters in respect of which the parties may reach a settlement, may, by agreement, be referred to one or several arbitrators for resolution."
[85] Respondent's Post-Hearing Brief, ## 142 and 156; Transcript Day 4, 126:12 ; 171:21-172:8
[86] Professor Nerep's Further Expert Report, #9; Professor Runesson's Further Legal Opinion, page 2
[87] Exhibit 12 to Professor Runesson's Further Legal Opinion
[88] Exhibits 11 and 12 to Professor Runesson's Further Legal Opinion

*Corporation (ADC))*,[89] the court decided not to take into account the Rome Convention even though the majority of the arbitral tribunal had concluded that it was possible to do so.[90] The Arbitral Tribunal understands that the Swedish court did not take it into account due to the principle of *rationae temporis*.

193. In this regard, the Arbitral Tribunal considers that, in addition to the fact that *rationae temporis* precludes the application of the Rome Convention or the Rome I Regulation to the disputes submitted to arbitration in this case, neither of these instruments applies to arbitration agreements. Indeed, Article 1.2 (d) of the Rome Convention provides that the Convention shall not apply to arbitration agreements.[91] Similarly, Article 1.2 (e) of the Rome I Regulation provides that arbitration agreements shall be excluded from the scope of this Regulation.[92] Furthermore, Section 48 of the 1999 Swedish Act provides that the default rule is that the law applicable to the arbitration agreement is deemed to be the law of the country where the arbitration takes place, i.e. in this case, the laws of Sweden. No reference is made therein to the conflict of law rules of Sweden. Therefore, the Arbitral Tribunal concludes that it is not bound by the conflict of law rules contemplated in these two instruments.

194. In the course of the expert evidence, the question has been raised as to the extent to which it might be appropriate to apply the public policy of another state, which may have a closer connection to the dispute, in circumstances in which, as in this case, there are no substantive links between the dispute and the seat of the arbitration. The Arbitral Tribunal observes that the Parties have not alleged, or submitted any evidence in support of such a proposition, that the intent of the Parties, at the time of entering into the Agreement, was fraudulently to avoid the application of Russian law. The choice of Stockholm as the seat of the arbitration and the choice of Swedish substantive law and procedural rules made by the Parties in the Agreement lead the Arbitral Tribunal to conclude that the intent of the Parties, one of U.S. and one of Russian nationality, was to choose a neutral law and a neutral forum, no more no less. Should the Parties have considered, at the time of making the Agreement, that there were mandatory rules of Russian law, which would compel the Parties to submit their disputes to the

---

[89] Exhibit CL-66 and Exhibit 5 to Professor Runesson's Further Legal Opinion
[90] Exhibit 5 to Professor Runesson's Further Legal Opinion, ##165-166
[91] Exhibit 2 to Professor Runesson's Further Legal Opinion
[92] Exhibit 3 Professor Runesson's Further Legal Opinion

Certified Document Number: 82350778 - Page 61 of 104

jurisdiction of the Russian courts, as alleged during this arbitration proceeding, then it would be difficult to conceive that they would do anything other than reflect that obligation by stipulating in the Agreement that the Russian courts had jurisdiction to resolve any disputes, which might arise out of the Agreement. The fact is that they did not do so and the Arbitral Tribunal concludes that there is no reason why they should not be entitled to the benefit of their bargain.

195. The Arbitral Tribunal accepts Professor Nerep's analysis regarding the circumstances of the applicability of foreign public policy under Swedish law. Thus, to the extent that the Parties have not proved that there are Swedish *ordre public* principles, which are equivalent to the Russian mandatory rules invoked by the Respondent, then, in the case at hand, the Arbitral Tribunal must determine whether the Claimant's claims are arbitrable exclusively by reference to Swedish law. Since the Parties concur that these claims are arbitrable under Swedish law, and in the leading Swedish case (i.e., *OAO Arkhangelskoe Geologodobychnoe Predpriyatie (AGD) v. Archangel Diamond Corporation (ADC)*) the Svea Court of Appeal decided, in similar circumstances, that there was no reason to allow the mandatory rules of another country to affect either the ability of the parties to reach a settlement in Sweden or the arbitrability of the disputes under Swedish law, [93] the Arbitral Tribunal rules that the Claimant's claims submitted in this arbitration are arbitrable.

196. As to any asserted obligation of the Arbitral Tribunal to ensure that its Final Award would be enforceable in Russia, the Arbitral Tribunal observes that neither Party has submitted that this Final Award could only be enforced in Russia by the Claimant, were it to prevail in this arbitration. Therefore, to the extent that: (i) this Final Award might be susceptible to enforcement in jurisdictions other than Russia, e.g., in other jurisdictions where the Respondent may have assets; and (ii) the Parties, after having been invited to do so by the Arbitral Tribunal, have been unable to find any Swedish case in which the courts had to interpret Article 47 of the SCC Rules, the Arbitral Tribunal considers that it has taken the appropriate steps to ensure that it complied with its obligation, so far as the provisions of the SCC Rules are concerned.

---

[93] Exhibit CL-66 and Exhibit 5 to Professor Runesson's Further Legal Opinion

Certified Document Number: 82350778 - Page 62 of 104

### d. The Limitation of Actions and the Applicable Law

197. The Parties and their respective Swedish legal experts agree that the time-bar issue is a matter of substantive law under Swedish law.[94]

198. However, the Parties have different views as to the law applicable to the merits. The Claimant and Professor Nerep assert that Swedish law should apply and, therefore, its claims are not time-barred.[95] For its part, the Respondent argues that Russian law applies,[96] and that, the Claimant's claims are time-barred under both Russian and Swedish law.[97]

199. The Respondent's principal position, with respect to the law applicable to the Claimant's claims, is that: (i) the provisions of the first sentence of Clause 9.3 of the Agreement have a limited scope; (ii) the Arbitral Tribunal has the power to choose the law applicable to the matters in dispute; and (iii) Russian law should apply because the subject matter of the dispute is most closely connected with Russia.[98]

200. The Claimant contends that its claims are governed by Swedish law. It relies on Professor Nerep's opinion, as expressed in his Further Expert Report, in which he states that Article 9 of the Agreement provides that "Swedish substantive law (including procedural law) applies to issues relating to the agreement".[99]

201. Taking into account that the Parties disagree as to which law applies to the merits of this case, the Arbitral Tribunal will need, first, to make a determination in this regard before it proceeds with the analysis of the time-bar issue.

---

[94] Claimant's Post-Hearing Brief, #288 ; Respondent's Post-Hearing Brief, #157 ; Professor Nerep's Further Expert Report, #20 ; Professor Runesson's Further Legal Opinion, page 5
[95] Claimant's Post-Hearing Brief, #288; Professor Nerep's Further Expert Report, #20
[96] Respondent's Post-Hearing Brief, ##109-130
[97] Respondent's Post-Hearing, ##158 and 160
[98] Respondent's Post-Hearing Brief, #130
[99] Professor Nerep's Further Expert Report, #20

### aa. The law applicable to the merits

202. The Claimant contends that the Arbitral Tribunal is under an obligation to apply the substantive law agreed by the Parties in Clause 9.3 of the Agreement,[100] i.e. Swedish law, based on the principle of party autonomy, as asserted by Professor Michael Bogdan.[101]

203. The Claimant maintains that it is necessary to distinguish between the applicable substantive law and the relevant choice-of-law used to identify the applicable substantive law, and that the source of the relevant conflict-of-law rules in the case at hand is Article 22(1) of the SCC Rules.[102] According to the Claimant, which also relies on Professor Kaj Hobér's opinion on this issue,[103] this provision reflects the modern view in international arbitration, that it is to say that arbitral tribunals may rely on a choice-of-law agreement directly, without having to go through a particular conflict-of-law system. The Claimant further contends that if arbitral tribunals consider that it is necessary to apply a conflict-of-law system in order to determine the validity of the choice-of-law agreement, then it is generally considered most appropriate to apply the conflict-of-law rules of the seat of the arbitration.[104]

204. The Respondent's position is that the doctrine of separability applies to choice-of-law agreements and that their validity and enforceability is governed by the *lex fori*'s conflict of law rules, i.e., the Swedish rules in the present case. The Respondent adds that the Arbitral Tribunal has the power to review such validity and enforceability under its Kompetenz-Kompetenz jurisdiction, and that in doing so the Arbitral Tribunal should apply the conflict-of-law rules of the forum, i.e., Swedish law, which provides that the corporate affairs of a company are governed by the law of the country where the company is established.[105]

---

[100] Clause 9.3 of the Agreement provides that: "The arbitrators shall use the Swedish substantive law and procedural rules for the analysis and interpretation of the present treaty. The trial of cases in the arbitration should be in English and the arbitrators make a decision also in English.

[101] Claimant's Statement of Reply, ##327-332; Exhibit CL-39, page 76

[102] Article 22(1) provides that: "[t]he Arbitral Tribunal shall decide the merits of the dispute on the basis of the law(s) or rules of law agreed upon by the parties. In the absence of such agreement, the Arbitral Tribunal shall apply the law or rules of law which it considers to be the most appropriate."

[103] CL-35, #2.99

[104] Claimant's Statement of Reply, #334

[105] Respondent Post-Hearing Brief, ##108 and 115

205. The Respondent adds that, although the Parties agree that the first sentence of Clause 9.3 of the Agreement is a choice-of-law agreement, which applies to the *lex contractus*, they disagree (i) regarding the scope of this provision, (ii) as to whether the Agreement also provides for the application of Russian law, and (iii) whether the Claimant's claims fall under the *lex contractus* or the *lex societatis* under the Agreement.

206. The Respondent further contends that the *lex contractus*, i.e., Swedish law, only applies to questions of interpretation of the Agreement and the arbitration proceedings, while the *lex societatis* applies to corporate matters involving the creation, functioning, internal affairs and liquidation of a corporate entity, such as the Joint Venture.[106]

207. According to the Respondent, the Agreement as a constitutional document of the Joint Venture provides, either expressly or implicitly, that the *lex societatis* is Russian law.[107]

208. The Respondent asserts that the Claimant's Russian legal expert accepted in her expert report that the Agreement addresses areas that fall to be governed by Russian law.[108]

209. But the Respondent goes further; it suggests that the entire Agreement is governed by Russian law, since: (i) it is a constitutional document of the Joint Venture; (ii) Clause 3.2 of the Agreement is directly copied from Regulation 37 of the Joint Stock Companies Regulation; and (iii) the capital contributions to be made to the Joint Venture are a matter of Russian law.

210. The Respondent concludes that the choice-of-law agreement contained in Clause 9.3 of the Agreement is invalid as a matter of Swedish conflict-of-law rules. It argues that, in consequence, Russian law should apply to the entire Agreement, and, in the alternative, to the Claimant's claims, as they concern matters of corporate law.[109]

211. The Arbitral Tribunal observes that in the Terms of Reference,[110] the Respondent stated that: "*in addition to Swedish law, Russian law applies to the present dispute in relation to, among*

---

[106] Respondent Post-Hearing Brief, ##111-113
[107] Respondent Post-Hearing Brief, #114
[108] CES-5, #139
[109] Respondent Post-Hearing Brief, #119
[110] cf. #9.2

64

Certified Document Number: 82350778 - Page 65 of 104

*other things, issues of (i) arbitrability of the Claimant's claims (as explained in paragraph 4.2.1(i) above); and (ii) grant and transfer of oil exploration and development licenses. (##55 of the Respondent's Answer)".*

212. The Arbitral Tribunal further observes that Article 22(2) of the SCC Rules provide that:

> *"Any designation made by the parties of the law of a given state shall be deemed to refer to the substantive law of that state and not to its conflict of law rules."*

213. Noting that Clause 9.3 of the Agreement provides for the application of Swedish substantive law without reference to the Swedish conflict-of-law rules, the Arbitral Tribunal is of the opinion that Swedish law is to be applied to the merits of this case in accordance with Article 22 of the SCC Rules.

214. In addition, the Arbitral Tribunal recalls that the Claimant's Primary and Secondary Claims are contractual claims based either on the Agreement or on agreements reached between the Parties during the Paris Meeting. They are not corporate claims, which might require the application and/or the interpretation of Russian corporate law, as *lex societatis*.

215. The Arbitral Tribunal is satisfied that the choice of Swedish substantive law made by the Parties in Clause 9.3 of the Agreement is a valid choice, made in accordance with the principle of party autonomy, and that it is not necessary to have recourse to the conflict-of-law rules of Swedish law.

216. Taking into account that the Arbitral Tribunal has found that Swedish law applies to the merits of this case and that according to Swedish law the time-bar issue is a matter of substance, the Arbitral Tribunal considers that the analysis of the time bar-issue under Russian law is not relevant for the resolution of the dispute. Hence, the Arbitral Tribunal will consider the time-bar issue solely from the perspective of Swedish law.

### bb. The Limitation of Actions under Swedish law

217. The Respondent submits that the Claimant's claims are time-barred under Swedish law based on (i) the 3-year limitation period under the Swedish Partnership Act with respect to the Primary Claims, and (ii) further or in the alternative, under the 10-year limitation period under the Limitation Act, as far as the Primary and Secondary Claims are concerned.

218. The Claimant disputes the Respondent's submission on both counts.

### (i) The Swedish Partnership Act

219. The Respondent relies on the opinion expressed by Professor Runesson to the effect that one of the main concerns regarding the limitation of actions is the availability and preservation of evidence in different types of disputes.

220. According to Professor Runesson, the intent of the legislator was to apply the 10-year limitation for contract claims essentially to straight-forward debt claims; such claims required little by way of substantiating documentary evidence necessary to support them and little prejudice would be caused by the application of an extended limitation period.

221. When cases become more complex and require more evidence, the various exceptions under Swedish law set shorter limitation periods. This is the reason why claims arising in the context of partnership disputes, which are more complex and require the production of considerable and divers kinds of evidence to support them, are subject to a shorter limitation period, i.e., three years. That, according to Professor Runesson is the case in the present dispute.

222. The Respondent emphasizes the fact that the principal difference between the Parties, so far as the application of the Partnership Act is concerned, is that the Respondent considers that its provisions apply to claims related to rights and obligations that the Parties, as shareholders of the Joint Venture, owe directly to each other rather than to the Joint Venture. The Claimant, however, rejects the suggestion that the Partnership Act is of any application in this case.

Certified Document Number: 82350778 - Page 66 of 104

223. The starting point of Professor Runesson's analysis is that in a situation in which the parties carry out their business without incorporating a company the claims that they may have against each other are subject to the 3-year limitation period under the Partnership Act. If, thereafter, these same parties decide to incorporate a company to continue to carry on the same business, their respective rights and obligations towards each other under the partnership agreement continue.[111] Professor Runesson concludes that the 3-year limitation period should continue to apply in the event of any dispute arising between them, and he looks to prevailing academic opinion in Sweden for support.[112]

224. The Respondent contends that, in the present case, the Agreement contains both elements of the company by-laws and a shareholders' agreement. As to the former point, the Respondent notes that the Agreement forms an appendix to the Charter of the Joint Venture pursuant to Clause I.1 of which, the Joint Venture was established. The Parties' obligations towards each other as partners under the "shareholders agreement" element of the Agreement should be subject to the 3-year limitation period contained in the Partnership Act.[113] The Respondent adds that (i) a copy of the Agreement was provided to the authorities for state registration in accordance with Clause 12.3 of the Agreement, (ii) the provisions of the Agreement take precedence over those of the Charter, pursuant to Clause 12.1 of the Agreement, (iii) the rights of the founders of the Joint Venture to participate in the latter's affairs derive from both the Charter and the Agreement by virtue of Clause 4.1 of the Agreement. The Respondent also relies on Professor Asoskov's opinion that the Agreement is a constitutional document of the Joint Venture under Russian law.[114]

225. In sum, the Respondent considers that since the breaches alleged by the Claimant are breaches of the constitutional documents of the Joint Venture, the Arbitral Tribunal should apply the 3-year limitation period contained in the Partnership Act and dismiss the Claimant's claims.[115]

226. The Respondent rejects Professor Nerep's opinion, that once the legal entity is established, economic activity takes place within that legal entity and the Partnership Act ceases to apply

[111] Transcript Day 3, at 35:15-36:21; 77:4-78:11
[112] Transcript Day 4, at 63:21-64:24
[113] Respondent's Post-Hearing Brief, #165
[114] Respondent's Post-Hearing Brief, #168
[115] Respondent's Post-Hearing Brief, ##168-169

Certified Document Number: 82350778 - Page 67 of 104

to the relationship between the co-venturers. Their continuing rights and obligations become subject to the 10-year limitation period contained in the Limitations Act. The Respondent contends that that theory is (i) conceptually unsound, because the limitation period necessarily becomes a moving target depending on whether the economic activity is carried out within or outside the partnership relationship, creating legal uncertainty, and (ii) is unworkable in practice, because it requires an extensive factual investigation to be undertaken as to where (and when) the economic activity is carried out and by whom.

227. The Respondent also criticizes Professor Nerep's premise that the Charter and the Agreement are two separate documents and his conclusion that a breach of the Charter is an independent breach and not a breach of the Agreement.[116]

228. The Claimant's position is that it is clear from the wording, drafting history, purpose and context of Chapter 4, Section 4 of the Partnership Act that it only applies to breaches of fiduciary duties owed between partners, and that Professor Runesson is incorrect when he states that, in the context of a general partnership (of which the Claimant says the Agreement is an example), there can be no fiduciary duties or duties owed to the Joint Venture as such.[117]

229. Thus, the Claimant disagrees with Professor Runesson's opinion that the 3-year time limitation should apply to any breach of the Agreement, because he considers that a general partnership is not a legal entity and is based on an agreement.[118]

230. The Claimant further argues that there are two types of general partnerships. In the first, the partners carry out joint business activities in the form of a general partnership.[119] In such a case, the partners have fiduciary duties toward the partnership and breaches of these fiduciary duties may be subject to the 3-year time limitation of the Partnership Act.[120]

231. However, the Claimant contends that the Agreement belongs to a second type of general partnership within which there are no joint business activities. This is the case of shareholders

---

[116] Transcript Day 3, 161 :21-161-23 ; Respondent's Post-Hearing Brief, #167
[117] Claimant's Reply, Section 7.4.2 ; Claimant's Post-Hearing Brief, ##290-291
[118] RES-5, ##15-19 ; Claimant's Post-Hearing Brief, ##291-292
[119] Appendices 3 and 4 to RES-5
[120] Claimant's Post-Hearing Brief, ##291-292, Exhibit CL-46

Certified Document Number: 82350778 - Page 68 of 104

agreements, of which it says that the Agreement is an example. The joint business activities are carried out by a related legal entity. In this regard, the Claimant relies on Professor Nerep's testimony during the Evidentiary Hearing. [121]

232. Professor Nerep concurs with the views expressed by Professor Stefan Lindskog in his commentary to the Partnership Act in which he stated that one *"must distinguish between the mere contractual relation on the one hand and the business activity on the other hand, which is, in this case, taking place in the joint venture"*.[122] According to Professor Nerep, the time bar section in the Partnership Act chapter 4 has no applicability if one is dealing with shareholders' agreements and the shareholders establish a joint venture, which pursues the business activity, rather than the partners pursuing the activities in question for themselves within the partnership.[123]

233. The Claimant contends that by the Agreement, the Parties set up a joint legal entity, i.e., the Joint Venture, which had to carry out all economic activities. Accordingly, there are no fiduciary duties between the Parties as partners, which arise pursuant to the terms of the Agreement. Thus, since the Agreement sets out contractual rights and obligations between the Parties, Chapter 4, Section 4 of the Partnership Act is not applicable to any asserted breaches of the Agreement.[124]

234. The Claimant notes that in the 2011 Arbitration, the eminent Swedish jurist, Justice Johan Munck, testified that there was no precedent providing for the application of the time-bar in the Partnership Act to contractual claims between co-venturers.[125] Further the Claimant drew attention to the fact that the arbitral tribunal in the 2011 Arbitration reached the conclusion that the Claimant's Primary Claim could not be time-barred under the Partnership Act.[126]

---

[121] Claimant's Post-Hearing Brief, #290-292, Transcript Day 3, 130:14-25 and 131:1-16
[122] Transcript Day 3, 130 :1-9
[123] Transcript Day 3, 130 :10-16
[124] Claimant's Post-Hearing Brief, #294
[125] Exhibit C-54, #11.80 ; Claimant's Post-Hearing Brief, #295
[126] Claimant's Post-Hearing Brief, #296; Exhibit C-54, #11.81

Certified Document Number: 82350778 - Page 69 of 104

Certified Document Number: 82350778 - Page 70 of 104

235. The Arbitral Tribunal accepts the Claimant's submission that the Primary Claim is based on asserted contractual breaches of the Agreement and not on breaches of fiduciary duties under company law.

236. The intent of the Parties was to set up the Joint Venture with the purpose of developing the Kalchinskoye oil field.[127] There is no suggestion in the Agreement that the Parties had to carry out any of the economic activities contemplated in the Agreement. They were vested in the Joint Venture.

237. As the Arbitral Tribunal has noted, the Agreement clearly sets out the mutual rights and obligations as between the Parties and not as between the Parties and the Joint Venture. The Joint Venture itself is a creature of the Agreement. It is not a party to the Agreement and, therefore, it could not assert a claim for breach of a contractual duty against either of the Parties.

238. For these reasons, the Arbitral Tribunal concludes that the Agreement should be treated as if it were analogous to a shareholders agreement, setting out the rights and obligations of the Parties to one another in the context of the formation and maintenance of the Joint Venture. The Charter of the Joint Venture was registered on 10 April 1992, by means of a Directive of the Head of Administration of the City of Tyumen.[128] Thus, the Joint Venture was established as a separate legal entity incorporated under Russian law.

239. The Parties have not submitted any Swedish case law, which might support a proposition that contractual claims between them would come within the time-bar provided for in the Partnership Act. In fact, the Swedish Supreme Court, in cases related to shareholders agreements, has applied the Limitations Act.[129] On this basis and for the reasons set out above, the Arbitral Tribunal finds that the Claimant's Primary Claim, which is based on alleged contractual breaches of the Agreement by the Respondent, cannot be considered as being time-barred under the Partnership Act.

---

[127] cf. Clause 1,1
[128] Exhibit R-11
[129] Exhibit CL-58

70

### (ii) The Swedish Limitations Act

240. The Arbitral Tribunal observes that it is common ground between the Parties that the generally applicable limitation period under the Limitations Act is 10 years.[130]

241. The Parties take different positions, however, so far as the starting points of the limitation periods for the Primary and Secondary Claims are concerned.

### (a) Limitation period: Primary Claim

242. Regarding the Primary Claim, the Claimant contends that the limitation period started to run on 23 March 1992, i.e. the date of the Agreement.[131] The position of the Respondent has evolved during the course of this arbitration. In its Rejoinder, the Respondent stated that the prescription period commenced when the Parties signed the Agreement,[132] while in its Post-Hearing Brief, the Respondent stated that the starting point for the limitation period is 2 July 1993, at the latest, i.e., when the alleged misrepresentations were made during the Paris Meeting.[133]

243. The Arbitral Tribunal, having considered the submissions made by the Parties and the opinions expressed by the Parties' legal experts, has come to the conclusion that the starting point for the calculation of the limitation period for the Primary Claim is the date when the Parties signed the Agreement, i.e., 23 March 1992, as submitted by the legal experts of the Parties,[134] and as stated by Justice Lindskog in his book on prescription: "*A claim based on an agreement is ordinarily considered to have arisen on the date the agreement was entered into. It is irrelevant that the claim was not completed until a later time*".[135] The Arbitral Tribunal notes that this principle is consistent with the intent behind the imposition of statutory time limitation periods, which is to prevent the parties from taking too long to bring their contractual claims.

---

[130] Respondent's Post-Hearing Brief, #170; Claimant's Statement of Reply, #368; Exhibit CL-45
[131] Claimant's Statement of Reply, ## 378
[132] Respondent's Rejoinder, ##201.6
[133] Respondent's Post-Hearing Brief, #174
[134] CES-6, ##15 and 21; RES-5, #25
[135] Exhibit CL-48, pages 393-394, #2.2.3 and page 397, #2.2.4

Certified Document Number: 82350778 - Page 71 of 104

244. However, considering the arguments submitted by the Parties and their respective legal experts as to whether the 10-year statutory limitation period had been interrupted pursuant to Section 5 of the Limitations Act, the Arbitral Tribunal will need to examine this issue hereinafter.

### (b) Limitation period: Secondary Claim

245. As to the Secondary Claim, the Claimant states that for the purpose of determining the commencement of the limitation period, the claim can be considered to have arisen either on the date of the Agreement or that of the Paris Meeting, i.e., July 1993.[136] The Respondent's position is that the limitation period started to run on 2 July 1993, i.e. the last day of the Paris Meeting.[137]

246. The Claimant states that the Secondary Claim is based on a repayment obligation, which was agreed at the Paris Meeting. Alternatively, the Claimant argues that it terminated the Agreement on 21 May 2012, and as a consequence, the Respondent is obliged to reimburse any funds still outstanding under Swedish law,[138] although the Respondent disputes this contention.[139]

247. During the Paris Meeting, the Parties agreed that the foreign currency investments made by the Claimant would be repaid by 1 January 1994.[140]

248. Based on the Parties' submissions and the evidence on the records, the Arbitral Tribunal finds that the Respondent's obligation to repay the Claimant's investments is the result of the decisions made by the Parties during the Paris Meeting, as clearly stated in the Minutes of that meeting.[141] Therefore, the Arbitral Tribunal considers that limitation period of the Secondary Claim commenced on 2 July 1993, consistent with the principle that claims based on a

---

[136] Claimant's Statement of Reply, #397
[137] Respondent's Rejoinder, ##215.2
[138] Statement of Claim, #189; Claimant's Statement of Reply, ##238-243
[139] Statement of Defense, #292; Respondent's Rejoinder, #283
[140] Exhibit C-13
[141] Exhibits C-13 and R-49

Certified Document Number: 82350778 - Page 72 of 104

contractual obligation are considered to arise on the date when the agreement was made, as discussed *supra* regarding the Primary Claim.[142]

### (c) Tolling of the Limitation Periods

249. The Parties also disagree as to whether, and, if so, to what extent, the limitation periods in respect of both claims have been interrupted.[143]

250. The Arbitral Tribunal will examine separately whether the limitation periods applicable to the Primary Claim and the Secondary Claim respectively have been interrupted in accordance with Swedish law and whether either of these claims is time-barred under the Limitations Act.

### aa. The Claimant's Primary Claim

251. Section 5 of the Limitations Act provide that a limitation period shall be interrupted by the occurrence of the following events:

> (1) *where the debtor offers the payment, makes payment of interest or principal or otherwise acknowledges the claim of the creditor;*

> (2) *where the debtor receives from the creditor a demand in writing or other written reminder in respect of the debts; or*

> (3) *the creditor commences legal proceedings or otherwise pleads the claim against the debtor in any court, before the Debt Enforcement Authority, or in arbitration proceedings, bankruptcy or insolvent liquidation proceedings, or in negotiations in respect of judicial composition.*[144]

---

[142] Exhibit CL-48, pages 393-394 and 397

[143] Claimant's Post-Hearing Brief, #297; Respondent's Rejoinder ##202 and 216; Respondent's Post-Hearing Brief, #170

[144] Exhibit CL-45

252. The Claimant submits that claims arising from an agreement may be acknowledged, namely, by way of performance (including breaches of an agreement), other exercises of claims under the agreement by the parties or by the acceptance of contractual provisions.[145]

253. Justice Stefan Lindskog, on whose writings the Claimant relies, considers that in certain cases, compliance with an agreement can be interpreted as an acknowledgement that has the effect of tolling the limitation period, although he recognizes that it is not always a straightforward matter to determine. In his analysis, Justice Lindskog suggests that the starting point could be the principle of reasonable reliance, which he describes as follows:

> *"The debtors conduct [which can consist of passive conduct] in accordance with an agreement constitutes an acknowledgement of the debtor's obligations under the agreement, which has the effect of tolling the limitation period, provided that, based on the circumstances, the creditor could reasonably interpret the debtor's conduct in that way. In this respect, the object of the creditor's reliance is the debtor's (implied) view of whether it is bound by the contract, not the extent to which the limitation period was intended to be tolled."[146]*

254. In the case of continuous agreements, such as the Agreement, continuous performance pursuant to the agreement serves continuously to toll the limitation period, according to the Claimant.[147]

255. The Claimant also contends that the tolling effect of such performance relates to the entire agreement (with the exception of certain specific independent obligations, such as liquidated damages), and points to the following quotation from Justice Lindskog's book:[148]

---

[145] Claimant's Statement of Reply, #372
[146] Exhibit CL-48, page 249
[147] Claimant's Statement of Reply, #372
[148] Claimant's Post-Hearing Brief, #298

Certified Document Number: 82350778 - Page 74 of 104

> *"...On the other hand, a creditor can hardly be asked to toll the limitation period in respect of all claims that may arise from an agreement which is being applied by and between the parties. This supports the argument that the acknowledgement of a certain provision of an agreement should relate to the agreement as a whole, i.e. have the effect of tolling the limitation period in respect of all claims arising from the agreement in the same way as an express acknowledgement, which also constitutes a clear and simple procedure".[149]*

256. The Claimant adds that acknowledgement can be either express or implied and either intended or unintended; the decisive factor is whether under the circumstances, the creditor could reasonably rely on the acknowledgement.[150]

257. The Claimant further states that the filing of a request for arbitration tolls the limitation period, even if the proceedings are later discontinued, provided that the creditor did not waive or abandon its claim.

258. In addition, the Claimant contends that if the debtor intentionally provides misleading information in order to deceive the creditor into taking no action to toll the limitation period and the debtor succeeds in this deception, the creditor's rights under the claim are preserved until the creditor is made aware or should have become aware of the debtor's wrongful actions and has sufficient time to take action.[151]

259. Both Parties agree that the legal effect of interruption is to reset the limitation period (i.e., the entire 10 year period starts to run once more from the date of interruption without any account being taken of time elapsed prior to the interruption).[152]

260. The Claimant contends that the 10-year limitation period has been tolled on five occasions:[153]

---

[149] Exhibit CL-48, pages 354-355
[150] Claimant's Statement of Reply, #372; CES-6, ##23-27
[151] Claimant's Statement of Reply, #374
[152] Claimant's Statement of Reply, #375; Respondent's Post-Hearing Brief, ##170 and 201.5

(i) from 23 March 1992 (i.e., the date of the Agreement) to 2 July 1993 (i.e., the last day of the Paris Meeting), by reason of the asserted acknowledgement of the Agreement by the Respondent;[154]

(ii) correspondence from the Respondent to the Claimant, dated 9 January 1998, which the Claimant contends constituted an acknowledgement of the Agreement;[155]

(iii) 25 December 1998, when the liquidation papers (in respect of the Joint Venture) were drawn up, allegedly constituting acknowledgement of the Agreement;[156]

(iv) 28 December 2007, upon the filing of the request for arbitration in the 2007 Arbitration;[157] and

(v) 23 December 2011, upon the filing of the request for arbitration in the 2011 Arbitration.[158]

261. The Claimant submits that the License Breach, the Paris Breach, the Failure-to-Correct Breach and the Liquidation Breach are continuing breaches resulting in the interruption of the limitation period. The Claimant specifies that any breach related to the failure to transfer the license to the Joint Venture continued at least until 21 May 2012 when the Agreement was terminated.[159]

262. In sum, the Claimant claims that as a result of the above chain of tolling events, as at the date of the commencement of this arbitration, i.e., 23 December 2015, the limitation period of the

---

[153] Claimant's Statement of Reply, ##378-382; CES-6, #35
[154] Exhibit C-13
[155] Exhibit C-25
[156] Exhibit C-38
[157] Exhibit C-49
[158] Exhibit C-54, #3.1
[159] Claimant's Statement of Reply, ##383-384

Certified Document Number: 82350778 - Page 76 of 104

Primary Claim would expire on 23 December 2021, due to the filing of the Claimant's request for arbitration in the 2011 Arbitration.[160]

263. The Respondent disputes the Claimant's conclusions.

264. First, the Respondent argues that the proposed theory of acknowledgement through performance of the Agreement cannot be used to renew the limitation period. The Respondent relies on Professor Runesson, who stated, in particular, that "[T]*he idea that a mere abstention from a breach is apt to toll the limitation period in my opinion lacks of support in Swedish law*".[161] In this sense, Professor Runesson states that the proposition that the "performance of an obligation to refrain from certain actions can serve as a recognition at all has only weak support in legal sources", and they, in any event, are to found in cases that are old and open to interpretation.[162]

265. Second, the Respondent contends that its letter to the Claimant dated 9 January 1998[163] did not interrupt the limitation period, since it related only to the Secondary Claim,[164] and it cannot be construed as giving rise to reasonable reliance on the part of the Claimant with regard to its Primary Claims.

266. Third, relying on Professor Runesson's opinion, the Respondent contends that in light of a finding that a criminal offence had been committed in the liquidation of the Joint Venture, the limitation period would have started on 29 June 1999. In the absence of a criminal finding, then the limitation period should start on the date of the Agreement, as it could be foreseeable that one party might improperly cause the liquidation of the Joint Venture, to the extent that it was contemplated in the Agreement.[165] On this issue, the Respondent adds that the liquidation on 25 December 1998 was not notified to the Claimant and, therefore, such liquidation could not toll the limitation period.[166]

---

[160] Claimant's Statement of Reply, #382
[161] RES-5, ##28 and 42-43
[162] RES-5, #42
[163] Exhibit C-25
[164] Respondent's Rejoinder, #206
[165] Respondent's Rejoinder, #207 ; RES-5, #33
[166] Respondent's Post-Hearing Brief, #176; Exhibit C-38

Certified Document Number: 82350778 - Page 77 of 104

267. Fourth, the Respondent argues that the filing of the requests for arbitration in 2007 and 2011 could not toll the limitation period because it had already expired by then.[167]

268. Finally, the Respondent contends that the Arbitral Tribunal should not apply its own discretion to extend the prescription period, as submitted by the Claimant might be the case in circumstances in which the debtor had allegedly misled a creditor.[168] The Respondent asserts that there is no basis under Swedish law to toll the limitation period by over 13 years, i.e., from 1 July 2003 until 23 December 2015 when the Request for Arbitration was filed in this arbitration.[169] It relies on Professor Runesson's opinion that a ten-year period is already quite long in international comparison.[170] According to Professor Runesson, in exceptional circumstances where the principle of *de lege ferenda* has been applied, the extension granted was within a year after the discovery of the claim.[171]

269. Taking into account the foregoing, the Arbitral Tribunal concludes that the limitation period commencing on the date of the Agreement, i.e., 23 March 1992, was suspended and further reset for 10 years, when the Parties met in Paris in July 1993 and reached the agreements contained in these minutes.[172] The content of the 1993 Minutes of the Management Board of the Joint Venture taken at the Paris Meeting (the **"Paris Minutes"**) reflect an acknowledgement by the Parties of their rights and obligations under the Agreement, and, therefore, can be regarded as an acknowledgement for the purposes of Section 5 (1) of the Limitations Act.[173] Thus, the new 10-year limitation period commenced on 2 July 1993, i.e., the last day of the Paris Meeting.[174] The Arbitral Tribunal considers that such acknowledgement by the Parties relates to the entire Agreement, as suggested by Justice Lindskog in his book,[175] in that the Parties did not exclude the application of any particular provision of the Agreement in the Paris Minutes. Thus, the new 10-year limitation period applies to all of the Primary Claims.

---

[167] Respondent's Rejoinder, #208; Respondent's Post-Hearing Brief, #176; Claimant's Statement of Reply, #381
[168] Respondent's Rejoinder, #210; Respondent's Post-Hearing Brief, #176; Claimant's Statement of Reply, #377
[169] Respondent's Statement of Defense, #215; Respondent's Rejoinder, #210 ; Respondent's Post-Hearing Brief, #176
[170] RES-5, #33
[171] RES-5, #28
[172] Statement of Claim, ##179-181
[173] Exhibits C-13 and R-49
[174] Exhibits C-14 and R-49
[175] Exhibit CL-48, pages 354-355

Certified Document Number: 82350778 - Page 78 of 104

Certified Document Number: 82350778 - Page 79 of 104

270. Hence, the next issue which will the Arbitral Tribunal will have to determine hereinafter is whether any or all of the Primary Claims became time-barred on 1 July 2003.

271. As to the Paris Breach, the Arbitral Tribunal cannot adhere to Professor Nerep's suggestion that all the breaches should be regarded as continuous performance under the Agreement, because the Paris Breach, as specified by the Claimant, is limited to the events, which occurred during the Paris Meeting and which are recorded in the Paris Minutes.[176] The Claimant has never specified when it states that it became aware that it had been misled by the Respondent during the Paris Meeting. Assuming only for the purpose of the argument that the Claimant had been misled, the Arbitral Tribunal considers that the Claimant had ample opportunity to commence legal proceedings against the Respondent within a reasonable period of time after the Paris Meeting in order to interrupt the 10-year limitation period. The Arbitral Tribunal finds no basis to conclude that the new limitation period, expiring on 1 July 2003, should be extended in the case of the Paris Breach.

272. In any event, the Arbitral Tribunal observes that the Paris Minutes record that Mr. Pavlov notified those attending the meeting that: "it had not proved possible to have the license for the right to carry out work at the field re-issued to Tyumtex JV".[177] The evidence of Professor Volkov was to the effect that until the change in the law in March 1995, it was not possible for subsoil users to require the Russian authorities to have a license re-issued to a party of their choice. That evidence is unchallenged so far as it goes, although there was evidence adduced before the Arbitral Tribunal that certain licenses had in fact been re-issued before March 1995.[178] The Arbitral Tribunal is not satisfied, however, that there is sufficient evidence to support a finding that Mr. Pavlov's statement was misleading or deliberately intended to mislead.

273. So far as the information provided by Mr. Pavlov at the Paris Meeting as to the estimated level of oil reserves in the Kalchinskoye oil field is concerned, the minutes of the Paris Meeting record that Mr. Pavlov provided the Management Board of the Joint Venture with "new

---

[176] CES-6, #46

[177] Exhibit C-13

[178] Transcript Day 5, 93:8; 109:11-110:6

79

geological information regarding the Kalchinskoye Field obtained from the exploratory wells, based on the data of the geological studies and data obtained during the drilling and testing of producing wells".[179] While the Parties contest the accuracy of the data of the estimated reserves at that meeting, Mr. Genin acknowledged during the Evidentiary Hearing that Mr. Pavlov's presentation ran for no more than 10 minutes,[180] and that he had not asked Mr. Pavlov for the underlying materials.[181] The Arbitral Tribunal notes that, following the Paris Meeting, Mr. Vershinin informed the Ministry of Fuel and Energy of the Russian Federation that the Management of the Joint Venture had decided that it was inadvisable for the Joint Venture to continue developing the Kalchinskoye oil field. A copy of the Paris Minutes was submitted to the Ministry.[182]

274. In the opinion of the Arbitral Tribunal, this is not clear evidence indicative of an intention on the Respondent's part to mislead.

275. Of even greater evidential weight in the opinion of the Arbitral Tribunal was the evidence of Mr Genin at the hearing. As became clear in the course of his evidence, Mr Genin had been indifferent to the truth of what he was being told in Paris. Whether or not the Claimant was convinced that the representations made by the Respondent were well founded, Mr Genin was clear that the Claimant would accede to Mr. Vershinin's terms provided it recovered its investments.

276. In the answer to the Chairperson's questions, Mr. Genin stated:

> "THE CHAIRMAN: All right, let me be very straightforward here: so in fact **whether the statement was correct or not regarding the change of regulation, whether it was possible or not possible to get the licence,** for you that was the end of the story, you wanted your money back? (Emphasis added).

---

[179] Exhibit C-13

[180] Transcript Day 2, 163:21-164:3

[181] Transcript Day 2, 163:3-168:5

[182] Exhibit C-17

Certified Document Number: 82350778 - Page 80 of 104

A. [Mr. Genin] **Correct**, because if they take this position, that they will not transfer cannot transfer, you cannot force them to do it. I understand, because they control oilfield, they control all regulatory situation in Russia, I was not going to legally sue them, it's ridiculous. You can't do anything in Russia in 1993, for all practical reasons.

**If your partner tells you this, whatever the reason, either they made up their mind or it's true, and that's how it's going to be.** (Emphasis added).

THE CHAIRMAN: So in fact you took it as a decision on their side that they didn't want to transfer the licence to you? That's the way you perceived this answer from Mr --

A. [Mr. Genin] Correct, they did not want to transfer. Be honestly (sic), I thought it's possible they couldn't either. It's both ideas floating in my head either one."[183]

277. Moreover, the Chairperson posed the following question to Mr. Genin:

"THE CHAIRPERSON: And you invested a lot of money already at this stage into this JV, so you were happy with the answer that was given to you just because regulations, and you were aware there were – you said that there were changes in the regulations in Russia at that time, so was this answer satisfactory to you enough in order just to end this project at that time --"[184]

278. Mr. Genin answered as follows:

"A. [Mr. Genin] My thought was like this: when he said this, like in an affirmative way, I was shivering, because it's the end of the project for me, because without licence it cannot be anything, and it was a pause, and he looked at me, probably I was looking very worried or something, but he said – it takes about two or three minutes

---

[183] Transcript, Day 2, pages 202-203

[184] Transcript, Day 2, page 202

Certified Document Number: 82350778 - Page 81 of 104

and he stated, "But you are a friend, we will not let you down, and we are going to pay you back expenses".

To me, that is what I call carrot and I was very happy actually and I was so happy I want to get the money back basically if I can. So I would say. "Okay, let's do the deal".[185]

279. Based on Mr. Genin's testimony, the Arbitral Tribunal concludes that whatever he thought of the representations made to him during the Paris Meeting, he believed that he had secured the return of the Claimant's investments in return for the relinquishment of the Claimant's 40% interest in the oil field.

280. Turning now to the Failure-to-Correct Breach, the Arbitral Tribunal observes that this claim is strictly related to the Paris Breach but the essence of the claim is the failure to correct the allegedly misleading information provided during the Paris Meeting.[186] If the Arbitral Tribunal is right in its conclusions that the evidence available to it is insufficient to support a complaint that the information provided by the Respondent at the Paris Meeting was misleading, then no question of a failure thereafter to correct it arises and the Claimant's Failure-to-Correct Breach claim must fail.

281. Further and in any event, and noting the subsidiary rule suggested by Justice Lindskog, the Arbitral Tribunal observes that the Claimant had the opportunity to challenge the information and, if it believed a breach to have been committed, to commence legal proceedings against the Respondent in order to interrupt the 10-year limitation period in accordance with Section 5 of the Limitation Act. Instead, the Claimant opted to wait until 2011 to take legal action against the Respondent based on the Failure-to-Correct Breach. Hence, the Arbitral Tribunal concludes that by adopting so passive an approach, the Claimant showed no intent to toll the limitation period. It finds that the Claimant cannot claim for an extension of limitation period until 2011 based on the subsidiary rule.

[185] Transcript, Day 2, page 202
[186] Statement of Claim, #182

Certified Document Number: 82350778 - Page 82 of 104

Certified Document Number: 82350778 - Page 83 of 104

282. Regarding the License Breach, which is based on the breach of the Respondent's alleged obligation to transfer the license to the Joint Venture, pursuant to Clause 4.6, item 2 and Clause 3.3 of the Agreement,[187] the Arbitral Tribunal observes that, as in the case of the Failure-to-Correct Breach, the Claimant failed to commence legal proceedings against the Respondent within a reasonable period starting from the date of the Paris Meeting, i.e., when Mr. Pavlov stated that: "it was not possible to renew the operating license for JV "Tyumtex" on this field".[188] At the very latest, the Claimant had the opportunity to pursue the matter with the Respondent, following its rejection of the Respondent's invitation to liquidate the Joint Venture of 14 May 1996 and the submission of its subsequent proposals relating to its interest in the Joint Venture to the Respondent on 25 May 1996 (see *supra*). On the record available to the Arbitral Tribunal, it seems that the Claimant did nothing until it wrote to TNK-BP on 15 March 2004. Therefore, the Arbitral Tribunal concludes that the Claimant did not interrupt the limitation period, pursuant to Section 5 of the Limitation Act.

283. As to the Exclusivity Breach, the Claimant alleges that the Respondent breached Clauses 1.1 and 4.5, items 6 and 7 of the Agreement, and the duty of loyalty incumbent on the Respondent, when, without reference to the Claimant, the Respondent established the Tura JV on 30 April 1996,[189] together with Great Plains, for the exploration of the same Kalchinskoye oil field and the same exploration rights, which were the subject of the Agreement.[190] The Claimant contends that by entering into the Tura JV, the Respondent committed an intentional (or, alternatively, grossly negligent) and substantial breach of the Agreement, which constituted a continuing breach between 30 April 1996 and August 2000 when the Respondent and Great Plains reached a settlement agreement to put an end to their disputes and the exploration and development of the Kalchinskoye oil field through the Tura JV ceased.[191] However, the Claimant failed to explain whether and, if so, how the breach continued beyond August 2000. The fact that the establishment of the Tura JV was not disclosed to the Claimant in 1996 justifies the conclusion that the Claimant's rights were reserved until it learned of the deception and had the time to take action, as suggested by

---

[187] Statement of Claim, #178
[188] Exhibit C-13
[189] Exhibit C-26
[190] Statement of Claim, ##183-184
[191] Statement of Claim, #183; Statement of Defense, #277

83

Justice Lindskog in his book.[192] Neither of the Parties addressed the issue of the precise date upon which the Claimant became aware of the existence of the establishment of the Tura JV in their submissions. Neither the 2007 request for arbitration nor the 2011 Award is of any help in this regard.[193] The record shows that on 15 March 2004 the Claimant approached TNK-BP, after the latter had acquired the Respondent, in order to enquire about the Respondent's interest in the Joint Venture.[194] On 5 April 2004, TNK-BP responded that the Joint Venture had been liquidated in 1999.[195] Further to these exchanges, Mr. Genin arranged for a meeting with TNK-BP's representatives in Moscow in November 2004. During this meeting he discovered that his signature and the corporate seal of the Claimant were forged on the documents, which formed the basis for the liquidation of the Joint Venture.[196] However, the record does not show whether the issue of the establishment of the Tura JV was discussed at that meeting. Mr. Genin asserted that he learned about the existence of the Tura JV through public media.[197]

284. In these circumstances, taking into account that the breach continued until August 2000, the Arbitral Tribunal has to come to the conclusion that the 10-year limitation period expired at the latest in August 2010. Therefore, the Arbitral Tribunal will need to determine whether the 2007 Arbitration interrupted the limitation period.

285. As to the Liquidation Breach,[198] the Arbitral Tribunal is not persuaded by Professor Runesson's conclusion that a breach of the obligation to obtain the Claimant's approval in order to liquidate the Joint Venture, as required by Clauses 10.1.3 and 10.1.5 of the Agreement was a reasonably foreseeable occurrence when the Parties made the Agreement.[199] In fact, the record demonstrates that the Respondent did seek the Claimant's approval by letter dated 14 May 1996,[200] but it was not forthcoming (see the Claimant's reply of 20 May 1996).[201] The breach lies in the Respondent's decision nonetheless, and without the

---

[192] Exhibit CL-48, ##453 and 490
[193] Exhibits C-49 and C-54
[194] Exhibit C-44
[195] Exhibit C-45
[196] Transcript, Day 1, at 78:19-80:3; Witness Statement of Mr. Alex Genin, #61
[197] Mr. Alex Genin's Witness Statement, #57
[198] Statement of Claim, #185
[199] RES-5, #33
[200] Exhibit C-30
[201] Exhibit C-31

Certified Document Number: 82350778 - Page 84 of 104

Certified Document Number: 82350778 - Page 85 of 104

knowledge of the Claimant, to proceed to liquidate the Joint Venture and to have no compunction to resort to fraud and to criminal conduct to achieve its goal. On the basis of the record available to the Arbitral Tribunal, it is apparent that none of the representatives of the Claimant recorded as being present at the meeting of 25 December 1998 at which a decision was taken to liquidate the Joint Venture (the "Liquidation Protocol") was actually in attendance. The application for authorization to liquidate the Joint Venture filed the following day was based upon false signatures and a forged seal company seal.

286. The Respondent's letter of 14 May 1996,[202] in which it requested the Claimant to consent to the liquidation of the Joint Venture can be considered to be an "acknowledgement of the creditor", in the sense of Section 5(1) of the Limitation Act, having a tolling effect on the 10-year limitation period. Thus, it can be concluded that the limitation period of the Liquidation Breach was reset as at 14 May 1996 for another 10-year period until 13 May 2005. Since the Claimant was not aware of the liquidation of the Joint Venture until TNK wrote in answer to an enquiry of the Claimant on 5 April 2004,[203] the latter was not able to exercise its legal rights in this regard until that date. The letter of 5 April 2004 can be considered to be an acknowledgement of the creditor's claim, in the sense of Section 5(1) of the Limitation Act, having the effect of resetting a new limitation period until 4 April 2014. Thus, the Arbitral Tribunal will need to determine, hereafter, whether the 2007 and/or the 2011 Arbitrations interrupted the 10-year limitation period, so far as the Liquidation Breach is concerned.

### The 2007 Arbitration

287. The Claimant and Professor Nerep assert that the initiation of arbitration proceedings tolls the running of a limitation period, even if the arbitration is subsequently withdrawn as, in this case, it was by the Claimant, in circumstances in which the Claimant contends that it is clear that the claim is not waived or abandoned.[204]

---

[202] Exhibit C-30
[203] Exhibit C-45
[204] Claimant's Statement of Reply, ##374 and 381; CES-6, ##40-41

85

288. For its part, the Respondent contends that the 2007 Arbitration did not toll the limitation period, because the Claimant did not identify, or rely upon, the Exclusivity Breach and the Liquidation Breach in the 2007 request for arbitration.[205]

289. In light of its conclusion that the Paris Breach, the Failure-to-Correct Breach and the License Breach were time-barred before the 2007 Arbitration, the Arbitral Tribunal will only examine whether the 2007 Arbitration interrupted the time limitation of the Exclusivity Breach and the Liquidation Breach.

290. Pursuant to the 2007 version of the Rules of Arbitration of the SCC, the 2007 Arbitration was deemed formally to have been commenced on the date on which the request for arbitration was received by the SCC.[206] The 2007 request for arbitration was filed on 28 December 2007.[207] There is nothing in the record to suggest that although the 2007 request for arbitration was withdrawn for lack of funding, the Claimant waived its rights or abandoned its claims.

291. The Arbitral Tribunal further observes that the Claimant referred to the liquidation of the Joint Venture as part of the dispute between the Parties in the 2007 request for arbitration,[208] which demonstrates the existence of a relationship between the Liquidation Breach and the 2007 Arbitration.

292. Therefore, the Arbitral Tribunal concludes that the Claimant satisfied the requirements of Section 5(3) of the Limitation Act, and, in consequence, reset the limitation period of the Liquidation Breach for an additional 10-year period until 27 December 2017.

293. Thus, considering that the Request for Arbitration was filed on 23 December 2015, the Arbitral Tribunal concludes that the Liquidation Breach is not time-barred.

294. As to the Exclusivity Breach, the Arbitral Tribunal observes that the 2007 request for arbitration does not make any reference to the Tura JV in particular or otherwise to the issue of the Exclusivity Breach generally. Hence, the Arbitral Tribunal concludes that the initiation

---

[205] Statement of Defense, #212
[206] Article 4 of the 2007 Arbitration Rules provides that "The arbitration shall be deemed to commence on the date on which the Request for Arbitration is received by the SCC Institute."
[207] Exhibit C-49; Claimant's Statement of Reply, #381
[208] Exhibit C-49

86

Certified Document Number: 82350778 - Page 86 of 104

of the 2007 Arbitration did not interrupt the 10-year time limitation related to the Exclusivity Breach. Accordingly, the limitation period expired at the latest in August 2010.

295. In the opinion of the Arbitral Tribunal, the Respondent's letter of 9 January 1998, on which the Claimant also sought to rely in support of its contention that the limitation period was tolled, is of no assistance, so far as its Primary Claim is concerned. The letter is clear as to its subject matter; it relates to: "*...the decision regarding the payment of the outstanding sums concerning our joint project of development of Kalchinsk oil field (JV Tyumtex) in accordance with the decisions in Paris (1993) take time due to objective reasons*".[209] The Arbitral Tribunal observes that in this letter the Respondent is reacting to a request for the payment of amounts claimed by the Claimant in the Secondary Claim. The letter cannot be considered, in the Arbitral Tribunal's opinion, as tolling the limitation period of any element of the Primary Claim.

296. On the basis of the Arbitral Tribunal's conclusions, as stated in this sub-section, the limitation period of the Paris Breach, the Failure-to-Correct Breach and the License Breach expired on 3 July 2003, i.e., 10 years after the Paris Meeting. As to the Exclusivity Breach, the limitation period expired at the latest in August 2010.

297. The Arbitral Tribunal has also taken into account Justice Lindskog's views,[210] to which Professor Runesson refers in his Expert Legal Opinion of 13 February 2017.[211] For the purposes of a *de lege ferenda* extension of time it would be necessary to define when, after the discovery of the claim, the creditor needed to toll the limitation period. Its implementation should be based on an act of legislation or a decision of the Swedish Supreme Court clarifying the provisions of the Limitation Act. In any event, a 10-year limitation period should not be prolonged beyond a period of one year from the date of the discovery.[212]

298. Therefore, the Arbitral Tribunal finds that the Claimant's Primary Claim is time-barred, except to the extent it is based on the Liquidation Breach. Hence, the Paris Breach, the

---

[209] Exhibit C-25
[210] Lindskog, Preskription, page 488
[211] RES-5, #28
[212] Lindskog, Preskription, page 488

Certified Document Number: 82350778 - Page 87 of 104

Failure-to-Correct Breach, the License Breach and the Exclusivity Breach are dismissed in their entirety with prejudice.

### bb. The Claimant's Secondary Claim

299. So far as the Secondary Claim is concerned, it is the Claimant's case that it was tolled by (i) the Claimant's various letters to the Respondent, including its letter of 17 May 1996, and its subsequent payment demand of 24 March 1997 and (ii) by the Respondent's letter to the Claimant on 15 December 1997 (notifying the Claimant that Mr. Vershinin, who was dealing with the matter "personally" was "sick") and its subsequent correspondence of 9 January 1998 "acknowledging the same debt" and in which the Respondent represented that the matter would be resolved "within 30-40 days".[213]

300. For its part, the Respondent accepts that the latest event that might have the effect of tolling the limitation period was the Respondent's aforementioned letter of 9 January 1998.[214] Thus, according to the Respondent, the limitation period expired on 8 January 2008.

301. The Claimant further contends that the limitation period was also tolled[215] by way of two letters sent by the Claimant to the Respondent's parent company, TNK-BP, on 15 March 2004,[216] and 3 March 2005.[217]

302. However, the Respondent argues that those two letters cannot be treated as notices of the debt to the debtor, since (i) they were addressed to TNK-BP, which is not the debtor, and (ii) they do not refer to the Secondary Claim, since it concerns the Claimant's interest in the Joint Venture.[218] The Respondent adds that at the Evidentiary Hearing, Professor Nerep accepted that he had not seen any evidence that the letters were communicated to the Respondent and that they may be regarded as a possible claim against TNK-BP.[219]

---

[213] Appendix F to the Claimant's Reply; Claimant's Post-hearing Brief, #300; Exhibits C-18 to C-25, C-31, C-37,
[214] Exhibit C-25
[215] Claimant's Post-Hearing Brief, ##301-304
[216] Exhibit C-44
[217] Exhibit C-47
[218] Respondent's Rejoinder, ##219-223; Respondent's Post-Hearing Brief, #178
[219] Respondent's Post-Hearing Brief, #179; Transcript Day 3, 170:16 -170:20

Certified Document Number: 82350778 - Page 88 of 104

Certified Document Number: 82350778 - Page 89 of 104

303. Furthermore, the Respondent contends that the request for arbitration in the 2007 Arbitration could not toll the limitation period, since it did not contain any claim related to the Secondary Claim. As the Respondent pointed out, Professor Nerep stated at the Evidentiary Hearing that he had not presented any analysis on this ground, because he had concluded that the 2007 request for arbitration had not included the Secondary Claim.[220]

304. Therefore, the Respondent contends that the limitation period of the Secondary Claim expired on 8 January 2008, and so the Claimant's Secondary claim should be dismissed with prejudice.[221]

305. The Arbitral Tribunal does not accept that either the letter sent by the Claimant's counsel to TNK-BP, on 3 March 2005[222] or the letter sent by the Claimant to TNK-BP on 15 March 2005 constitutes a demand in writing addressed to a debtor, pursuant to Section 5 (2) of the Limitations Act. Both letters were addressed to the TNK-BP. There is no evidence that either of them was communicated to the Respondent. Furthermore, the Arbitral Tribunal observes that these letters refer to the Claimant's interest either in the Joint Venture or in the Kalchinskoye oil field. They do not relate to any claim in respect of the Respondent's outstanding debts.

306. Hence, the Arbitral Tribunal finds that neither of these two letters constitutes a tolling event for the purposes of the Secondary Claim.

307. Now, the Arbitral Tribunal has to examine whether the 2007 Arbitration can be considered to be a tolling event, taking into account that the issue in dispute here is whether the Claimant's claims included in the 2007 request for arbitration should be understood as being also related to the Secondary Claim.[223]

308. By its Secondary Claim, the Claimant claims payment from the Respondent of the amounts it had invested in the Joint Venture and which the Respondent undertook to pay to the Claimant at the Paris Meeting. In the 2007 Arbitration, however, the Claimant asserted the right to

---

[220] Respondent's Post-Hearing Brief, #180; Transcript Day 3, 173:12-174:16
[221] Respondent's Post-Hearing Brief, #179; Respondent's Rejoinder, #359.3
[222] Exhibit C-47
[223] Exhibit C-49, #2.12

recover its 40% share of the actual value of the Kalchinskoye oil field, and the value of its 40% share of any production from the Kalchinskoye oil field to the date of the 2007 Arbitration.[224]

309. Therefore, the Arbitral Tribunal reaches the conclusion that the Claimant's request for arbitration in the 2007 Arbitration did not contain a request for payment of the amounts allegedly owed by the Respondent to the Claimant as a result of the Paris Meeting. Indeed, the amounts claimed in the Secondary Claim arise out of the agreement reached by the Parties during the Paris Meeting. However, the amounts of the claims, as structured by the Claimant in the 2007 Arbitration, dealt with the value of the Claimant's 40% interest in the Kalchinskoye oil field and the past production from the field.[225] They have nothing to do with the discrete issue of moneys due to the Claimant pursuant to the agreement made between the Parties at the Paris Meeting.

310. Thus, the Arbitral Tribunal concludes that the 2007 Arbitration did not toll the limitation period in respect of the Secondary Claim, which expired on 8 January 2008, i.e., 10 years after the Respondent sent its letter of 9 January 1998.[226]

311. The Claimant's submission that the requests for arbitration in the 2007 and 2011 Arbitrations are to be regarded as a tolling event, so far as the Secondary Claim is concerned fails.


## 2. THE MERITS OF THE CLAIMANT'S CLAIMS

312. Taking into account that the Arbitral Tribunal found that the Paris Breach, the Failure-to-Correct Breach, the License Breach, the Exclusivity Breach and the Secondary Claims have been submitted in this arbitration after the expiration of the relevant limitation periods, and that in consequence, they should be dismissed with prejudice, the Arbitral Tribunal will not undertake any analysis of the merits of those claims. Thus, in this part of the Final Award, the Arbitral Tribunal will limit its analysis to the merits of the Liquidation Breach and the quantum claim related thereto.

---

[224] Exhibit C-49, #3.1 and #3.2
[225] Exhibit C-49, #2.15
[226] Exhibit C-25

Certified Document Number: 82350778 - Page 90 of 104

## A. THE MERITS OF THE LIQUIDATION BREACH

313. The Claimant contends that the Respondent committed a substantial breach of both Clauses 10 and 11 of the Agreement and of its duty of loyalty towards the Claimant under the Agreement, when it liquidated the Joint Venture without the Claimant's knowledge or approval. Clause 10.1 of the Agreement requires a unanimous decision to liquidate the Joint Venture.[227]

314. As the Arbitral Tribunal has already noted above and as the Claimant rightly emphasizes, the Respondent approached the Claimant in May 1996 in order to seek its approval to liquidate the Joint Venture.[228] The Claimant made clear to the Respondent in its letters of 20 May 1996 and 26 May 1996 that if the payment of the amounts due to it pursuant to the deal struck at the Paris Meeting were not made, it did not and would not, consent to the liquidation of the Joint Venture.[229]

315. On the face of the record, the Respondent drew up and signed the Liquidation Protocol on 25 December 1998. A day after, on 26 December 1998, the Respondent applied to the Russian authorities to have the Joint Venture liquidated, relying on what were subsequently determined by the Russian authorities in 2009 to be forged signatures of the Claimant's representatives and a forgery of the Claimant's company seal.[230]

316. Pursuant to the Respondent's application for authority to liquidate, the Russian authorities approved the liquidation of the Joint Venture on 29 June 1999.[231]

317. On 27 November 2008, Mr. Genin filed an investigation request with the Russian authorities against the Respondent and its representatives.[232]

---

[227] Claimant's Post-Hearing Brief, ##214, 219 and 221
[228] Exhibit C-30
[229] Exhibits C-31 and C-37
[230] Exhibits C-38, C-39, C-51, C-52 and C-53; Statement of Claim, ##128-138; Statement of Reply, #232; Claimant's Post-Hearing Brief, #214
[231] Exhibit C-41
[232] Exhibit C-52

91

318. According to the Claimant, the liquidation of the Joint Venture deprived it of its rights as a shareholder and any possibility of acquiring its right to 40% of the net profits deriving from the exploration and exploitation of the oil fields as from the date of the liquidation.[233]

319. The Claimant contends that since the breach of the Agreement was intentional (or grossly negligent), the Respondent should be ordered to pay the full amount claimed in the Primary Claim in damages based on the Liquidation Breach.[234]

320. The Respondent's position on the Liquidation Breach is that: (i) the Respondent did not breach Clauses 10 and 11 of the Agreement, since the Parties decided to abrogate the Agreement at the Paris Meeting, insofar as the Parties agreed that the Joint Venture would no longer explore and develop the Kalchinskoye oil field, which was its primary purpose, and (ii) the liquidation of the Joint Venture did not cause any harm to the Claimant, since the Joint Venture conducted minimal business activity in 1994 and ceased all trading activity in 1995.[235]

321. In addition, the Respondent contends that there has not been any argument before this Arbitral Tribunal as to whether the liquidation procedure was carried out in accordance with Russian law, as provided for in Clause 11.1 of the Agreement. Therefore, according to the Respondent, the Arbitral Tribunal is not in a position to make any findings on this point or to determine whether any alleged criminal act occurred.[236]

322. The Claimant's position is that the Agreement was not abrogated at the Paris Meeting. Rather, it remained in full force and effect until it was terminated by the Claimant in 2012.[237] According to the Claimant, its exit from the Joint Venture was conditional upon the Respondent's payment of the agreed compensation in respect of the Claimant's investments. No such payment was ever forthcoming from the Respondent and so, argues the Claimant, it continued to own a 40% interest in the Joint Venture and the Kalchinskoye oil field.[238]

---

[233] Statement of Reply, # 235 ; CES-1, #63 and figure 5
[234] Statement of Claim, #221
[235] Statement of Defense, ##137-138 and 282-283; Respondent's Rejoinder, #280
[236] Post-Hearing Brief, #213
[237] Statement of Reply, ##202-209 and 234
[238] Post-Hearing Brief, #216

Certified Document Number: 82350778 - Page 93 of 104

323. On the evidence before it, the Arbitral Tribunal is satisfied that at the Paris Meeting, the Parties reached an agreement to discontinue the participation of the Tyumtex Joint Venture in the development of the Kalchinskoye oil field on the basis of the repayment by the Respondent of the Claimant's investments and to instruct the Joint Venture to focus its efforts on the implementation of projects related to "brand filling stations" and "supply of material and equipment for the production of oil and drilling".[239] Although at the Paris Meeting, it was agreed to compensate the Claimant for the investments it had made in the Joint Venture, there is nothing in the Paris Minutes to suggest that the discontinuation of the actual development of the Kalchinskoye oil field by the Joint Venture was in any way conditional upon the payment of the Claimant's financial compensation. What was conditioned to the reimbursement of the Claimant's investments was the relinquishment of its interest in the oil field.

324. Once the Claimant's investments had been repaid, then it would relinquish its 40% interest and thereafter, its interest would be limited to new activities assigned by the Parties to the Joint Venture, i.e., the distribution of oil through fuel stations and the supply of material and equipment. However, these activities ended in 1994 and the Joint Venture became operationally dormant, according to Mr. Genin's testimony at the Evidentiary Hearing.[240]

325. That, however, does not detract from the fact in the absence of payment pursuant to the Paris Agreement, the Claimant retained its 40% interest in the Joint Venture in respect of which in the event of a wrongful taking by the Respondent, it would be entitled to maintain a claim for damages to the extent of the value of its interest in the Kalchinskoye oil field.

326. The Arbitral Tribunal has already considered Claimant's assertion that the information provided by the Respondent regarding the possibility of providing the oil field rights to the Joint Venture was misleading and that, based upon the Respondent's misrepresentations, it had been induced into giving up its interest in the Joint Venture in return for the return of its investment from the Respondent.[241] For the reasons set out at paragraphs 271-279 above, the Arbitral Tribunal is not persuaded that any such inducement arose in the course of the Paris meeting - or even, if it did, it was decisive to Mr. Genin's determination to proceed as he did.

---

[239] Exhibit C-13, page 3
[240] Transcript, Day 2, ##212:15-215:1
[241] Claimant's Post-Hearing Brief, ##142-188

Certified Document Number: 82350778 - Page 94 of 104

327. The fact is, however, that the Claimant was not paid, notwithstanding the various written reminders issued to the Respondent,[242] which did not question the Claimant's requests for payment or its entitlement to be paid. When the Claimant was still out of its money nearly five years after the Paris Meeting, Mr. Pavlov wrote on 9 January 1998 that: "Unfortunately, the decision regarding payment of the outstanding sums concerning our joint project of development of Kalchinsk oil field (JV Tyumtex) in accordance with the decisions in Paris (1993) take time due to objective reasons".[243]

328. The Arbitral Tribunal has examined, first the exchanges of correspondence (and the Houston Board Minutes) in the lead up to the Paris Meeting and the Minutes of the Paris Meeting themselves in order to ascertain whether the agreement reached in Paris that the Claimant should no longer: "work with the Joint Venture on the project of the Kalchinskoye oil field location" and instead that the Claimant should participate as a "currency and rouble creditor"[244] was contingent upon the repayment to be made by the Respondent to the Claimant.

329. Second, the Arbitral Tribunal has considered whether the conduct of the Parties after the Paris Meeting would give any indication as to whether the understanding of the Parties when they entered into the agreements recorded in the Paris Minutes would shed light upon the intent of the Parties when they reached the agreements contained therein.

330. The letters sent by the Claimant to the Respondent in May 1996 conditioned its consent to the liquidation of the JV upon the payment of the amounts claimed by the Claimant and the release of its interest in the Kalchinskoye oil field.[245] There is a complete absence of any disagreement by the Respondent over the years (i.e., 1997 and 1998)[246] to the Claimant's insistence on the fact that it's "share in JV (40%) and in Kalchinsk oil field is still the same".[247]

---

[242] Exhibits C-18, C-19, C-20, C-21, C-22, C-23, C-31, C-37
[243] Exhibit C-25
[244] See paragraph 124 above
[245] Exhibits C-23 and C-31
[246] Exhibits, C-24 and C-25

[247] Exhibit C-23

94

331. These facts demonstrate that the abandonment of the Claimant's right to the Kalchinskoye oil field agreed between the Parties during the Paris Meeting was contingent upon the receipt by the Claimant of the reimbursement of its investment. The Respondent failed to pay that amount to the Claimant and thus failed to fulfill its obligations under the agreement reached in Paris. As a result, the Claimant still held its interest in the Kalchinskoye oil field on 25 December 1998 when the Respondent improperly sized the Claimant's interest by dissolving the Joint Venture without any authority to do so and, thereafter, secured government dissolution of that entity through the submission of forged documents. The Claimant is, therefore, entitled to compensation equal to the value of its interest in the Kalchinskoye oil fields as of 25 December 1998.

332. The Arbitral Tribunal observes that Clause 10.1 of the Agreement provides that the Agreement can only be abrogated by the agreement of the Parties. There is nothing in the Paris Minutes to suggest that the Agreement was abrogated at the time of the Paris Meeting – far from it; it is apparent that the Claimant's interest in the Joint Venture was very much in place. Accordingly, the Arbitral Tribunal finds that the Agreement was not abrogated by the Parties until it was terminated by the Claimant.

333. Furthermore, the Arbitral Tribunal observes that Clause 10.1.3 of the Agreement clearly provides that the Joint Venture may only be liquidated "unanimously and in writing" by the Parties. Clause 10.1.5 also requires the "unanimous agreement" of the Parties to liquidate the Joint Venture. The terms of the Claimant's letters of 20 May 1996 and 26 May 1996,[248] sent in reply to the Respondent's 14 May 1996 letter, inviting the Claimant to accede to the liquidation of the Joint Venture,[249] are unambiguous as to the Claimant's refusal to liquidate the Joint Venture until the Respondent had paid the amounts due to the Claimant pursuant to the Paris Meeting.

334. In flagrant breach of its obligations pursuant to the Agreement, the Respondent drew up and adopted the Liquidation Protocol dated 25 December 1998, which bore the forged signatures of the Claimant's representatives and a forged company seal of the Claimant, to apply to the

---

[248] Exhibits C-31 and C-37
[249] Exhibit C-30

Russian authorities for the liquidation of the Joint Venture, which duly relied upon these forgeries when they approved the liquidation of the Joint Venture on 29 June 1999.[250]

335. On the basis of the evidence before it, the Arbitral Tribunal finds that the Claimant did not consent to the liquidation of the Joint Venture and, further, that the Respondent intentionally breached Clause 10 of the Agreement and its duty of loyalty by its manifest abuse of the Claimant's rights under Clause 10 of the Agreement.

336. The issue as to whether the liquidation of the Joint Venture was effected in compliance with Russian law, as provided for in Clause 11.1 of the Agreement, is irrelevant for the determination of the Respondent's breach of Clause 10 of the Agreement.

## B. THE QUANTUM OF THE LIQUIDATION BREACH

337. As mentioned above, the Respondent contends that even if it breached the Agreement through the liquidation of the Joint Venture, the Claimant cannot demonstrate that it suffered any harm as a result of this liquidation.[251]

338. The Claimant contends that there is a link between the Respondent's breach and the Claimant's loss.[252]

339. The Respondent contends that the Claimant elected to give up its rights to explore and develop the Kalchinskoye oil field in exchange for being repaid the amount of its investments in the Joint Venture.[253] That should be the limit of its recovery and the Claimant should not be entitled to any profits that resulted from any subsequent exploration and development activity of the fields.[254]

340. The Respondent further contends that its quantum expert, Mr. Knyazev, concluded that the Claimant should receive nothing by way of putative lost profits. The Respondent states that it

---

[250] Exhibits C-38, C-39, C-52 and C-53
[251] Statement of Defense, #283
[252] Claimant's Post-Hearing Brief, ##222-246
[253] Respondent's post-Hearing Brief, #221
[254] Respondent's Post-Hearing Brief, #222

Certified Document Number: 82350778 - Page 96 of 104

is very likely that the Joint Venture would have been liquidated by the Russian authorities due to the Claimant's failure to contribute the required amount of capital or else that it would have become insolvent before the Joint Venture became cash positive due to the chronic cash deficits and the lack of external financing available during the 1998 Russian financial crisis. The Respondent asserts that the Joint Venture only became cash positive in 2005, long after the Claimant's interest would have come to an end.[255]

341. According to the Claimant's expert, Mr. Kaczmarek,: (i) it was not appropriate to assume that there would have been external financing, (ii) the terms of the debt financing were not known, and (iii) the Joint Venture might have had access to external financial resources.[256]

342. The Arbitral Tribunal considers that the Respondent's arguments are based on speculations and assumptions, which cannot be verified. It would be inappropriate to limit the Claimant's entitlement to damages on the basis of these assumptions.

343. The economic experts appointed by the Parties used different approaches in calculating the value of a 40% share in the Joint Venture. The Claimant's expert, Mr. Kaczmarek, applied the *ex-post* approach, arriving at USD 172,646,664.00 as the total amount of the loss suffered as a result of the Respondent's breach. On the instructions of the Respondent's Counsel, the Respondent's expert, Mr. Knyazev, had adopted the *ex ante* approach to calculate damages, but in the course of his examination he accepted that a proper application of Mr. Kaczmarek's *ex post* approach would result in an estimated loss to the Claimant of USD 70,000,000.00.

344. Applying the *ex-ante* approach on the basis of the information available at the end of the Paris Meeting on 2 July 1993, Mr. Knyazev calculated the amount of lost profits to be between USD 1.4 and USD 5.5 million.[257] Mr. Kaczmarek rejected this approach as inconsistent with Swedish law on damages for breach of contract.[258]

345. The Claimant relies on Justice Johnny Herre's for its contention that an *ex ante* valuation is not consistent with Swedish law:[259]

---

[255] Respondent's Post-Hearing Brief, #223
[256] CES-2, ##31-33
[257] RES-8, sections 2A and 3

[258] Transcript 6, 129: 11. 14-16
[259] Claimant's Post-Hearing Brief, #257

Certified Document Number: 82350778 - Page 98 of 104

> *"The general principle for calculation of damages is therefore, that compensation shall be paid on the basis of the 'positive contractual interest' in the performance of the contract, i.e., the non-breaching party shall, through the payment of damages, be placed in the same financial situation as he would have been, had the contract been duly performed. Damages can, in other words, be described as a surrogate for performance, since it is in the interest in performance, or the expectation interest, which is to be protected."*[260]

346. The Respondent has not submitted any evidence that the *ex-ante* valuation is consistent with Swedish law.[261] Therefore, the Arbitral Tribunal, guided by the opinion of Justice Herre on this issue, finds that it should apply an *ex-post* valuation in its assessment of Claimant's claim for damages.

347. Although the Claimant had been willing in July 1993 to value its interest in the Kalchinskoye oil field at the amount it had to that date invested in the Joint Venture, the Respondent's improper and illegal actions, which were hidden form the Claimant, deprived the Claimant of the opportunity to assess the value of that interest as of 25 December 1998.

348. By that time, the value of a 40% interest in the Kalchinskoye oil field was considerably more than in 1993, as evidenced by the valuation placed on the Kalchinskoye oil field by a subsidiary of Great Plains Petroleum when it entered into the Tura JV. At that time the subsidiary invested USD 50 million in the joint venture and Great Plains Petroleum estimated the value of its 50% interest at USD 76.4 million in 1996.[262] That the Respondent understood the value of the Kalchinskoye oil field had increased by 1998 is further supported by the Respondent's successful efforts in early 1998 to terminate the Tura JV and to take overall operational control of the Kalchinskoye oil field, and its willingness to resort to illegal measures to attempt a dissolution of the Joint Venture, which it clearly knew was inconsistent with its contractual obligations.

---

[260] Exhibit CL-7, page 3
[261] Respondent's Post-Hearing Brief, #246-247

[262] Exhibit C-83 at 7-8.

349. Accordingly, the Arbitral Tribunal finds that the Claimant is entitled to receive the repayment of its investment in the JV from the Respondent as compensation for its abandonment of the Claimant's right to the Kalchinskoye oil field.

350. The question for the Arbitral Tribunal is how to best determine the value of that interest as of 25 December 1998. As noted at paragraph 346, the proper approach in determining this value is through an *ex post* analysis. The Claimant (USD 172,646,664.00) and the Respondent (USD 70,000,000.00) have each estimated the value of the Claimant's interest in the Kalchinskoye oil field applying the *ex post* valuation method as of the Paris Meeting in 1993. Neither Party has provided an estimation specifically addressing the valuation of the Claimant's interest on 25 December 1998.

351. The Arbitral Tribunal questions the reliability of the calculations offered by the Parties and those of the Claimant in particular, because they assume perfect foresight on the Claimant's part during the period used for the calculation, i.e., through 2012. That is, the Claimant is assumed to have been able to foresee and ride out all the ups and downs in the market price for oil, Russia's fiscal uncertainties, and numerous other factors that might have affected the value of the Claimant's interest and its willingness or ability to continue with its participation in the development of the Kalchinskoye oil field.

352. Although the Respondent's calculations are subject to some of the same deficiencies, Mr. Knyazev's calculations overstate the adjustments that should be made to come to a reasonable valuation, as the Claimant has pointed out. Thus, the Arbitral Tribunal cannot fully rely on either calculation in order to reach an appropriate result in the dispute.

353. After reviewing all the valuation evidence, and taking into account the valuation placed on the Kalchinskoye oil field by Great Plains Petroleum, the Arbitral Tribunal concludes that the evidence in the record supports a conclusion that a reasonable valuation of the Claimant's interest in the Kalchinskoye oil field as of 25 December 1998 is USD 70,000,000.00. The Arbitral Tribunal, therefore, will award that amount to the Claimant as damages for the Respondent's breach of the Agreement, which required the liquidation of the Joint Venture could occur only with the agreement of both Parties. Interest on this amount shall run from 25

Certified Document Number: 82350778 - Page 99 of 104

December 1998, calculated in accordance with Sections 4 and 6 of the Swedish Interest Act (SFS 1975:635), until payment is made in full.[263]

## 3. OTHER GROUNDS

354. The Arbitral Tribunal, in considering the issues, which it had to resolve in the case at hand, has examined all grounds, contentions, arguments and evidence submitted by the Parties. Nonetheless, the Arbitral Tribunal has only referred in this Final Award to those grounds, contentions, arguments and evidence, which it deemed relevant for the determination of the issues in dispute. Therefore, the grounds, contentions, arguments and evidence, which are not expressly mentioned in the reasoning of the Arbitral Tribunal as set out above, have to be considered as being either irrelevant for the determination of the issue in dispute or dismissed by the Arbitral Tribunal.

# IX. THE COSTS OF THIS ARBITRATION

355. In its Statement of Costs, the Claimant requested the Arbitral Tribunal to order the Respondent (i) to compensate the Claimant in full for its costs, including interest pursuant to Section 6 of the Swedish Arbitration Act from the date of any Final Award until the date of payment by the Respondent, and (ii) to pay all fees and costs of the Arbitral Tribunal and the SCC, including interest pursuant to Section 6 of the Swedish Interest Act from the date of the Final Award until the date of payment by the Respondent.

356. The Claimant submits that the outcome of this arbitration should follow the event.[264]

357. The costs in the arbitration claimed by the Claimant amount to USD 4,383,066.23, plus EUR 1,150,488.41, plus SEK 9,390,425.95 and GBP 37,075.27, all exclusive of VAT, plus interest

---

[263] Exhibit CL-13
[264] Claimant's Comments on the Respondent's Statement of Costs, #2

Certified Document Number: 82350778 - Page 100 of 104

pursuant to Section 6 of the Swedish Interest Act (SFS 1975:635) from the date of this Final Award until its payment in full.

358. As part of its cost claim, the Claimant seeks an order that the Respondent compensate the Claimant for the legal costs that it has incurred since the commencement of the 2011 Arbitration. The Claimant states that it cannot be blamed for the annulment of the final award in the 2011 Arbitration, and that significant aspects of the work effected in relation to the 2011 Arbitration have enabled savings in terms of cost and time to be made in this arbitration.

359. In this regard, the Respondent argues that the Claimant is not entitled to recover costs and legal fees incurred in the 2011 Arbitration because the Swedish court annulled the award in its entirety and the costs/legal fees incurred in the 2011 Arbitration have no relevance to the current proceeding.[265]

360. In its Costs Schedule, the Respondent claims an amount of EUR 3,120,927.21. It submits that if the Arbitral Tribunal rejects all of the Claimant's claims, the Respondent should be awarded its costs in full, following the principle that costs follow the event.

361. The Respondent further contended that the Claimant has not disclosed the terms of its third-party financing, including whether the latter agreed to pay the Respondent for its costs and legal fees that might be awarded to the Respondent if the Claimant is unable to satisfy this Final Award.[266]

362. The Respondent points out that the Arbitral Tribunal has a broad discretion in terms of the allocation of the costs of the arbitration and costs incurred by the Parties, pursuant to Article 43(5) and 44 of the SCC Rules. In both cases, the Arbitral Tribunal is required to have regard to the *"outcome of the case and other relevant circumstances"*. Although the Claimant agrees with this contention, the Claimant submits that the SCC Rules should be read together with Article 42 of the Swedish Arbitration Act,[267] being the *lex arbitri*. Further, the *travaux*

---

[265] Respondent's Response Submission to the Claimant's Costs Schedule, #6
[266] Respondent's Response Submission to the Claimant's Costs Schedule, #7
[267] Article 42 provides that: "Unless agreed by the parties, the arbitrators may, upon request by a party, order the opposing party to pay compensation for the party's costs and determine the manner in which the compensation to the arbitrators shall be finally allocated between the parties. The arbitrator's order may also include interest, if a party has so requested."

Certified Document Number: 82350778 - Page 101 of 104

*préparatoires* to the Swedish Arbitration Act state that the legal praxis should correspond to the court's application of the provisions of Chapter 18 of the Code of Judicial Procedure, according to which '[t]*he losing party shall reimburse the opposing party for litigation costs unless otherwise provided*".

363. In accordance with Article 43(4) of the SCC Rules, the Arbitral Tribunal requested the Board of the SCC to determine and specify the individual fees and expenses of each Member of the Arbitral Tribunal and the SCC, on 11 January 2018.

364. The Board of the SCC made the following determination:

    - Fees and expenses of José Rosell, Chairperson: EUR 182,000.00 as fees;

    - Fees and expenses of Co-Arbitrator Platt W. Davis III: EUR 109,200.00 as fees, USD 7,885.46 and SEK 1,200.00 as expenses, and EUR 1,000.00 *per diem* allowance;

    - Fees and expenses of Co-Arbitrator John Beechey CBE: EUR 109,200.00 as fees, as expenses, and EUR 2,000.00 *per diem* allowance;

    - SCC's administrative fees: EUR 60,000.00;

    - Expenses connected to reimbursements to the Arbitral Tribunal in the course of the proceedings: EUR 35,194.50.

365. The Arbitral Tribunal has found (i) that the Claimant's Primary Claim, with the exception of the Liquidation Claim and Secondary Claim were submitted after the expiration of the relevant limitation periods, and that (ii) the Claimant is entitled to damages with respect to the Liquidation Claim. On the other hand, the Respondent did not prevail on most of its preliminary objections.

366. Pursuant to Articles 43(5) and 44 of the SCC of the SCC Rules, the Arbitral Tribunal has a broad discretion to allocate the costs of the arbitration and the Parties' costs. Thus, after having taken into account the arguments submitted by the Parties and the outcome of the case

the Arbitral Tribunal finds that (i) each of the Parties should bear its own legal costs and expenses, and that (ii) the Parties should share all of the fees and expenses of the Arbitral Tribunal and the administrative fees of the SCC. Therefore, the Respondent should reimburse to the Claimant the amount of EUR 264,700.00 corresponding to the Respondent's advance on costs paid by the Claimant to the SCC, plus interest pursuant to Section 6 of the Swedish Interest Act (SFS 1975:635) from the date of this Final Award until its payment in full.

367. Any Party may challenge the decision on the compensation due to the Members of the Arbitral Tribunal by bringing a legal action before the Stockholm District Court within three months, starting on the date of receipt of this Final Award.


## X. THE AWARD

368. On the basis of the foregoing considerations, the Arbitral Tribunal renders the following Final Award:

    1. Swedish law governs the Primary Claim and the Secondary Claim brought by the Claimant and applies to the time-bar issue.

    2. The Arbitral Tribunal decides that the Claimant's Primary Claim, except the Liquidation Claim, is time-barred and dismisses it with prejudice.

    3. The limitation period for the submission of the Claimant's Secondary Claim expired on 8 January 2008.

    4. The Arbitral Tribunal decides that the Claimant's Secondary Claim is time-barred and dismisses it with prejudice.

    5. The Respondent shall pay the Claimant the amount of USD 70,000,000.00, together with interest calculated in accordance with Sections 4 and 6 of the Swedish Interest Act (SFS 1975:635) from 25 December 1998 until its payment in full.

    6. The Respondent shall reimburse to the Claimant the amount of EUR 264,700.00 corresponding to the advance on Respondent's costs paid by the Claimant to the SCC,

Certified Document Number: 82350778 - Page 103 of 104

103

plus interest pursuant to Section 6 of the Swedish Interest Act (SFS 1975:635) from the date of this Final Award until its payment in full.

7. The Parties shall bear their own legal costs and expenses.

8. All and any other requests and claims submitted by the Parties are dismissed.

This Final Award is signed in six original copies.

Place of Arbitration: Stockholm, Sweden

Date: 30 March 2018

## THE ARBITRAL TRIBUNAL

Platt W. Davis III
Co-arbitrator

John Beechey
Co-arbitrator

José Rosell
Chairperson

Certified Document Number: 82350778 - Page 104 of 104



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 10, 2019

Certified Document Number:        82350778 Total Pages:  104

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# EXHIBIT B

Certified Document Number: 82350777 - Page 1 of 8

Certified Document Number: 82350777 - Page 2 of 8

ARBITRATION INSTITUTE

OF THE

STOCKHOLM CHAMBER OF COMMERCE

SCC Arbitration V (2015/178)

FIRST NATIONAL PETROLEUM CORPORATION

(U.S.A.)

Claimant

v.

OAO TYUMENNEFTEGAZ (TNG)

(Russian Federation)

Respondent

CORRECTION OF THE FINAL AWARD
According to Section 41 (1) and (2) of the 2010 SCC Arbitration Rules

Place of Arbitration: Stockholm

1

# I.  PARTIES AND COUNSEL

1. Claimant

> **FIRST NATIONAL PETROLEUM CORPORATION**
> 2973 Bingle Rd.
> Houston, Texas 77055
> United States of America

Represented by:

> Mr. Johan Sidklev
> Mr. Carl Persson
> Ms. Annika Pynnä
>
> ROSCHIER, Attorneys Ltd.
> Box 7358
> SE-103 90 Stockholm
> Tel.: + 46.8.553.190.00
> E-mails: johan.sidklev@roschier.com
> carl.persson@roschier.com
> annika.pynna@roschier.com

2. Respondent

> **OAO TYUMENNEFTEGAZ**
> 67 Lenin Street
> 625000 Tyumen
> Russian Federation

Represented by:

> Mr. Thomas Sprange QC
> Mr. Viren Mascarenhas
> Mr. Grigori Lazarev
> Ms. Alexandra Rotar
> Ms. Valeriya Subocheva
> Ms. Pui Yee (Lisa) Wong
> KING & SPALDING International LLP
> 125 Old Broad Street
> London EC2N 1AR
> United Kingdom

Certified Document Number: 82350777 - Page 3 of 8

Tel: +44.20.7551.7578
E-mails: TSprange@KSLAW.com
VMascarenhas@KSLAW.com
GLazarev@KSLAW.com
Arotar@KSLAW.com
VSubocheva@KSLAW.com
LWong@KSLAW.com

3. The Claimant may hereinafter be referred to either as "FNP" or the "Claimant". The Respondent may hereinafter be referred to as "TNG" or the "Respondent". The Claimant and the Respondent will hereinafter be referred to jointly as the "Parties".

## II. THE ARBITRAL TRIBUNAL

4. The Claimant nominated as Co-arbitrator:

Mr. Platt W. Davis III
7500 San Felipe, suite 600
Houston, Texas 77063
United States of America
Tel: +1.713.825.3123
Email: plattdavis@comcast.net

5. The Respondent nominated as co-arbitrator:

Mr. John Beechey CBE
Arbitration Chambers Hong Kong
Chinachem Hollywood Centre
1 Hollywood Road, Suite 801
Hong Kong S.A.R.
China
Tel: +44.7785.700171
Email: jb@beecheyarbitration.com

Certified Document Number: 82350777 - Page 4 of 8

6. The Arbitration Institute of the Stockholm Chamber of Commerce (the **"SCC Institute"**) appointed as Chairperson of the Arbitral Tribunal:

> Mr. José Rosell
> Bredgade 30
> DK-1260 Copenhagen K
> Denmark
> Tel: +33.6.08.72.67.22
> E-mail: jose.rosell@arb-intal.com

## III. BACKGROUND

7. In the SCC Arbitration between the Claimant and the Respondent, the Final Award was rendered on 30 March 2018.

8. After rendering the Final Award the Arbitral Tribunal noticed that (i) the costs of the arbitration proceedings were not sufficiently specified, in particular the fees of the Members of the Arbitral Tribunal and the fees of the SCC Institute (ii) the amount of the expenses of Mr. John Beechey, acting as Co-Arbitrator, were not included in paragraph 364 of the Final Award, and (iii) the daily allowances of the Co-Arbitrators were misplaced.

9. Therefore, on 3 April 2018 the Chairperson informed the Parties that the Arbitral Tribunal would correct the Final Award in accordance with Article 41(2) of the 2010 SCC Arbitration Rules and Section 32 of the Swedish Arbitration Act.

10. On 6 April 2018, the Claimant requested the Arbitral Tribunal to correct a typographical error with respect of the name of the Claimant's external funder in the proceedings, which appeared in paragraphs 57-59 of the Final Award, in accordance with Article 41(1) of the 2010 SCC Arbitration Rules.

Certified Document Number: 82350777 - Page 5 of 8

4

## IV. CORRECTION OF THE FINAL AWARD

11. The Arbitral Tribunal hereby makes the following corrections in the Final Award.

12. In paragraph 57 (third line) of the Final Award, the reference to the name "Mintron Limited ("Mintron")" should read "Mintorn Limited ("Mintorn")". In paragraphs 57 (fifth line), 58 (second line) and 59 (second line) of the Final Award, the reference to the name "Mintron" should read "Mintorn".

13. Paragraph 364 of the Final Award should read as follows:

    "The Board of the SCC made the following determination:

    - Fees and expenses of José Rosell, Chairperson: EUR 182,000.00 as fees;

    - Fees and expenses of Co-Arbitrator Platt W. Davis III: EUR 109,200.00 as fees, USD 7,885.46 and SEK 1,200.00 as expenses, and EUR 2,000.00 *per diem* allowance;

    - Fees and expenses of Co-Arbitrator John Beechey CBE: EUR 109,200.00 as fees, SEK 2,195.00 and GBP 755.00 as expenses, and EUR 1,000.00 *per diem* allowance;

    - SCC's administrative fees: EUR 60,000.00;

    - Expenses connected to reimbursements to the Arbitral Tribunal in the course of the proceedings: EUR 35,194.50."

14. Item 6 of Section X. (THE AWARD) of the Final Award should read as follows:

    "6. The Board of the SCC made the following determination regarding the individual fees and expenses of each Member of the Arbitral Tribunal and the SCC:

5

Certified Document Number: 82350777 - Page 7 of 8

- Fees and expenses of José Rosell, Chairperson: EUR 182,000.00 as fees;

- Fees and expenses of Co-Arbitrator Platt W. Davis III: EUR 109,200.00 as fees, USD 7,885.46 and SEK 1,200.00 as expenses, and EUR 2,000.00 *per diem* allowance;

- Fees and expenses of Co-Arbitrator John Beechey CBE: EUR 109,200.00 as fees, SEK 2,195.00 and GBP 755.00 as expenses, and EUR 1,000.00 *per diem* allowance;

- SCC's administrative fees: EUR 60,000.00;

- Expenses connected to reimbursements to the Arbitral Tribunal in the course of the proceedings: EUR 35,194.50.

The Respondent shall reimburse to the Claimant the amount of EUR 264,700.00 corresponding to the advance on Respondent's costs paid by the Claimant to the SCC, plus interest pursuant to Section 6 of the Swedish Interest Act (SFS 1975:635) from the date of this Final Award until its payment in full."

15. Any Party may challenge the decision on the compensation due to the Members of the Arbitral Tribunal by bringing a legal action before the Stockholm District Court within three months, starting on the date of receipt of the Award.


This Correction of the Final Award is signed in six original copies.


Place of Arbitration: Stockholm, Sweden

Date: 15 April 2018

**THE ARBITRAL TRIBUNAL**


Platt W. Davis III
Co-arbitrator


John Beechey
Co-arbitrator


José Rosell
Chairperson

7



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   January 10, 2019

Certified Document Number:        82350777 Total Pages:  8

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**